# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CSX TRANSPORTATION, INC. | ) | CIVIL ACTION |
| 500 Water Street | ) | |
| Jacksonville, FL  32202-4423 | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CASE NO.:  05-139 Erie |
| | ) | |
| PORT ERIE PLASTICS, INC. | ) | |
| 909 Troupe Road | ) | |
| Harborcreek, PA  16421 | ) | RELATED DOCUMENT NO. ____ |
| Defendant | ) | |

## AFFIDAVIT OF JOHN JOHNSON

AND NOW COMES, John Johnson, duly authorized representative of Port Erie Plastics, Inc., and hereby makes this Affidavit in Support of Defendant's Motion for Summary Judgment and after being duly sworn sets forth the following:

1.        I am an adult individual with a business address of 909 Troupe Road, Harborcreek, PA  16421 where I hold the position of President of Port Erie Plastics, Inc.

2.        In my capacity as President of Port Erie, I have knowledge of the business relationship and agreements that existed between Port Erie and Nexpak Corporation for all times relevant to the lawsuit brought by CSX Transportation.

3.        On or about February 7, 2002, Port Erie entered into a production agreement with NexPak.  Port Erie received two blanket purchase orders from Nexpak, and Port Erie agreed to produce plastic DVD cases for them.

1

4.        At all times relevant to the instant case, Port Erie purchased specific quantities of the plastic resin raw material, needed for production of the cases, from bulk quantities owned by NexPak.

5.        Pursuant to a July, 2000 agreement between Port Erie and NexPak, which was memorialized in a July 13, 2000 letter between Port Erie Purchasing Manager, James Witkowski, and Nexpak, Port Erie utlilized a "just in time" inventory system . As a result, Port Erie took title to quantities of said plastic resin only at the moment that Port Erie actually removed the material from silo storage for production. Port Erie did not assume ownership or risk of loss of the bulk plastic resin at any point in its transport to storage, nor during storage of the plastic resin. Risk of loss for specific quantities of the plastic resin transferred from NexPak to Port Erie only at the time that those quantities of material were delivered to Port Erie's Harborcreek, PA facility.

6.        In the normal course of business, Port Erie would account for its purchase from Nexpak of the quantities of plastic resin used for production as an offset against amounts invoiced to NexPak for completed orders of DVD cases.

7.        Prior to taking title to the resin material, Port Erie acted only in the capacity of agent for NexPak to instruct and pay Presque Isle Trucking to transport the plastic resin owned by NexPak from the rail siding to a storage silo located at Port Erie's Haborcreek facility.

8.        At all times relevant to this instant case, Port Erie did not receive notice of placement, nor notice of constructive placement (as defined in the CSXT Tariff) of rail cars containing the resin owned by NexPak from CSX.

2

9.        In response to NexPak's orders to Port Erie, Port Erie would instruct Presque Isle to offload particular types and quantities of resin from rail cars, and transport this resin to a storage silo at Port Erie's Harborcreek facility.

10.       The resin would remain in storage at the Harborcreek facility until such time that production necessitated Port Erie's extraction of the resin from storage to place it in production.

11.       Port Erie did not control any aspect of CSX's transport or constructive placement of plastic resin purchased by NexPak to Erie.  Further, to the extent that Port Erie had any involvement with the movement of resin owned by NexPak, the movement was at the direction of NexPak.

12.       Port Erie did not receive any "notice of constructive placement" from CSX at any time material to the instant lawsuit.

13.       At all times relevant to the instant case, Port Erie did not have authority, nor did it ever attempt to exercise authority, over the placement and/or release of rail cars dedicated to the transport of plastic resin for NexPak.

14.       On at least one occasion, NexPak diverted rail cars filled with plastic resin from Erie, Pennsylvania to Atlanta, Georgia without Port Erie's awareness.

15.       Upon the diversion of said rail cars to Atlanta, Georgia, NexPak did not need, nor did it seek, Port Erie's consent to divert the cars.

3

16.    At all times relevant to the demurrage charges that are the subject of the instant lawsuit, Port Erie had neither ownership or control of the plastic resin that was transported in rail cars by CSX.

17.    Port Erie's only role in relation to the transportation of the bulk plastic resin was to act in the capacity of agent of NexPak in arranging for the transport of the bulk material from the rail siding to the storage silo at Port Erie.

18.    Prior to the truck transport of the plastic resin from rail cars to the storage silo, Port Erie did not have any involvement in the transport or the arrangement of transport of the bulk plastic resin material by CSX from the plastic resin manufacturer to the railroad siding in Erie, Pennsylvania.

19.    Port Erie did not have a direct or indirect contractual relationship with CSX for the transport of the above referenced bulk plastic resin at any time material to the instant case.

20.    Following the receipt of invoices for demurrage from CSX, Port Erie explained to CSX on numerous occasions that Port Erie did not have any involvement in the rail transport of the resin material, nor did it even own the resin.

21.    At all times relevant to the instant case, Port Erie was not a consignee, nor did it ever consent to being designated as a consignee, in the shipment of plastic resin material by CSX for NexPak. Rather, Port Erie purchased from Nexpak (as production needs dictated by NexPak warranted) specific quantities of the plastic resin from bulk material that was already in storage at the Mountfort storage facility.

4

22.    Port Erie has repeatedly notified CSX that Port Erie is not a consignee to the subject shipments of plastic resin purchased by NexPak, and that the CSX waybills designating Port Erie as consignee are incorrect and apparently produced by BP Amoco who guaranteed all shipping bills.

_____  2/6/06
                                   John Johnson

Sworn to and subscribed before me

this  6th  day of February, 2006

Notarial Seal
Cynthia A. Hannon, Notary Public
Harborcreek Twp., Erie County
My Commission Expires Apr. 20, 2006

932822

5

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CSX TRANSPORTATION, INC. | ) | CIVIL ACTION |
| 500 Water Street | ) | |
| Jacksonville, FL  32202-4423 | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CASE NO.:  05-139 Erie |
| | ) | |
| PORT ERIE PLASTICS, INC. | ) | |
| 909 Troupe Road | ) | |
| Harborcreek, PA  16421 | ) | RELATED DOCUMENT NO. ____ |
| Defendant | ) | |

## AFFIDAVIT OF JAMES WITKOWSKI

AND NOW COMES, James Witkowski, duly authorized representative of Port Erie Plastics, Inc., and hereby makes this Affidavit in Support of Defendant's Motion for Summary Judgment and after being duly sworn sets forth the following:

1.        I am an adult individual with a business address of 909 Troupe Road, Harborcreek, PA, 16421, where I hold the position of Purchasing Manager of Port Erie Plastics, Inc.

2.        In my capacity as Purchasing Manager of Port Erie, I have knowledge of raw materials agreements existing between Port Erie and NexPak Corporation at all times relevant to the present cause of action brought by CSX Transportation.

3.        On July 13, 2000, acting on behalf of Port Erie, I made an agreement with NexPak Corporation governing the ownership and control of plastic resin material sold by NexPak to Port Erie for purposes of Port Erie's production of items for NexPak.

1

4.       This agreement specified that NexPak retained ownership, and retained risk of loss for the bulk plastic resin during the transport of the material to the storage facility in Erie, Pennsylvania and its storage at said facility. Port Erie assumed ownership of the plastic resin at the point that it transported the material from the storage facility to Port Erie's Haborcreek production facility.

5.       This agreement was operative at all times relevant to the instant lawsuit by CSX Transportation.

6.       An electronic mail correspondence written by me to Barbara Jenkins of CSX on August 4, 2004, stating that "Port Erie does not take ownership of the resin until it is put in my silo" was an unintentional misstatement and intended to refer to the time the resin was used by Port Erie in its production of DVD cases for NexPak. The terms of the agreement memorialized in the July 13, 2000 letter from me to Mr. Jeff Caldren, referenced above, were effective at all times relevant to the present cause of action.

_James J. Witkowski_
James Witkowski

_Cynthia A. Hannon_
Sworn to and subscribed before me

this ___20th___ day of January, 2006

Notarial Seal
Cynthia A. Hannon, Notary Public
Harborcreek Twp., Erie County
My Commission Expires Apr. 20, 2006

932880

2

# EXHIBIT C



- 909 Troupe Road
- Harborcreek, PA 16421
- 814/899-7602
- FAX: 814/899-7854

July 13, 2000

Nexpak
330 South Wood Street
East Canton, Ohio 44730
Attn: Mr. Jeff Caldren

Jeff,

I just wanted to confirm my understand of the arrangement we have in place with regards to the shipment of resins to Port Erie Plastics ("Port Erie") since the situation is a little unique. We will be operating with the understanding that ownership of the resin will not transfer to Port Erie until the material is delivered to our facility in Harborcreek, PA. Therefore, ownership and all risk of loss will remain with Nexpak, and or the shipping companies, while the resin is in transit and or in storage at the Plastek storage facility.

If your assessment of this situation agrees with my understanding as detailed above, please indicate so by signing this letter and returning it to my attention with the envelope below. If my understanding of the situation does not meet that of yours, please call me as soon as possible to work out an arrangement to minimize our exposures to any potential losses.

It is a pleasure working with all of the people at Nexpak. I am looking forward to many more exciting opportunities where our relationship will grow.

Sincerely,

James Witkowski
Purchasing Manager


Jeff Caldren
Materials Manager
Nexpak

# EXHIBIT D

**February 7, 2002**

# Agreement
# NEXPAK & Port Erie Plastics

| Price of | **Our Press** | **Their Press** |
|---|---|---|
| | $0.119084 | |
| | - $0.001500 | |
| First 533,000,000 | $0.117584 | $0.118584 |
| After 533,000,000 | $0.116084 | $0.117084 |

If on 12/31/05 NEXPAK has purchased less than 533,000,000 parts, NEXPAK will pay $0.0015 for the balance of the 533,000,000 parts not taken.

Includes:

| **Material** | **B.O.M. Quantity per case** | **What Port Erie is paying** | |
|---|---|---|---|
| * RM0093 | 0.12825 | $0.3106 | $2=6 |
| * RM0097 | 0.04275 | $0.3106 | |
| scrap on material | | | |
| CL0504 | 0.00069 | | |
| KV1229 | 0.00715 | $1.5000 | |
| PV1029 | 0.00036 | $0.5733 | |
| PV0701 | 0.00036 | $0.5560 | |
| Labels | - direct thermo 4x6 one per box | $7.1200 | |
| Pallet Sheets | - 4 per pallet $.02 each | $.02 each | |
| Shrink wrap $1.00 per pallet | | | |
| 201111 | 0.01311 | $0.8200 | |

* Includes Bulk Freight

Price includes maintenance on NEXPAK presses and molds.

NEXPAK will pay for mold engineering changes and press components in excess of $10,000.

On July 1, 2004 price increases $0.001275.

Price prior to facilitation:

| **Our Press** | **Their Press** |
|---|---|
| $0.116084 | $0.117084 |
| $0.003000 | $0.003000 |
| $0.119084 | $0.120084 |

Terms are 1% 10 Net 60 Days.

2/7/02

## Nexpak - Port Erie Molding Quote Details - 02/06/02

### For Molding Agreement 2/7/02 - 12/31/05

Current piece price quote given today's cost for resin and packaging.
Any changes in these prices result in a direct change in piece price.
All parts quoted are in standard gray @ .4%
Molding and labor rates are guaranteed for calendar 2002 and 2003.
Labor and press rates +3% 1/1/04, then guaranteed through 12/31/05

### Per Piece Pricing

|  | Port Erie Press | Nexpak Supplied Press |
|---|---|---|
| Port Erie Running Less Than 9 Presses | $0.121584 | $0.120584 |
| Port Erie Running 9 through 19 Presses | $0.119834 | $0.118834 |
| Port Erie Running 20+ Presses | $0.118584 | $0.117584 |

**Terms: 1% 10 days—net 60: The date of the resin offset will coincide with payment terms taken.**
            **(net 29 days from shipment on discounted terms, net 60 days from shipment on net 60 terms)**

### Notes

To run white we would add $.001 to each selling price
Press count to receive volume discount would include all DVD like products except D-DVD's with
    a page insert like the ones we currently run.
Port Erie is to have the option to quote on all new or existing parts to be molded as well as the last look, for all items
    to be manufactured/outsourced "East of the Rockies" for the duration of this agreement.
Above pricing assumes Phase 1 - 7 Port Erie Presses, 6 Nexpak presses (note we
    could ramp to 10 Port Erie presses and 8 Nexpak supplied if necessary)
Phase 2 - Up to 10 Port Erie Presses and up to 21 Nexpak presses
    We would need up to 16 weeks to be ready to start production and a firm purchase order or
    commitment that will add $.0015 per part to the selling price of all DVD like products for the
    next 533,000,000 shipped.
    By committing to this we will be adding power, material handling,
    water, warehousing and production capacity strictly for Nexpak.   We will also be
    committing to a land purchase and two new buildings as a result of this growth.

If within 47 months of issuance of a 533,000,000 piece purchase order with the $.0015 increase Nexpak
    has not completed the order, the balance of the quantity shipped less then 533,000,000 will be invoiced to
    Nexpak @ $.0015 and due immediately. Nexpak and Port Erie will monitor the remaining balance monthly.
Spare parts are critical to the success of this project we will need an inventory of parts or daily access to one.

Repair and Maintenance of the molds and presses:  Routine preventative maint. is to be the responsibility of
    Port Erie-for a price of $.002 per part-applicable for all parts run in a Nexpak press, Port Erie will be responsible for all
    R & M under $ 10,000 exclusive of labor, on the presses and molds. Nexpak will only pay for parts that exceed $ 10,000 each
    Any major items(exceeding $ 10,000) will be approved with Nexpak prior to $$ being spent.
    Nexpak is responsible for all revision changes. R & M -Port Erie responsibility begins once the mold or press is production ready
We assume in our pricing that mold clamps, heat controllers 22 per, thermolaters etc. will be supplied with
    each press except for new molds such as the Nexcase.  Port Erie will absorb the cost of installation, rebuilding doors,
    oil nitrogen etc.
For the duration of the agreement Nexpak will not remove more than 25% of the presses they have placed
    at Port Erie.

**Nexcase**

| YEAR | PIECES | $ |
|------|--------|---|
| 2002 | 14,361,800 | 1,608,043.51 |
| 2003 | 17,211,285 | 470,109.88 |
| 2004 | 727,480 | 25,525.44 |

**DVD**

| | YEAR | PIECES | $ |
|---|------|--------|---|
| | 2002 | 129,267,815 | 15,914,325.26 |
| | 2003 | 126,478,403 | 15,268,766.81 |
| | 2004 | 41,917,362 | 6,697,480.18 |

*350,000 still due 235,000,000 AUA's end of 05*

TOTAL P.04

# EXHIBIT E



"Riddle, Chris"
<Chris_Riddle@CSX.c
om>

08/05/2004 11:26 AM

To: <JWitkowski@porterie.com>, "Jenkins, Barbara"
<Barbara_Jenkins@csx.com>, "Shafer, Martha"
<Martha_Shafer@csx.com>
cc: <BFahey@porterie.com>, <JJohnson@porterie.com>, "Fearrington,
Kay" <Kay_Fearrington@csx.com>, "Shebby, Mark"
<Mark_Shebby@csx.com>, "Hicks, Janet" <Janet_Hicks@CSX.com>
Subject: RE: Demurrage

Jim,

      According to the CSXT Tariff- 8100, the inbound cars were consigned
to Port Erie Plastics on arrival. The inbound private demurrage charges
are calculated from notification to order. CSX faxed a Constructive Placement
notice to Port Erie Plastics when the inbound car arrived, Port Erie Plastics
then ordered in the car. I have pulled various fax notices and Plant Switch
instructions as examples and are available upon request. I also have a copy of
the waybill which proves the cars were consigned to Port Erie Plastics.

      A final demand letter was sent to Port Erie Plastics on March 23, 2004.
The terms of this demand letter were 15 days to send CSX either payment in
full or partial payment with a written dispute for the difference. CSX did not
receive a response within the 15 days given so the account has been forwarded
to CSX's Treasury department.
According to CSX's records these are valid charges and payment is due for $115,560.

Attached is a copy of the Final Demand letter sent to Port Erie Plastics on
March 23 2004, a copy of the outstanding demurrage bills, and copy of the
demurrage section of the CSXT-8100 tariff.

Please see page 7 item 8070, letter G, and page 11 the definition of "consignee"
in the CSXT-8100.

If you have any further question please feel free to give me a call. Thank you,

Chris Riddle
CSX Account Analyst
904- 279-4897 phone
904- 279-4663 fax
Chris_Riddle@csx.com

-----Original Message-----
From: JWitkowski@porterie.com [mailto:JWitkowski@porterie.com]
Sent: Wednesday, August 04, 2004 4:26 PM
To: Jenkins, Barbara; Shafer, Martha; Riddle, Chris
Cc: BFahey@porterie.com; JJohnson@porterie.com
Subject: Demurrage

Barb,
    I talked to you last week about the demurrage charge and asked you
for all the invoices and documentation that show why Port Erie is

responsible for these charges. As of today I have not received any info
that I have asked for. As I told you Port Erie does not order, schedule or
purchase the railcars. We have an agreement with Nexpak dated July of 2000
that states Port Erie does not take ownership of the resin until it is put
in my silo.

As of today Port Erie Plastics is giving CSX 10 days to show proof as
to WHY Port Erie is responsible for the charges. After the 10 days we are
considering this a charge NULL and VOID and CSX cannot pursue this any more
or file any liens against Port Erie now or in the future. Also it is noted
that this claim is being reported against our credit record. We insist that
this record be removed immediately.

Jim Witkowski
jwitkowski@porterie.com
Port Erie Plastics
P - 814-899-7602
F - 814-899-7854

  

Port Erie Plastics demand letter.doc    Port Erie Plastics 2-10-04.xls    000057669-1.pdf



CSXT_8100_Demurrage_Provisions_Section_VIII_as_of_122002-REF10286.pdf

# EXHIBIT F

**The waybills enclosed herewith are representative of all waybills produced by CSX.**



**Ed S. Cummings**
10/20/2005 03:33 PM

To:
cc:
Subject: C S X T

```
ST*404*001906513
BX*00*R*PP*80296113*UP*L*B*N
BNX*S**S
M3*R*020501*0829
N9*BM*80296113**020501
N9*CO*74211
N9*CT**MP-C-25525
N9*SO*ZNMJ04PPZT*PAYKEY NUMBER
N7*TEIX*058051*191450*N******RR
F9**CHOCOLATE BAYOU*TX
D9**ERIE*PA
N1*SH*AMOCO CHEMICAL COMPANY
N3*801 WARRENVILLE ROAD*MAIL CODE 7038C
N4*LISLE*IL*60532
PER*IC*CHEMTREC*TE*1-800-424-9300
N1*CN*PORT ERIE PLASTICS*93*90071133
N3*MOUNT FORT TERMINAL ERIE
N4*ERIE*PA*16506
N1*PF*BP AMOCO CHEMICALS
N3*C/O CTC SERVICES, INC.*P.O. BOX 66999 AMF O'HARE
N4*CHICAGO*IL*606666999
R2*UP*S*ESTL
R2*CSXT*1
L5*1*PLASTIC MATERIALS, NOI*2821163*T
L5*1*10-8931 RANDOM COPOLYMER - BULK
L5*1*333158
L0*1***191450*N*****L
SE*28*001906513

ST*404*001943825
BX*00*R*PP*80309888*UP*L*B*N
BNX*S**S
M3*R*020524*1931
N9*BM*80309888**020524
N9*CO*74210
N9*CT**MP-C-25525
N9*SO*ZNMJ04PPZT*PAYKEY NUMBER
N7*AMCX*107877*187900*N******RR
F9**CHOCOLATEVIASPRI*TX
D9**ERIE*PA
N1*SH*AMOCO CHEMICAL COMPANY
N3*801 WARRENVILLE ROAD*MAIL CODE 7038C
N4*LISLE*IL*60532
PER*IC*CHEMTREC*TE*1-800-424-9300
N1*CN*PORT ERIE PLASTICS*93*90071133
N3*MOUNT FORT TERMINAL ERIE
N4*ERIE*PA*16506
N1*PF*BP AMOCO CHEMICALS
```

UP00022

N3*C/O CTC SERVICES, INC.*P.O. BOX 66999 AMF O'HARE
N4*CHICAGO*IL*606666999
R2*UP*S*ESTL
R2*CSXT*1
L5*1*PLASTICS, RESINS, NEC*2821143*T
L5*1*10-8941 RANDOM COPOLYMER - BULK
L5*1*334262
L5*1*RM-0093
L0*1***187900*N******L
SE*29*001943825


ST*404*001953339
BX*00*R*PP*80310566*UP*L*B*N
BNX*S**S
M3*R*020528*1706
N9*BM*80310566**020528
N9*CO*74210
N9*CT**MP-C-25525
N9*SO*ZNMJ04PPZT*PAYKEY NUMBER
N7*AMCX*108141*190700*N*******RR
F9**CHOCOLATEVIASPRI*TX
D9**ERIE*PA
N1*SH*AMOCO CHEMICAL COMPANY
N3*801 WARRENVILLE ROAD*MAIL CODE 7038C
N4*LISLE*IL*60532
PER*IC*CHEMTREC*TE*1-800-424-9300
N1*CN*PORT ERIE PLASTICS*93*90071133
N3*MOUNT FORT TERMINAL ERIE
N4*ERIE*PA*16506
N1*PF*BP AMOCO CHEMICALS
N3*C/O CTC SERVICES, INC.*P.O. BOX 66999 AMF O'HARE
N4*CHICAGO*IL*606666999
R2*UP*S*ESTL
R2*CSXT*1
L5*1*PLASTICS, RESINS, NEC*2821143*T
L5*1*10-8941 RANDOM COPOLYMER - BULK
L5*1*334262
L5*1*RM-0093
L0*1***190700*N******L
SE*29*001953339


ST*404*001945349
BX*00*R*PP*80310565*UP*L*B*N
BNX*S**S
M3*R*020528*1708
N9*BM*80310565**020528
N9*CO*74211
N9*CT**MP-C-25525
N9*SO*ZNMJ04PPZT*PAYKEY NUMBER
N7*AMCX*108320*189300*N*******RR
F9**CHOCOLATEVIASPRI*TX
D9**ERIE*PA
N1*SH*AMOCO CHEMICAL COMPANY
N3*801 WARRENVILLE ROAD*MAIL CODE 7038C

UP00023

N4*LISLE*IL*60532
PER*IC*CHEMTREC*TE*1-800-424-9300
N1*CN*PORT ERIE PLASTICS*93*90071133
N3*MOUNT FORT TERMINAL ERIE
N4*ERIE*PA*16506
N1*PF*BP AMOCO CHEMICALS
N3*C/O CTC SERVICES, INC.*P.O. BOX 66999 AMF O'HARE
N4*CHICAGO*IL*606666999
R2*UP*S*ESTL
R2*CSXT*1
L5*1*PLASTIC MATERIALS, NOI*2821163*T
L5*1*10-8931 RANDOM COPOLYMER - BULK
L5*1*333158
L0*1***189300*N******L
SE*28*001945349


ST*404*002342511
BX*00*R*PP*80375171*UP*L*B*N
BNX*S**S
M3*R*020807*1023
N9*BM*80375171**020807
N9*CO*74211
N9*CT**MP-C-25525
N7***AMCX*006769**188600*N*******RR
F9**CHOCOLATE BAYOU*TX
D9**ERIE*PA
N1*SH*AMOCO CHEMICAL COMPANY
N3*801 WARRENVILLE ROAD*MAIL CODE 7038C
N4*LISLE*IL*60532
PER*IC*CHEMTREC*TE*1-800-424-9300
N1*CN*PORT ERIE PLASTICS*93*90071133
N3*MOUNT FORT TERMINAL ERIE
N4*ERIE*PA*16506
N1*PF*BP AMOCO CHEMICALS
N3*C/O CTC SERVICES, INC.*P.O. BOX 66999 AMF O'HARE
N4*CHICAGO*IL*606666999
R2*UP*S*ESTL
R2*CSXT*1
L5*1*PLASTIC MATERIALS, NOI*2821163*T
L5*1*10-8931 RANDOM COPOLYMER - BULK
L5*1*333158
L5*1*RM-0097
L0*1***188600*N******L
SE*28*002342511


ST*404*002357920
BX*00*R*PP*80378669*UP*L*B*N
BNX*S**S
M3*R*020809*1608
N9*BM*80378669**020809
N9*CO*74210
N9*CT**MP-C-25525
N7***AMCX*104098*191500*N*******RR
F9**CHOCOLATE BAYOU*TX

# EXHIBIT G

**The waybills enclosed herewith are representative of all waybills produced by CSX.**

REASON - OTHER

VOID VOID VOID  354571

AMCX   6898    C214

001   00   00   NS    000 00    NS    0570

04/04/02          535406

0800 CGP          DVH

52660    CHOCOLATE BAYOU          TX

18085    ERIE                 PA

JACKSONVILLE          FL

UP   ESTL   NS   ERIE   CSXT

BP AMOCO CHEMICAL CO          26602X

S

CHOCOLATE BAYOU      TX

1190515          04/04/02

PORT ERIE PLASTICS          FU6A01   535406  555  010087  ERIE          PA
                                     04/13/02   AMCX    6898

909 TROUPE RD- HARBOUR CRK PA
ERIE                 PA 016421

SHPR WGT AGRT

18085 ERIE                 PA

CONSIGNEE SERVED BY CSXT                          193050
AND CLOSED TO RECIPROCAL SWITC
CSXT TO FILE CLOSED TRACK
AGAINST NSRR

PREPAID

06/14/02
                 28 211 63

PLASTIC FLAKES, GRANULES,
PLASTIC FLAKES, GRANULES,
CONSIGNEE CLOSED TO RECIPROCAL
SWITCHING ON CSXT, CSXT TO
FILE "CLOSED TRACK AGRT"
WITH NSRR
CSXT WILL NOTIFY SHPR TO
ROUTE VIA CSXT FOR FUTURE
MOVES PER DAVE STEINBRECHER
SHIPPERS LOAD WEIGHT & COUNT
INTERSTATE SHIPMENT
IN BULK

CSX00034

00  06 INTERFACED                          CREATED 06/14/02 132

RAILROAD COMPANY

802

CYA38

REASON - ADJUSTMENTS-KEY CHANGE                    VOID VOID VOID0  345112

WLPX  10268   C214

001  00  00   NS   000 00   NS   0622

04/10/02              602527

1101 XXM              INB-XWB

52946  SPRING              TX

.18085   ERIE                           PA

SPRING                    TX

UP   ESTL  NS   CLEVE CSXT

BP AMOCO CHEMICAL CO          266028

S

SPRING          TX

80284074      04/10/02

PORT ERIE PLASTICS          FU6A01   602527  555  024071  DECATUR        IL
04/10/02

909 TROUPE RD- HARBOUR CRK PA
ERIE                PA 016421

SHPR WGT AGRT

18085 ERIE                           PA

193650

PREPAID
YES

06/12/02

28 211 42

POLYETHYLENE, OTHER THAN          REVENUE WAYBILL SAME DATE
M COPOLYMER-BATCH                 AND NUMBER TO FOLLOW VIA U. S. MAIL
546355-546372-EMERGENCY
RC: DIVERTED AT DECATUR,          MAIL FREIGHT BILL TO
RC: NCSC-BRENDA MOSS              BP AMOCO CHEMICALS
SHIPPERS LOAD WEIGHT & COUNT      % CTC SERVICES INC
INTERSTATE SHIPMENT               PO BOX 66999 AMF O'HARE
IN BULK                           CHICAGO          IL 60666-699
IRDE CNTL#  666031

CSX00035

1U      INTERFACED                  04/16/02  1016  UPDATED 06/12/02 124

# EXHIBIT H





**TRANSPORTATION**
TARIFF CSXT 8100

---

### DEMURRAGE SECTION

---

# SECTION VIII – C
## (Cancels Section VIII – B)
# DEMURRAGE PROVISIONS

CSXT bases its freight transportation prices on the expectation that railcars furnished to customers will be promptly loaded and unloaded. The purpose of this Section is to describe how the time railcars are under the control of customers is defined, and to specify the prices that CSXT charges should a customer retain control of railcars beyond the time incorporated into our freight rates.

**(N) – Correction of an update.**

---

ISSUED DECEMBER 19, 2002                                                      EFFECTIVE DECEMBER 21, 2001

---

**CSX TRANSPORTATION**
Marketing Services – Price Management
500 Water Street
Jacksonville, FL  32202



**TARIFF CSXT 8100**

CSXT 8100

2nd REVISED VIII-C PAGE 2
Cancels 1st REVISED VIII-C PAGE 2

**DEMURRAGE SECTION VIII - C**

**(C) APPLICATION – ITEM 8000**

This section applies to all CSXT served customers and covers all railroad and private marked freight car(s) held for or by the customer(s), with the following exceptions:

A.  Coal and coke governed by Tariff CSXT 8200-series
B.  Car(s) moving into any CSXT TransFlo terminal, governed by TransFlo Price List 9300
C.  Car(s) used in the shipment of commodities purchased by CSXT ("Company Material")
D.  Private car(s), on private tracks, except as provided in Item 8050
E.  Empty private car(s)
F.  Car(s) containing refused or unclaimed freight to be sold by CSXT
G.  Empty car(s) rejected as unsuitable for loading
H.  Mutli-level equipment

**DEMURRAGE DEFINITIONS - 8010**

Refer to the demurrage definitions at the end of this section.

**NOTIFICATION TO CONSIGNOR OR CONSIGNEE – ITEM 8020**

A.  CSXT will furnish the following notifications as indicated:

    1.  Cars for other than public delivery tracks:
        a.  Notice of constructive placement if car(s) are held on CSXT tracks due to reasons attributable to the consignor or consignee.
        b.  Delivery of car(s) upon tracks of consignee will constitute notice.
        c.  When two or more parties, each performing their own switching, take delivery of cars from the same interchange track, notice will be given when cars are placed on the interchange track.

    2.  Cars for public delivery tracks:
        a.  Notice will be given to the party entitled to receive notification when car(s) is actually placed.

    3.  Cars stopped In transit :
        a.  Notice will be given to the consignor, consignee or owner responsible for the car being stopped upon arrival of the car at the point of stoppage.

    4.  Refused loaded car(s):
        a.  When a loaded car is refused at destination, CSXT will give notice of such refusal to the consignor or owner.

B.  Notification may be given in writing or electronically, and will contain the following:

    1.  Car initials and number.

    2.  If lading transferred en route, the initials and number of the original car.

    3.  Commodity.

**(C) – Change in wording which results in neither increase nor reduction in charges**

ISSUED DECEMBER 19, 2002

EFFECTIVE DECEMBER 20, 2002

**CSX TRANSPORTATION**
Marketing Services – Price Management
500 Water Street
Jacksonville, FL  32202



**TARIFF CSXT 8100**

CSXT 8100

**(N)** 1st REVISED VIII-C PAGE 3
Cancels ORIGINAL VIII-C PAGE 3

**DEMURRAGE SECTION VIII - C**

**NOTIFICATION TO CSXT – ITEM 8030**

    A.    CSXT will accept forwarding instructions, empty release information or, other disposition twenty-four hours a day at the CSXT Customer Operations Center (1-800-327-5405).

    B.    When electronic or mechanical devices are used to furnish notification to CSXT, the recorded date and time that the instructions are received will govern.

**HANDLING OF SHIPPER ASSIGNED CAR(S) – ITEM 8035**

**A.  APPLICATION**

    1.    The shipper must provide advance notice for all car assignment requests, in writing, in the following form:

(Company Name) hereby requests the assignment of car(s) (Enter the number of cars here), (Enter car type here), located at (Enter location here).  If said assignment, is granted by CSXT, it is understood that the car(s) will be subject to the rules and charges in CSXT Tariff 8100-series.

                                                            _____
                                                                (Signed & Date)

                                                                 _____
                                                                 (Title)

Accepted by CSXT on (Enter date here), (Enter the number of cars here) car(s) will be placed in this assignment.

BY: _____

TITLE: _____

    2.    Assignment of car(s) will be at the sole discretion of CSXT.

    3.    When CSXT agrees to an assignment of car(s), the assignee will be notified by the accepted return of the assignee's written request.

**B.  RELEASE OF CAR(S) FROM ASSIGNMENT**

    1.    The assignee may release car(s) from assignment by providing notice to CSXT, in writing or confirmed in writing, at least one (1) day prior to the date of the desired release.

    2.    CSXT will select the car(s) to be removed from the assignment.

    3.    Assignee will not be permitted to release car(s) until all shipper-owned appurtenances have been removed.

**(N) – Correction of an update.**

ISSUED JANUARY 4, 2002

EFFECTIVE DECEMBER 21, 2001

**CSX TRANSPORTATION**
Marketing Services – Price Management
500 Water Street
Jacksonville, FL  32202



**TARIFF CSXT 8100**

CSXT 8100

**DEMURRAGE SECTION VIII - C**

**ACCOUNTABILITY AND CHARGES**
The shipper assigned car(s) will be subject to the "car(s) held for loading" provisions in Item 8040.

**(C ) PRIVATE CAR APPLICATION FOR RAILROAD MARKED CARS – ITEM 8038**

CSXT is aware that shippers, acting as consignors and/or consignees, may sometimes lease railcars from other railroads for shipments that may originate or terminate on CSXT. Such railcars normally contain the reporting marks of the lessor railroad. In order to avoid the assessment of demurrage charges by CSXT when such railcars are located on private or leased tracks, on CSXT rail lines, it is necessary that shippers apply to, and receive the approval of, CSXT for the designation of such cars as "private" cars for the purposes of demurrage.

**A.   APPLICATION:**

1.   Shippers must submit a written application that is received by CSXT not less than thirty (30) days prior to the date that the shipper desires the "private" car designation to take effect. The application must include:

   - The name of the shipper
   - The name of the lessor railroad
   - A listing of the reporting marks of the railcars leased by the shipper from the lessor railcar
   - The type of railcar
   - The length of time requested for the private railcar designation

   The application must be sent to CSXT at the following address:

   > CSX Transportation, Inc.
   > 500 Water Street
   > Jacksonville, FL  32202
   > Attn: Vice President Car Management J-887

2.   Upon the request of CSXT, shipper agrees to furnish a copy of the applicable railcar lease to CSXT.

3.   CSXT will provide a written reply to each application within thirty (30) days of receipt of the application. CSXT, in its sole discretion may accept or reject the application in whole or in part. CSXT may accept a smaller number of railcars than requested and/or for a shorter amount of time.

**(C)  - Change in wording which results in neither increase nor reduction in charges**

ISSUED DECEMBER 19, 2002                                              EFFECTIVE DECEMBER 20, 2002



**TRANSPORTATION**
**TARIFF CSXT 8100**

CSXT 8100

**DEMURRAGE SECTION VIII - C**

**(Continued) - ITEM 8038**

**B. ACCOUNTABILITY AND CHARGES:**

1.  While the acceptance is in effect, the applicable railcars will not be assessed demurrage by CSXT when such railcars are located on private sidetracks that connect with CSXT or on CSXT tracks that are leased for storage or loading/unloading purposes.

2.  At the end of the period designated by CSXT the railcars will return to "railroad" marked status for demurrage purposes. If the shipper wishes to extend the "private" marked status for the railcars, a new application must be received by CSXT not later than thirty (30) days prior to the end of the period. CSXT may accept or reject the application, as provided herein.

**CAR(S) HELD FOR LOADING – ITEM 8040**

**TENDER:**

Shipper Assigned Car(s):
    A. The notification that an empty car is available.

Other than Shipper Assigned Car(s):
    A. The notification, actual or constructive placement, of empty car(s) placed on orders of the consignee.
    B. Cars held by CSXT will be constructively placed on "order date" if the car order is not cancelled prior to the order date or, if placement instructions have not been received by CSXT.

**RELEASE:**

    A. Date and time forwarding instructions are received.
    B. Car(s) placed on the interchange tracks of a consignor, who performs its own switching, must be returned to the interchange track for release.
    C. Improperly loaded or overloaded car(s) at origin will not be considered released until the load has been adjusted properly.
    D. Shipper assigned car(s) released:
        1. When car(s) are released to a rail carrier other than CSXT at a jointly served facility location (an industry switched by CSXT and another railroad), the car(s) are considered released by CSXT upon interchange to the other carrier.
        2. Car(s) released from assignment by the assignee will be considered released from demurrage at the first 0001 hour after the release from the assignment. (Release from assignment cannot be made retroactive).
        3. During plant shutdowns, car(s) must be released from assignment to prevent demurrage from accruing.

**COMPUTATION:**

    A. Time will be computed from the first 0001 hours after tender until the release.
    B. If the car is placed earlier than the date of the order, time will be computed from the first 0001 hours after the order date until it is released.

(C) – Change in wording which results in neither increase nor reduction in charges.

ISSUED DECEMBER 19, 2002

EFFECTIVE DECEMBER 20, 2002

**CSX TRANSPORTATION**
Marketing Services – Price Management
500 Water Street
Jacksonville, FL 32202



**TARIFF CSXT 8100**

CSXT 8100

### DEMURRAGE SECTION VIII - C

C. When the same car is unloaded and reloaded, time will be computed from the first 0001 hours after advice is received that the car(s) is empty until the car(s) is released.

D. When the same car is unloaded and reloaded, empty release information must be furnished. If not furnished, demurrage will continue on the car until the forwarding instructions are received.

## CREDITS:

A. Credits will be allowed for each car released from loading in accordance with the Table of Charges in Item 8075.

## CAR(S) HELD FOR COMPLETE UNLOADING – ITEM 8050

The application of demurrage under this item for loaded private car(s) held on private tracks at the destination, will apply only when all of the following conditions have been met:

1. The shipping document furnished to direct the movement of the car(s) to the unloading station contains an endorsement substantially stating that:

   – car(s) is subject to demurrage at destination when held on private tracks as provided in destination carrier's tariff,

   **or**

   _ car(s) is subject to Item 8050, CSXT 8100 Series

2. When the shipping document is provided in an electronic format, the appropriate ANSI (American National Standards Institute) Special Handling Code should be furnished to reflect Condition Number 1. If the Special Handling Code is furnished, inclusion of the endorsement language in Condition Number 1 is optional.

3. The notation of the shipping document is declared before the car leaves the initial origin.

**TENDER:** The notification, actual or constructive placement, of a loaded car(s).

## RELEASE:

A. Date and time that the railroad receives advice that the car(s) is empty.

   **EXCEPTION:** When in connection with the **Unit Grain Trains** (as described in CSXT 9305 Series), release will occur the date and time that the railroad receives advice that all cars in the Unit Grain Train are empty.

B. Car(s) placed on the interchange tracks of a consignee who performs its own switching must be returned to the interchange track for release.

C. When the same car is unloaded and reloaded, empty release information must be furnished at the time the car is made empty. If not furnished, demurrage will continue on the car until the forwarding instructions are received.

**(N) – Correction of an update.**

ISSUED JANUARY 4, 2002

EFFECTIVE DECEMBER 21, 2001

**CSX TRANSPORTATION**
Marketing Services – Price Management
500 Water Street
Jacksonville, FL 32202



**TARIFF CSXT 8100**

**CSXT 8100**

**DEMURRAGE SECTION VIII - C**

**COMPUTATION:**
Time will be computed from the first 0001 hours after tender until release.

**CREDITS:**

    A.   Credits will be allowed for each car released from unloading in accordance with the Table of Charges in Item 8075.

    B.   One additional credit will be allowed on a car when it has a demurrage day occurring on:

        1.   Thanksgiving Day
        2.   Christmas Day
        3.   New Year's Day

**PRIVATE CAR(S) AND RAILROAD CAR(S) HELD FOR OTHER THAN LOADING OR UNLOADING – ITEM 8060**
Applies to car(s) held:

    A.   On orders of consignor or consignee.
    B.   Awaiting proper disposition from the consignor or consignee.
    C.   As a result of conditions attributable to consignor or consignee.

**DISPOSITION:**
That information, including forwarding instructions or empty release information, that allows the railroad to either tender or release the car from the consignor's or consignee's account.

**TENDER:**
The notification, actual or constructive placement of a loaded car(s).

**RELEASE:**
Date and time that the railroad receives advice that the car is empty, or that forwarding instructions are received.

**COMPUTATION:**
Time will be computed from the first 0001 hours:

    A.   After tender, until release, on car(s):

        1.   Diverted
        2.   Empty for loading – ordered and not used (other than a rejected car)
        3.   Partially unloaded
        4.   Reconsigned
        5.   Reshipped
        6.   Stopped in transit

    B.   After car(s) are received by CSXT until date of disposition on:
        1.   Car(s) received from connecting carriers
        2.   Loaded private car(s) returned to railroad tracks
        3.   Empty car(s) moving as freight with STCC 37 422 XX

**(N) – Correction of an update.**

ISSUED JANUARY 4, 2002

EFFECTIVE DECEMBER 21, 2001

**CSX TRANSPORTATION**
Marketing Services – Price Management
500 Water Street
Jacksonville, FL 32202

# CSX
## TRANSPORTATION
**TARIFF CSXT 8100**

**CSXT 8100**

2nd REVISED VIII-C PAGE 7
Cancels 1st REVISED VIII-C PAGE 7

**DEMURRAGE SECTION VIII - C**

C. After tender until date of refusal on:
1. Refused loaded car(s) (consignee)

D. After tender until date of disposition on:
1. Refused loaded car(s) (consignor)

E. After tender until release or placement on private tracks on:
1. Loaded private car(s) – while held on railroad tracks.
2. Empty car(s) moving as freight with STCC 37 422 XX

**CREDITS:**

Credits will be allowed for each car released, or on which disposition is provided in accordance with the Table of Charges in Item 8075.

(B) B. Cancel - Account Obsolete

**DEMURRAGE PLAN – ITEM 8070**

A. Settlement of charges will be made monthly on all car(s) released during each calendar month.

B. Credits earned and demurrage days accrued by customers having facilities at separate stations cannot be combined.

C. Credits earned, and demurrage days accrued, will be calculated separately in accordance with the Table of Charges in Item 8075.

D. Excess credits earned for one demurrage transaction cannot be used to offset days for another demurrage transaction.

E. Excess credits earned cannot be used to offset demurrage between loading and unloading credits.

F. Excess credits earned in one calendar month cannot be used to offset demurrage days in another calendar month.

G. Unless otherwise advised, in WRITING, that another party is willing to accept responsibility for demurrage, consignor at origin or consignee at destination will be responsible for the payment of demurrage charges.

H. **Calculation of charges:**
1. Total demurrage days for all car(s) released will be added
2. Total credits for all car(s) released will be added
3. If total days exceed the total credits, calculation of charges will be made as follows:
   a. Subtract number of total credits from total demurrage days to determine number of chargeable days
   b. Chargeable days will be assessed charges in accordance to the Table of Charges in Item 8075

(B) – Cancel – Account Obsolete

---

ISSUED NOVEMBER 25, 2002

EFFECTIVE NOVEMBER 26, 2002

**CSX TRANSPORTATION**
Marketing Services – Price Management
500 Water Street
Jacksonville, FL 32202



**TRANSPORTATION**
**TARIFF CSXT 8100**

**CSXT 8100**

(N) 2nd REVISED PAGE VIII-C 8
Cancels 1st REVISED PAGE VIII-C 8

**DEMURRAGE SECTION VIII - C**

**(N) CSXT's SUMMER GRAIN SHIPPERS DEMURRAGE RELIEF PROGRAM**

Effective Date June 1, 2003        Expiration Date: September 30, 2003

Grain elevator shippers located on CSXT in the States of AL, FL, GA, NC, SC and VA who enroll in CSXT's Summer Grain Shippers Demurrage Relief Program will be exempt from all demurrage provisions at **ORIGIN** on shipments of Grain (STCC 01 13X XX & 01 14X XX). To be eligible, grain shippers must furnish the information requested in writing via FAX or Mail to the Director of Grain Express at CSX Transportation (address below).

**Mail or FAX Request(s) to:**    CSXT Transportation; Howard Mallon
500 Water Street, S/C J805
Jacksonville, FL 32202
FAX: 904-245-2852

Date: _____
Name of Company: _____
Grain Elevator Location: _____
Contact Name: _____
Phone Number: _____
FAX Number: _____

Anticipated Number of Carloads to be shipped during        –        : _____

**DEMURRAGE APPLICATION – ITEM 8075**

| Demurrage Application | Car Equipment as Published in: The Official Railway Equipment Register | Loading Credits | Unloading Credits | Daily Charge |
|---|---|---|---|---|
| **TABLE OF CHARGES** | | | | |
| Railroad cars, including "railroad controlled private equipment" | Railroad equipment | 2 | 2 | $60.00 |
| Private marked cars, excluding "railroad controlled private equipment" | Private car owners equipment carrying hazardous material or other than hazardous material. Hazardous materials are list in: **Table, Section 172.101, Tariff BOE 6000-Series.** | 2 | 2 | $60.00 |
| | | Origin Credits | Destination Credits | Daily Charge |
| Empty cars and locomotives moving on own wheels in revenue service (STCC: 37 411 XX and 37 422 XX) | Railroad equipment and private car owner equipment | 2 | 2 | $60.00 |
| All shipments for other than loading or unloading | Railroad equipment and private car owner equipment | 2 | 2 | $60.00 |

**(N) No Change**

ISSUED APRIL 17, 2003

EFFECTIVE APRIL 18, 2003

**CSX TRANSPORTATION**
Marketing Services – Price Management
500 Water Street
Jacksonville, FL 32202



**TARIFF CSXT 8100**

**DEMURRAGE SECTION VIII - C**

**CLAIMS – ITEM 8080**

A claim (A) must be submitted in writing to the name and number on the bottom of the freight bill within (A) ninety (90) days from the date that the bill for demurrage is rendered. The conditions for submitting the claim should be fully stated.

A.  **BUNCHING:**

   1.  **Cars Tendered for Loading** - When cars are bunched and placed for loading in accumulated numbers in excess of the normal daily placing as ordered, because of delay or irregularity in filling orders, the shipper shall be allowed the free time for loading he would have received had the cars been placed for loading as ordered.

   2.  **Cars Tendered for Unloading** – When cars are bunched and placed for unloading in accumulated numbers in excess of daily shipments as a result of:

      1.  the act, or neglect of any railroad
      2.  flooding, earthquakes, hurricanes, or tornadoes,
      3.  conditions in devastated areas resulting from any of the above

The consignee shall be allowed, for those cars tendered for delivery by this railroad in accumulated numbers in excess of daily shipments, the free time for unloading that he would have received had the cars not been bunched. The consignee shall be allowed the free time that he would have received had the cars been placed or tendered for placement in the order of their arrival. Cars arriving on Sundays and holidays will not be However, when any car(s) is released before the expiration of the prescribed free time, or the adjusted free time, the next cars bunched therewith will be treated as tendered the next 12:00 midnight following such release.

**CRITERIA**

   1.  cars originating at the same point, moving via the same route and consigned to one consignee at one point
   2.  cars originating at different points and transported via the same route from an intermediate common point to destination (bunched after arrival to common point)

   (The date of arrival of cars at the common point will govern in determining the bunching instead of the date of shipment.)

For the purpose of applying this item, cars moving from different points or via different routes to destination, and arriving on different dates, will not be considered bunched if tendered for delivery on the same day. The consignee shall be allowed the free time that he would have received had the cars been placed or tendered for placement in the order of their arrival. Cars arriving on Sundays and holidays will not be considered bunched when tendered for delivery on the first day thereafter that is not a Sunday or holiday.

**BUNCHING CLAIMS**

In no case will demurrage relief be granted from bunching unless this railroad receives a claim in writing within thirty days (30) from the date that the bill for demurrage is rendered. A statement certifying the car initial and number must support this claim, and either the date and point of the shipment, or the common point arrival date for each car involved in the bunching claim. The date of shipment shall be the forwarding date that the directions were furnished to the railroad for movement of the car(s) to the unloading point. The point of shipment is where the forwarding directions were effected for movement of the car to the point of unloading.

B.  **MISSED SWITCH ALLOWANCE:**

   An allowance for missed switching will be made for cars held under Constructive Placement Notification when CSXT is unable to place the cars in response to the customer's orders.

(A) – Increase

ISSUED DECEMBER 20, 2001

EFFECTIVE JANUARY 9, 2002

**CSX TRANSPORTATION**
Marketing Services – Price Management
500 Water Street
Jacksonville, FL  32202

# CSX

**TRANSPORTATION**
TARIFF CSXT 8100

CSXT 8100

2ⁿᵈ REVISED PAGE 10
Cancels 1ˢᵗ REVISED PAGE 10

---

## DEMURRAGE SECTION VIII - C

C.  **STRIKE INTERFERENCE:**

When it is impossible to load, unload, receive car(s) from or make car(s) available to CSXT because of strike interference at the point where the loading or unloading is to occur; demurrage days will be charged at the rate of $25.00 during the strike interference period, provided that:

1.  The disruption exceeds ten (10) days in duration during one calendar month

2.  The provisions of this item will not apply to:
    a.  Inbound car(s) when waybills are dated four (4) days after the beginning of strike interference
    b.  Car(s) for loading, when ordered after the beginning and prior to the ending of strike interference

D.  **WEATHER INTERFERENCE:**

1.  If the operations of the consignor or consignee are disrupted due to earthquakes, tornadoes, hurricanes, floods or heavy snow, the demurrage directly chargeable thereto, will be eliminated, provided the disruption exceeds (2) days in duration.

2.  Frozen lading in open-top hopper car(s) (Tariff ICC RER 6411 car type code "H" or "K").

E.  **RAILROAD ERROR:**

1.  If through railroad error, demurrage charges are assessed, demurrage will be adjusted to the amount that would have accrued if not for the error.

2.  Run-around of car(s) will not be considered as a railroad error.

**(AA) (R) DEMURRAGE AT LOU, FL AND ROCKPORT, FL – ITEM 8090**

1.  Applicable only on the complete unloading of car(s) at Lou, FL and Rockport, FL and the commodities specified

2.  Seven (7) days free time will be allowed the following commodities:
    1.  Diammonium Phosphate Fertilizer; STCC 28 712 35
    2.  Monoammonium Phosphate Fertilizer; STCC 28 712 36
    3.  Phosphate Rock; STCC 14 714 10
    4.  Superphosphate, other than ammoniated; STCC 28 712 50

3.  Free time will be computed starting from the first 0001 hours after actual or constructive placement

4.  Car(s) will be considered released from demurrage when CSXT is notified of the vessel's readiness to have product loaded
    **NOTE:** Notice of readiness to load will be accepted only when the vessel has berthed at Lou, FL or Rockport, FL or is at a holding location in Tampa Bay, FL.

5.  After the expiration of free time, charges will accrue as follows:
    1.  $33.00 per car, per day for each of the first two (2) chargeable days, or fraction thereof.
    2.  $66.00 per car, per day for each day, or fraction thereof, following the first two chargeable days.

**(AA) - Addition**
**(R) - Reduction**

---

ISSUED AUGUST 15, 2003

EFFECTIVE AUGUST 16, 2003

**CSX TRANSPORTATION**
Marketing Services – Price Management
500 Water Street
Jacksonville, FL  32202



**TRANSPORTATION**
TARIFF CSXT 8100

CSXT 8100

(N) PAGE: 11

---

### DEMURRAGE DEFINITIONS

**The following definitions define and govern the provisions outlined in this tariff.**

**ACTUAL PLACEMENT** – When a car(s) is placed in an accessible position for loading or unloading or, at a point designated by the consignor or consignee.

**CONSIGNEE** – The party to whom a shipment is consigned, or the party entitled to receive the shipment.

**CONSIGNOR** – The party in whose name a car(s) is ordered; or the party who furnishes forwarding directions.

**CONSTRUCTIVE PLACEMENT** – When a car(s) cannot be actually placed due to any condition attributable to the consignor or consignee, including order notify and in-bond shipments, such car(s) will be held on CSXT's tracks and notice will be provided to the consignor or consignee that the car(s) is held awaiting disposition instructions. Car(s), placed by CSXT on private or other than public delivery tracks, including lead tracks serving the consignor or consignee, will be considered constructively placed without notice.

**CREDIT** – A non-chargeable demurrage day. Credits may be earned when a car(s) is released by the customer and is used to offset chargeable demurrage days.

**DEMURRAGE DAY** – A twenty-four (24) hour period (calendar day), or part thereof, commencing 0001 after tender.

**DISPOSITION** – Information, including forwarding instructions or release, that allows the railroad to either tender or release the car(s) from the consignor's or consignee's account.

**DIVERSION** – An order provided by the consignor instructing that a car(s) be delivered to a location other than the one indicated on the original forwarding instructions.

**EMPTY CAR(S)ORDERED AND NOT USED** – Empty car(s), placed for loading as ordered, and subsequently released without being used in transportation service.

**EMPTY RELEASE INFORMATION** – Advice provided by the consignee to authorized personnel, that the car(s) is unloaded and available. This information must include the identity of the consignee, party furnishing information, and the car(s) initial and number.

**FORWARDING INSTRUCTIONS** – Shipping instructions provided at the point of loading that contain all of the necessary information to transport the shipment to its final destination.

**LEASE TRACK** – Track(s) assigned to a user through a written agreement. Lease tracks will be treated the same as private tracks.


**(N) No change**

---

ISSUED DECEMBER 20, 2001

EFFECTIVE DECEMBER 21, 2001

**CSX TRANSPORTATION**
Marketing Services – Price Management
500 Water Street
Jacksonville, FL 32202



**TRANSPORTATION**
**TARIFF CSXT 8100**

CSXT 8100

2nd REVISED VIII-C PAGE 7
Cancels 1st REVISED VIII-C PAGE 7

**DEMURRAGE SECTION VIII - C**

---

   C.  After tender until date of refusal on:
      1.  Refused loaded car(s) (consignee)

   D.  After tender until date of disposition on:
      1.  Refused loaded car(s) (consignor)

   E.  After tender until release or placement on private tracks on:
      1.  Loaded private car(s) – while held on railroad tracks.
      2.  Empty car(s) moving as freight with STCC 37 422 XX

**CREDITS:**

Credits will be allowed for each car released, or on which disposition is provided in accordance with the Table of Charges in Item 8075.

(B)  B.  Cancel - Account Obsolete

**DEMURRAGE PLAN – ITEM 8070**

   A.  Settlement of charges will be made monthly on all car(s) released during each calendar month.

   B.  Credits earned and demurrage days accrued by customers having facilities at separate stations cannot be combined.

   C.  Credits earned, and demurrage days accrued, will be calculated separately in accordance with the Table of Charges in Item 8075.

   D.  Excess credits earned for one demurrage transaction cannot be used to offset days for another demurrage transaction.

   E.  Excess credits earned cannot be used to offset demurrage between loading and unloading credits.

   F.  Excess credits earned in one calendar month cannot be used to offset demurrage days in another calendar month.

   G.  Unless otherwise advised, in WRITING, that another party is willing to accept responsibility for demurrage, consignor at origin or consignee at destination will be responsible for the payment of demurrage charges.

   H.  **Calculation of charges:**
      1.  Total demurrage days for all car(s) released will be added
      2.  Total credits for all car(s) released will be added
      3.  If total days exceed the total credits, calculation of charges will be made as follows:
         a.  Subtract number of total credits from total demurrage days to determine number of chargeable days
         b.  Chargeable days will be assessed charges in accordance to the Table of Charges in Item 8075

**(B) – Cancel – Account Obsolete**

---

ISSUED NOVEMBER 25, 2002

EFFECTIVE NOVEMBER 26, 2002

**CSX TRANSPORTATION**
Marketing Services – Price Management
500 Water Street
Jacksonville, FL  32202



**CSX**
**TRANSPORTATION**
TARIFF CSXT 8100

CSXT 8100

## DEMURRAGE DEFINITIONS

**LOADING** – The complete or partial loading of a car(s) in conformity with loading and clearance rules and, the furnishing of forwarding instructions.

**LOADED CAR(S)** – A car(s) that is completely or partially loaded.

**NOTIFICATION** – When required, written or verbal notification will be furnished to the parties entitled to receive notice that the car(s) is available for loading, unloading, or otherwise impacted by demurrage provisions.

**ORDER DATE** – The date that the consignor requests empty car(s) to be furnished for loading.

**OTHER THAN PUBLIC DELIVERY TRACK** – Any trackage assigned for individual use, including privately owned or leased tracks.

**PARTIAL UNLOADING** – The partial unloading of a car(s) and furnishing of the proper forwarding or handling instructions.

**PRIVATE CAR(S)** – A car(s) bearing other than railroad reporting marks that is not railroad-controlled.

**PRIVATE TRACK** – Tracks that are not owned or leased by the railroad.

**PUBLIC DELIVERY TRACK** –Track that is open to the general public for loading and unloading.

**RAILROAD-CONTROLLED CAR(S)** – A car(s) bearing other than railroad reporting marks that is either leased or controlled by a railroad.

**RECONSIGNMENT** – An order provided by consignor to bill a car(s) to other than the original consignee.  (An order to turn over the car(s) to another party that does not require any additional movement of the car(s), is not a reconsignment).

**REFUSED LOADED CAR(S)** – When the original loaded car(s) is refused at destination without being unloaded.

**RELOADING** – When a car(s) is held for loading after being released as an empty.

**RESHIPMENT** – A new document by which the entire original shipment is forwarded in the same car(s) to another destination.

**SERVING YARD** – A classification yard where the local train serving the customer originates.

**SHIPPER ASSIGNED CAR(S)** – Specific empty car(s) assigned to a particular shipper for their exclusive use.

**STOPPED IN TRANSIT** – When a car(s) is held en route due to any condition attributable to the consignor, consignee, or owner.

**(N) No change**

ISSUED DECEMBER 20, 2001

EFFECTIVE DECEMBER 21, 2001

**CSX TRANSPORTATION**
Marketing Services – Price Management
500 Water Street
Jacksonville, FL  32202



**TARIFF CSXT 8100**

CSXT 8100                                                                (N) PAGE 13

---

## DEMURRAGE DEFINITIONS

**TENDER** – The notification, actual or constructive placement, of an empty or loaded car(s).

**TIME** – Local time is applicable and is expressed on the basis of the 24-hour clock.

      **Example:** 12:01 AM is expressed as 0001 Hours.

**UNLOADING** – The complete unloading of a car(s), and the advice received from the consignee that the car(s) is empty and available to the railroad.

**(N) No change**

---

ISSUED DECEMBER 20, 2001                                    EFFECTIVE DECEMBER 21, 2001

**CSX TRANSPORTATION**
Marketing Services – Price Management
500 Water Street
Jacksonville, FL  32202

# EXHIBIT I

To insure prompt payment please include the
Bill of Lading number on all billing papers.

# Straight Bill of Lading - Short Form - Original - Not Negotiable

RECEIVED, subject to the Tariffs or Contract in effect on the date of the issue of this Bill of Lading and to the additional conditions shown below.

| 06/04/04   Page:1 of     1 | Prepaid  *If charges are to be prepaid, so indicate below.* | |
|---|---|---|

| Ship In The Name Of *(shippers name & permanent address)* | Charges Advanced | |
| | $ | |
| | Charges Received | PREPAID |
| | $ | To apply to the prepayment of the charges on the property described hereon |
| | Agent or Cashier | per Signature here                    The |

| Ship To *(Consignee)*<br>PORT ERIE PLASTICS<br>MOUNT FORT TERMINAL ERIE<br>ERIE, PA 16506 US | Collect *Subject to Section 7 of conditions of applicable Uniform Straight Bill of Lading referred to herein. If this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement. The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.*<br><br>Signature of Consignor |

| Sold To *(if other than 'Ship To')*<br>NEXPAK<br>3475 FOREST LAKE DRIVE SUITE 200<br>UNIONTOWN, OH 44685 US | COD Information (If Applicable)<br>Carriers Send Invoices To:<br>BP Chemicals<br>c/o CT Logistics<br>P.O. BOX 30382 |

| Ship From city, state<br>Alvin, TXC US | Shipped/Dispatch Date<br>06/04/04 | Consignee Purchase Order No | Order No<br>434101 |
|---|---|---|---|

| Carrier/Routing<br>UP-(ESTL)-CSXT | Car No. AMCX104596 | Bill of Lading No<br>81189358 |

| -HM    Quantity | Product Description and Other Information |
|---|---|

|    191,150.000 POUND | 10-8941 RANDOM COPOLYMER - LBS<br>Customer material number: RM-0093<br>Batch# TBY-011<br>Frt. Class Desc: PLASTIC MATERIALS, NOI<br>STCC #28-211-63 |
| | |
| | Contract No. (MP-C-2552S)<br>Customer P.O.No: 74211<br>Seal #: 880615-880632 |
| Vehicle ID - 0007<br>AMCX104596 | |
| | Delivery Date/Time : 06/17/04 / 00:00:00 |
| Total shipped weights<br>-------------------- | |
| Net:      191,150   LB<br>Gross:    258,950   LB | *Steve* |

I hereby declare that the contents of this consignment are fully and accurately described above by the proper shipping name, and are classified, packaged, marked and labeled, and are in all respects in proper condition for transport according to applicable international and national governmental regulations.

**For Truck Transportation:** Received the property described herein, in apparent good order, except as noted (contents and condition of containers and packages unknown).

| Shipper<br>BP Amoco Chemical Company | Truck Driver | Consignee |
| Per<br>Theresa Mayer | Per | Exceptions | Exceptions |
| Total Units | Weight of Pallets | Received Date<br>Time | Tendered Date<br>Time |

Notwithstanding any other provision in this or any referenced Bill of Lading, or in any other documents incorporated herein by reference, including without limitation, any tariff, classification, charge, price, rule or rate, no such provision shall supersede or negate any provision, not in contravention of applicable law, of any contract agreed to in writing between Shipper and Carrier.

* If the shipment moves between two ports by a carrier by water, delivery requires that the Bill of Lading shall state whether it is 'carrier's or shipper's weights'. Weights are shown on this Bill of Lading. If the shipper for the advancement of the carrier and can be verified in any time by examination of the records on file in the shipper's office. Carrier hereon received from shipper, subject to the tariffs in effect on this date. [remainder illegible]

When carriage is by vehicle owned by shipper or by buyer, the terms "Bill of Lading", "Tariffs", and other words and provisions peculiarly applicable to common or contract carriers, shall be considered. However, if delivery of the property described hereon in F.O.B. origin is made into the vehicle owned, leased or operated by the buyer, Uniform shall constitute a delivery receipt for the property described hereon unpaid order, and the title to such property shall pass in the buyer at the point of origin.

**EMERGENCY CONTACT:** For information to respond to any emergency involving Hazardous Material, call toll-free 1-800-424-9300 in the United States, or 613-996-6666 in Canada, day or night, 24 hours.

BP Amoco Chemical Company     Delivery note          Page 1
Chocolate Bayou TX       (ACC)

```
                              Print Date          : 06/04/2004
                              Print Time          : 12:29:44 CST
                              Delivery note number: 81189358
SHIP TO:                      Delivery Date       : 06/17/2004
Customer Number: 90071133     Delivery Time       : 00:00:00
PORT ERIE PLASTICS            Created by JONES8
MOUNT FORT TERMINAL ERIE      Plant: 0016-Chocolate Bayou
ERIE PA  16506


SOLD TO:                      Reference number/date
Customer Number: 90012138     74211   03/31/2004
NEXPAK                        Sales order number/date
3475 FOREST LAKE DRIVE SUITE 200   434101  03/31/2004
UNIONTOWN OH  44685           Goods issued date: 06/07/2004

                              Routing: Rail Delivered (PPD)
                              Freight: FOB Ship Pt, FRT Prepaid
CARRIER: UP-(ESTL)-CSXT



Total gross weight:   189,999.999 LB
Total net weight:     189,999.999 LB


SPECIAL INSTRUCTIONS:
FAX COPY OF B/L TO STEVE BARTOZBEK @ FAX 814-835-2118 ALSO FAX BOL TO JIM WITKOWSKI AT
814-899-7854
-------------------------------------------------------------------------------
ITEM   MATERIAL                      QUANTITY        NET WEIGHT
       DESCRIPTION
-------------------------------------------------------------------------------

000010 334262                   189,999.999  LB     189,999.999  LB
       10-8941 RANDOM COPOLYMER - LBS
       Customer material number: RM-0093
       1
```

Amcy
1045916
Tey-O11

# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CSX TRANSPORTATION, INC.<br>500 Water Street<br>Jacksonville, FL 32202-4423 | ) | CIVIL ACTION |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CASE NO.: 05-139 Erie |
| | ) | |
| PORT ERIE PLASTICS, INC.<br>909 Troupe Road<br>Harborcreek, PA 16421 | ) | |
| Defendant | ) | RELATED DOCUMENT NO. _____ |

## AFFIDAVIT OF BRIAN FAHEY

AND NOW COMES, Brian Fahey, former Controller of Port Erie Plastics, Inc., and hereby makes this Affidavit in Support of Defendant's Motion for Summary Judgment and after being duly sworn sets forth the following:

1.      I am an adult individual with a business address of 8040 Peach Street, Erie Pa. 16509, where I hold the position of Controller of Scott Enterprises.

2.      At all times relevant to the present cause of action, I held the position of controller of Port Erie Plastics, Inc.

1

3.      In my position as Controller, I had knowledge of the business relationship between Port Erie Plastics, Inc. and NexPak Corporation, and interacted with representatives of NexPak in the normal course of business.

4.      As a result of this interaction, I have knowledge of an instance that occurred within the time period that is relevant to the present cause of action.

5.      I recall that on one instance, NexPak ordered CSX to divert two rail cars loaded with plastic resin destined for Erie, Pennsylvania to be taken instead to NexPak's Canton, Ohio facility.  I recall that CSX complied with NexPaks order, and diverted said rails cars as instructed.

6.      I learned of this instance after it happened, and can attest that NexPak did not consult with, seek approval from, nor even give prior notice to Port Erie Plastics, Inc. regarding this diversion of rail cars destined for Erie, Pennsylvania.

7.      I also participated in the negotiations between NexPak and Port Erie Plastics to resolve issues with business agreements following NexPak's bankruptcy.

8.      In that agreement, NexPak agreed to cooperate fully with Port Erie Plastics, Inc. in resolving "NexPak's Raw Materials Claims."  This reference was to the instant litigation in which NexPak acknowledged that Port Erie was not a party to the business agreement that grounded CSX Transportation's lawsuit.

2



_____
Brian Fahey

Sworn to and subscribed before me

this _20th_ day of January, 2006

_Sharon L. Stutzman_

#933333

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Sharon L. Stutzman, Notary Public
Summit Twp., Erie County
My Commission Expires Jan. 19, 2009
Member, Pennsylvania Association of Notaries

# EXHIBIT K

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CSX TRANSPORTATION, INC.<br>500 Water Street<br>Jacksonville, FL 32202-4423 | : <br> : <br> : <br> : | CIVIL ACTION |
| Plaintiff | : <br> : | CASE NO. 05-139 Erie |
| v. | : <br> : | |
| PORT ERIE PLASTICS, INC.<br>909 Troupe Road<br>Harborcreek, PA 16421 | : <br> : <br> : <br> : | |
| Defendant. | : | |

## PLAINTIFF'S RESPONSES TO INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS <u>DIRECTED TO CSX TRANSPORTATION, INC. (FIRST SET)</u>

Pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure, plaintiff, CSX Transportation, Inc., by and through its attorneys, submit their responses to the Interrogatories and Request for Production of Documents propounded by defendant herein.

### <u>GENERAL OBJECTIONS</u>

1.    Plaintiff objects to Defendant's Interrogatories and Document Requests to the extent that they exceed the scope of permissible discovery under the applicable rules of the Federal Rules of Civil Procedure.

2.    Plaintiff objects to Defendant's Interrogatories and Document Requests to the extent that they are overly broad, vague or incomprehensible; not tied to any relevant time period; not limited in scope or description; or that responding to them would be oppressive, unduly burdensome, or unduly expensive.

3.      Plaintiff objects to Defendant's Interrogatories and Document Requests to the extent that they seek information not within Plaintiff's control, equally available to Plaintiff and Defendant, or already within Defendant's possession and/or control.

4.      Plaintiff objects to Defendant's Interrogatories and Document Requests to the extent that they pertain to matters not relevant to the subject matter involved in this action and are not reasonably calculated to lead to the discovery of admissible evidence.

5.      Plaintiff objects to Defendant's Interrogatories and Document Requests to the extent they seek information that is confidential or protected by the attorney-client privilege, statutory privilege, the work product doctrine, or any other applicable privilege.

These general objections are hereby incorporated into each and every response to Defendant's Interrogatories and Document Requests, whether or not specifically set forth therein.

## RESPONSES

1.      Please identify all persons by name, business address, title(s) held and length of employment service under each title held who have participated in the answering of these Interrogatories on behalf of plaintiff CSX Transportation, Inc :

**RESPONSE:**

Chris Riddle

05/2002 - 08/2003
**Revenue Accounting Clerk**

08/2003-Present
**Account Specialist**

John Underwood

| | |
|---|---|
| 1979-1982 | Willard, Ohio |
| **Chief Clerk** | |
| 1982-1984 | Russell, Ky. |
| **Asst. TSC Mgr.** | |
| 1984-1986 | Huntington, WV. |
| **General Agent** | |
| 1986-1988 | Russell, Ky. |
| **Asst. TSC Mgr.** | |
| 1988-1991 | Columbus, Ohio |
| **TSC Mgr.** | |
| 1991-1994 | Russell, Ky |
| **Trainmaster/TSC** | |
| 1994-1997 | Jacksonville, Fl |

**Mgr. Customer Service Operations III**
1998 – March 2000
**Mgr. Terminal Support – Northern Region**
March 2000 – Nov. 2001
**Asst. Supt. Customer Service Opns**.
Nov. 2001 to Nov. 2003
**Asst. Director CSO Admin & Manpower**
Nov. 2003 to April 2004
**Asst. Supt. Customer Service Opns.**
April 2004 to Present
**Manager Supplemental Revenue**


2.      To the extent known to plaintiff CSX Transportation, Inc., its attorneys or other
representatives, set forth the name, business address, title(s) held, and length of
employment service under each title held of the following persons:

        a.      Those who have any knowledge of or information as to any facts
pertaining to plaintiff CSX Transportation, Inc.'s claim that defendant Port Erie
Plastics, Inc. owes CSX Transportation, Inc. for the demurrage charges sought in
the Complaint:

        b.      Those who plaintiff CSX Transportation, Inc. expects to have testify as to
its claim that defendant Port Erie Plastics, Inc. owes CSX Transportation, Inc. for
the demurrage charges sought in the Complaint:

**RESPONSE:**

In response to sub-part (a), see CSX's response to Interrogatory No. 1 above. By way of further response to subpart (a), CSX identifies the following individuals:

a.    Bernie Keenen, CSX Yardmaster during relevant time period; and

b.    Steve Bartosik, General Manager of Presque Isle Trucking during relevant time period.

With respect to subpart (b), CSX states that at this time it has not yet determined who its trial witnesses will be. CSX will disclose its trial witnesses in accordance with the Federal Rules of Civil Procedure and/or all applicable case management orders entered by the Court.


3.    If you intend to call an expert witness at trial, please state:

a.    The name and business address of each such expert witness:

b.    The subject matter as to which each such expert witness is expected to testify:

c.    The substance of the facts and opinions to which each expert is expected to testify, and a summary of he grounds for each opinion and/or attach a copy of each expert's report:

d.    The educational background, field of expertise, professional experience, publications, membership in professional societies, employment experience and court appearances (including citations) of each expert witness identified:

**RESPONSE:**

CSX states that, at this time, it has not yet determined whether it will retain expert witnesses to testify in this matter. In the event that CSX retains individuals to provide expert testimony at trial, it will disclose its experts in accordance with the

Federal Rules of Civil Procedure and/or all applicable case management orders

entered by the Court.

4.    Please set forth any and all facts relating to, referring to, or supporting plaintiff
CSX Transportation, Inc.'s claim that defendant Port Erie Plastics, Inc. owes CSX
Transportation, Inc. for the demurrage charges sought in the Complaint, including
but not limited to CSX Transportation, Inc.'s claim that defendant Port Erie
Plastics is/was a consignee of the freight at issue.  Please include:

    a.    The identity of each person having knowledge of each fact, circumstance,
and/or item of information relating to, referring to, or supporting plaintiff CSX
Transportation, Inc.'s claim:

    b.    The identity of any and all documents relating to, referring to, or
supporting plaintiff CSX Transportation, Inc.'s claim that defendant Port Erie
Plastics, Inc. owes CSX Transportation, Inc. for the demurrage charges sought in
the Complaint.  Please provide copies of any and all documents identified:

**RESPONSE:**

CSX identifies the following facts which support its claims herein, individuals

with knowledge of those facts, and documents which relate to or support such facts:

    a.    CSX's Tariff 8100 entitles CSX to charge and collect demurrage charges

from consignees of freight delivered by CSX; Chris Riddle and John Underwood

would have knowledge of the applicable provisions of CSX's tariff;

    b.    PEP is identified as the "consignee" on the bills of lading which governed

the transportation of freight at issue; Chris Riddle; bills of lading produced by the

origin carrier of the freight at issue as well as by PEP;

    c.    PEP was entitled to receive the shipments at issue under the applicable

bills of lading; Jim Witkowski and Steve Bartosik; Witkowski letter to Caldren of

7/13/2000;

d.      PEP authorized Presque Isle Trucking ("PIT") to receive rail cars from

CSX for the purpose of unloading those cars into PIT's tanker trucks for delivery

to PEP's storage facilities in Harborcreek, PA; Steve Bartosik;

e.      Ownership of the material which was delivered in the rail cars was

transferred to PEP upon delivery of the material to its Harborcreek, PA facility;

Jeff Caldren and Jim Witkowski; Witkowski letter to Caldren of 7/13/2000;

f.      The bills submitted to PEP by CSX for the demurrage charges at issue

accurately reflect the circumstances which give rise to said charges.

g.      See documents Bates-labeled CSX 00211 - 00462, which are being

produced contemporaneously with the service of these discovery responses and

documents previously produced by CSX Bates-labeled CSX 00001 – 00210 and

UP00001 – 00089.


5.      Please identify and set forth the terms of any and all agreements entered into
        between plaintiff CSX Transportation, Inc. and defendant Port Erie Plastics
        relating to, referring to, or supporting plaintiff CSX Transportation, Inc.'s claim
        that defendant Port Erie Plastics, Inc. owes CSX Transportation, Inc. for the
        demurrage charges sought in the Complaint.  Please provide copies of any and all
        written agreements identified:

**RESPONSE:**

        CSX states that it is unaware of any such agreements.


6.      Please identify and set forth the terms of any and all agreements entered into
        between plaintiff CSX Transportation, Inc. and Nexpak Corporation relating to,
        referring to, or supporting plaintiff CSX Transportation, Inc.'s claim that
        defendant Port Erie Plastics, Inc. owes CSX Transportation, Inc. for the
        demurrage charges sought in the Complaint.  Please provide copies of any and all
        written agreements identified:

**RESPONSE:**

      CSX states that it is unaware of any such agreements.

7.      Please identify and set forth the term, to the extent of CSX's knowledge, of any and all agreements entered into between Nexpak Corporation and defendant Port Erie Plastics relating to, referring to, or supporting plaintiff CSX Transportation, Inc.'s claim that defendant Port Erie Plastics, Inc. owes CSX Transportation, Inc. for the demurrage charges sought in the Complaint. Please provide copies of any and all bills of lading identified:

**RESPONSE:**

      CSX identifies correspondence from Witkowski to Caldren dated 7/13/2000,

which was produced by PEP in response to CSX's requests for production of

documents.

8.      Please identify any and all bills of lading or way bills between plaintiff CSX Transportation, Inc. and defendant Port Erie Plastics, Inc. from April 2002 through the present. Please provide copies of any and all bills of lading identified:

**RESPONSE:**

      CSX refers PEP to documents which have been Bates labeled UP0001 – 0089 and

which it has previously produced to counsel for PEP. CSX also refers PEP to

documents which it produced in response to CSX's document request which

include a bill of lading which identifies "BP Amoco Chemical Company" as the

shipper, "Port Erie Plastics" as the consignee, the "Union Pacific Railroad" as the

origin carrier and CSX as the destination carrier.

9.    Please identify any and all bills of lading between plaintiff CSX Transportation, Inc. and Nexpak Corporation from April 2002 through the present. Please provide copies of any and all bills of lading identified:

**RESPONSE:**

At this time, CSX is unaware of any bills of lading which identify Nexpak

Corporation as either the shipper or the consignee, and which govern the movement of

any of the rail cars which are subject to the demurrage charges herein..

10.    Please identify any and all communications between plaintiff CSX Transportation, Inc. and defendant Port Erie Plastics from April 2002 to the present that reference or discuss any demurrage/storage charge(s) assessed by CSX Transportation, Inc. against Port Erie Plastics, Inc. and/or Nexpak Corporation. Please provide copies of any and all written communications identified:

**RESPONSE:**

All such communications are referenced in documents previously produced by

CSX to PEP in response to its obligation to make initial disclosures pursuant to Fed. R.

Civ. P. 26(a)(1)(B). To the extent any such communications were in written form,

documents which reflect such communications would have also been produced to PEP

pursuant to Fed. R. Civ. P. 26(a)(1)(B).

11.    Please identify any and all communications between plaintiff CSX Transportation, Inc. and Nexpak Corporation from April 2002 to the present that reference or discuss any demurrage/storage charge(s) assessed by CSX Transportation, Inc. against Port Erie Plastics, Inc. and/or Nexpak Corporation. Please provide copies of any and all written communications identified:

**RESPONSE:**

At this time, CSX is unaware of any such communications other than what may

be reflected in documents referred to in its response to Interrogatory no. 10 above.

12.    Please identify any and all documents that reference or describe plaintiff CSX Transportation, Inc.'s policies and/or procedures concerning the assessment and/or collection of accrued demurrage/storage fees. Please provide copies of any and all documents identified:

**RESPONSE:**

    CSX's "policies and procedures concerning the assessment and/or collection of …

demurrage fees" are described fully in its Tariff 8100, which has previously been

produced by CSX to PEP in this litigation.

13.    Please identify any and all documents from plaintiff CSX Transportation, Inc. to defendant Port Erie Plastics, Inc. from April 2002 through the present regarding the placement of railcars at Mount fort Terminal, located in Erie, Pennsylvania. Please provide copies of any and all documents identified:

**RESPONSE:**

    Documents responsive to this Interrogatory have been previously produced by

CSX to PEP in this litigation pursuant to Fed. R. Civ. P. 26(a)(1)(B).

14.    Please identify any and all documents from plaintiff CSX Transportation, Inc. to Nexpak Corporation from April 2002 through the present regarding the placement of railcars at Mount Fort Terminal, located in Erie, Pennsylvania. Please provide copies of any and all documents identified:

**RESPONSE:**

    CSX is unaware of any documents in its possession, custody or control which are

responsive to this Interrogatory. By way of further response, CSX states that it would

have had no reason, business or otherwise, to have had contact with an entity not

9

identified on a bill of lading as either a shipper or a consignee concerning the placement

of railcars at Mount Fort Terminal in particular or any terminal in general.

15.    Please identify any and all documents from defendant Port Erie Plastics, Inc. to
       plaintiff CSX Transportation, Inc. wherein Port Erie Plastics provided notice of
       released railcars for receipt by CSX Transportation, Inc. Please provide copies of
       any and all documents identified:

**RESPONSE:**

CSX objects to this Interrogatory on the grounds that it seeks information which

is neither relevant nor admissible at trial and which is not reasonably calculated to lead to

the discovery of admissible evidence. By way of explanation, CSX's demurrage charges

in this matter were not assessed based on the date on which rail cars were "released" to

CSX. CSX calculated the demurrage assessed to PEP based on the number of days which

elapsed between the date on which CSX notified PEP or its agent that railcars were

available for placement and the date on which PEP or its agent ordered the cars for actual

placement.

16.    Please identify any and all documents from Nexpak Corporation to plaintiff CSX
       Transportation, Inc. wherein defendant Port Erie Plastics, Inc. provided notice of
       released railcars for receipt by CSX Transportation , Inc. Please provide copies of
       any and all documents identified:

**RESPONSE:**

CSX objects to this Interrogatory on the grounds that it seeks information which

is neither relevant nor admissible at trial and which is not reasonably calculated to lead to

the discovery of admissible evidence. By way of explanation, CSX's demurrage charges

in this matter were not assessed based on the date on which rail cars were "released" to

CSX. CSX calculated the demurrage assessed to PEP based on the number of days which

elapsed between the date on which CSX notified PEP or its agent that railcars were

available for placement and the date on which PEP or its agent ordered the cars for actual

placement.

17.    Please identify any and all documents received by or sent by plaintiff CSX
       Transportation, Inc. that relate to or reference the demurrage/storage charges
       which are the subject matter of this lawsuit. Please provide copies of any and all
       documents identified:

**RESPONSE:**

All such documents responsive to this interrogatory have been previously

produced by CSX to PEP pursuant to Fed. R. Civ. P. 26(a)(1)(B).

18.    Please identify by name and business address the entity that paid for the shipping
       charges for any and all freight for which the demurrage/storage charges which are
       the subject matter of this lawsuit were assessed. Please provide copies of any and
       all documents evidencing such payments:

**RESPONSE:**

CSX objects to this Interrogatory on the grounds that it seeks information which

is neither relevant nor admissible at trial and which is not reasonably calculated to lead to

the discovery of admissible evidence. Subject to and without waiver of the foregoing

objection, the bills of lading which have been produced in this matter by the Union

Pacific Railroad as well as by PEP contain information responsive to this Interrogatory.

19.   Please state whether any shipments by plaintiff CSX Transportation, Inc.
      originally intended to be shipped or actually delivered to Mount Fort Terminal,
      located in Erie, Pennsylvania for Port Erie, were then diverted and/or shipped
      elsewhere without the plastic resin being unloaded.  If so, please identify by
      name, business address and title, the person/persons who directed that the
      shipments be diverted.  Please also state the date that the shipment was diverted
      and the location to where the shipment was diverted or then transferred.  Please
      provide copies of any and all documents evidencing such diversion of shipments:

**RESPONSE:**

       CSX objects to this Interrogatory on the grounds that it seeks information which

is neither relevant nor admissible at trial and which is not reasonably calculated to lead to

the discovery of admissible evidence.  By way of explanation, CSX states that the

demurrage charges at issue in this lawsuit are only for rail cars which were both

constructively placed by CSX and ordered for actual placement by PEP or its agent.


                              Paul D. Keenan
                              Charles L. Howard
                              **JANSSEN & KEENAN P.C.**
                              One Commerce Square
                              2005 Market Street, Suite 2050
                              Philadelphia, PA 19103
                              (215) 665-8888
                              (215) 665-8887 (fax)

                              Attorneys for Plaintiff
                              CSX Transportation, Inc.


Dated:  _1/11/06_

## **VERIFICATION**

I, John Underwood, hereby state that I am employed by CSX Transportation, Inc.,

as Manager Supplemental Revenue and that the responses provided in the foregoing

discovery responses are true and correct to the best of my knowledge, information and

belief. This Verification is made subject to the penalties for perjury.

Dated: 1/10/2006

<u>Certificate of Service</u>

I, Charles L. Howard, hereby certify that on this 11th day of January, 2006, I

caused a true and correct copy of the foregoing verified **Plaintiff's Responses to**

**Interrogatories and Request for Production of Documents Directed to CSX**

**Transportation, Inc. (First Set)** to be sent via overnight courier to counsel for defendant

identified below:


Richard J. Parks, Esquire
MacDONALD, ILLIG, JONES & BRITTON
100 State Street, Suite 700
Erie, PA
16507-7754



Charles L. Howard

# EXHIBIT L

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO, EASTERN DIVISION**

In re: **NEXPAK CORPORATION**

Case No.: **04-63816**

## SCHEDULE B - PERSONAL PROPERTY
### EXHIBIT B27

| Asset Id | Description | Location | Net Book Value |
|---|---|---|---|
| 290 | MACHINERY & EQUIPMENT | NEXPAK - HACKENSACK PLANT, MERCURY<br>80 LEUNING STREET<br>SOUTH HACKENSACK, NJ 07606 | $468,000.00 |
| 301 | MACHINERY & EQUIPMENT<br>CONTROLLERS | NEXPAK - HACKENSACK PLANT, MERCURY<br>80 LEUNING STREET<br>SOUTH HACKENSACK, NJ 07606 | $12,450.00 |
| 318 | MACHINERY & EQUIPMENT<br>CONTROLLERS<br>ACCUMULATED DEPRECIATION | NEXPAK - HACKENSACK PLANT, MERCURY<br>80 LEUNING STREET<br>SOUTH HACKENSACK, NJ 07606 | ($12,365.42) |
| 307 | MACHINERY & EQUIPMENT<br>ACCUMULATED DEPRECIATION | NEXPAK - HACKENSACK PLANT, MERCURY<br>80 LEUNING STREET<br>SOUTH HACKENSACK, NJ 07606 | ($464,820.62) |
| 306 | MACHINERY & EQUIPMENT<br>ACCUMULATED DEPRECIATION | NEXPAK - HACKENSACK PLANT, MERCURY<br>80 LEUNING STREET<br>SOUTH HACKENSACK, NJ 07606 | ($854,516.79) |
| 288 | MACHINERY & EQUIPMENT | NEXPAK - TUCSON PLANT<br>6270 S. COUNTRY CLUB ROAD<br>TUCSON, AZ 85706 | $2,471,081.34 |
| 287 | MACHINERY & EQUIPMENT | NEXPAK - TUCSON PLANT<br>6270 S. COUNTRY CLUB ROAD<br>TUCSON, AZ 85706 | $2,323,631.40 |
| 300 | MACHINERY & EQUIPMENT<br>CONTROLLERS | NEXPAK - TUCSON PLANT<br>6270 S. COUNTRY CLUB ROAD<br>TUCSON, AZ 85706 | $15,561.12 |
| 317 | MACHINERY & EQUIPMENT<br>CONTROLLERS<br>ACCUMULATED DEPRECIATION | NEXPAK - TUCSON PLANT<br>6270 S. COUNTRY CLUB ROAD<br>TUCSON, AZ 85706 | ($15,561.12) |
| 304 | MACHINERY & EQUIPMENT<br>ACCUMULATED DEPRECIATION | NEXPAK - TUCSON PLANT<br>6270 S. COUNTRY CLUB ROAD<br>TUCSON, AZ 85706 | ($1,625,165.74) |
| 305 | MACHINERY & EQUIPMENT<br>ACCUMULATED DEPRECIATION | NEXPAK - TUCSON PLANT<br>6270 S. COUNTRY CLUB ROAD<br>TUCSON, AZ 85706 | ($2,385,918.46) |
| 279 | MACHINERY & EQUIPMENT<br>MOLDS & DIES<br>ACCUMULATED DEPRECIATION | NEXPAK - TUCSON PLANT<br>6270 S. COUNTRY CLUB ROAD<br>TUCSON, AZ 85706 | ($3,179,955.69) |
| 273 | MACHINERY & EQUIPMENT<br>MOLDS & DIES | PORT ERIE PLASTICS<br>909 TROUPE ROAD<br>HARBOR CREEK, PA 16421 | $7,402,296.37 |
| 291 | MACHINERY & EQUIPMENT | PORT ERIE PLASTICS<br>909 TROUPE ROAD<br>HARBOR CREEK, PA 16421 | $5,087,258.81 |
| 292 | MACHINERY & EQUIPMENT | PORT ERIE PLASTICS<br>909 TROUPE ROAD<br>HARBOR CREEK, PA 16421 | $1,595,894.65 |

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO, EASTERN DIVISION**

In re:  **NEXPAK CORPORATION**                                                                     Case No.: **04-63816**

**SCHEDULE B - PERSONAL PROPERTY**
**EXHIBIT  B27**

| Asset Id | Description | Location | Net Book Value |
|---|---|---|---|
| 309 | MACHINERY & EQUIPMENT<br>ACCUMULATED DEPRECIATION | PORT ERIE PLASTICS<br>909 TROUPE ROAD<br>HARBOR CREEK, PA  16421 | ($1,284,133.99) |
| 308 | MACHINERY & EQUIPMENT<br>ACCUMULATED DEPRECIATION | PORT ERIE PLASTICS<br>909 TROUPE ROAD<br>HARBOR CREEK, PA  16421 | ($2,911,127.75) |
| 280 | MACHINERY & EQUIPMENT<br>MOLDS & DIES<br>ACCUMULATED DEPRECIATION | PORT ERIE PLASTICS<br>909 TROUPE ROAD<br>HARBOR CREEK, PA  16421 | ($5,817,678.88) |
| | | **TOTAL:** | $20,008,738.91 |

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

Page 7 of 84

In re: NEXPAK CORPORATION

Case No.:  04-63816

## SCHEDULE F - CREDITORS HOLDING UNSECURED NON-PRIORITY CLAIMS

| Creditor's Name and Mailing Address Including Zip Code | Date claim was incurred and consideration for claim.  If claim is subject to setoff, so state. | Contingent | Unliquidated | Disputed | Co-Debt | Amount of Claim |
|---|---|---|---|---|---|---|
| **Sub Schedule:   ACCOUNTS PAYABLE** | | | | | | |
| BELLSOUTH COMMUNICATION SERVICES ATTN: 8008581719 285 INTERNATIONAL BLVD. ATLANTA GA 30313 Creditor: 1291 - 10  Vendor: BSOU | 07/18/2004 | | | | | $3,402.32 |
| BFI OF GEORGIA, INC ATTN: CANDACE LAWRENCE ATLANTA DISTRICT 3045 BANKHEAD HWY NW LOUISVILLE KY 40290-1487 Creditor: 12336 - 37  Vendor: BFIG | 07/18/2004 | | | | | $1,942.66 |
| BHI PARTS, INC. ATTN: DEBBIE OLMSTEAD SUITE B-2 6825 SHELOH ROAD EAST ALPHARETTA GA 30005 Creditor: 12463 - 37  Vendor: BHIP | 07/18/2004 | | | | | $132.77 |
| BLACK, MCCUSKEY, SOUERS ATTN: TRACY SIRLOUIS 1000 UNIZAN PLAZA 220 MARKET AVE. SOUTH CANTON OH 44702 Creditor: 12357 - 37  Vendor: BLA1 | 07/18/2004 | | | | | $4,025.65 |
| BLAZE RECYCLING 1882 MITCHELL ROAD PO BOX 1824 NORCROSS GA 30071 Creditor: 12506 - 37  Vendor: BLAZ | 07/18/2004 | X | X | X | | $0.00 |
| BMS BURNS ATTN: HEATHER HAYHURST 1061 INDUSTRIAL PKWY. MEDINA OH 44256 Creditor: 12441 - 37  Vendor: BMSB | 07/18/2004 | | | | | $267.25 |
| BP ATTN: TRACY/ PAUL MORTON JR MAIL CODE CS-3 150 WEST WARRENVILLE NAPERVILLE IL 60563 Creditor: 12228 - 37  Vendor: AMO1 | 07/18/2004 | | | | | $1,763,573.01 |
| BRANSON ULTRASONICS CORP. ATTN: ARLEAN 10117 BRECKSVILLE RD. BRECKSVILLE OH 44141 Creditor: 12457 - 37  Vendor: BRA1 | 07/18/2004 | X | X | | | $169.10 |

PAGE TOTAL:          $1,773,512.76

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

In re : NEXPAK CORPORATION                          Case No.: 04-63816

## Schedule G - Executory Contracts and Unexpired Leases

| Name and Mailing Address of Other Parties to Lease or Contract | Description of Contract or Lease and Nature of Debtor's Interest, State Whether Lease is for Nonresidential Real Property. State Contract Number of any Government Contract. |
|---|---|
| **Sub Schedule** | **MISCELLANEOUS CONTRACTS** |
| BP AMOCO CHEMICALS COMPANY<br>ATTN: ROBERT RUSSELL<br>GEN SALES & TECHNICAL SERVICE MGR.<br>150 WEST WARRENVILLE ROAD - MC-H1<br>NAPERVILLE IL 60563<br>Creditor: 6118 | CONTRACT TYPE: SUPPLY AGREEMENT |
| BP AMOCO POLYMERS, INC.<br>4500 MCGINNIS FERRY ROAD<br>ALPHARETTA GA 30005-3914<br>Creditor: 6119 | CONTRACT TYPE: SUPPLY AGREEMENT |
| C.H. ROBINSON CO.<br>ATTN: ANGELA STANLEY, SALES MGR.<br>PO BOX 86<br>MINNEAPOLIS MN 55486-0805<br>Creditor: 6214 | CONTRACT TYPE: CUSTOMER PRICING AGREEMENT |
| CANON BUSINESS SOLUTIONS<br>NORTHEAST, INC.<br>ATTN: IRIS JOHNSON<br>GPO BOX 33198<br>NEWARK NJ 07188-0198<br>Creditor: 6490 | CONTRACT TYPE: FAX MAINTENANCE AGREEMENT<br>CANON 7000 DATED 08/15/01-08/14/02 |
| CANON BUSINESS SOLUTIONS<br>NORTHEAST, INC.<br>ATTN: IRIS JOHNSON<br>GPO BOX 33198<br>NEWARK NJ 07188-0198<br>Creditor: 6490 | CONTRACT TYPE: FAX MAINTENANCE AGREEMENT<br>SHARP 2040 - SERIAL #UBL 09934 DATED 03/16/02-03/16/03 |
| CAROLINA HANDLING, LLC.<br>ATTN: RICHARD STRATTON<br>CUSTOMER SUPPORT REP.<br>1955 MONTREAL ROAD<br>TUCKER GA 30084-5218<br>Creditor: 6430 | CONTRACT TYPE: COMPREHENSIVE FIXED PRICE MAINTENANCE<br>AGREEMENT - DATED: JANUARY 1, 2001 - DECEMBER 31, 2005<br>DATED: MAY 1, 2001 - APRIL 30, 2006 |
| CENTURY PLASTIC & ELECTRONIC CO.<br>ATTN: LU NAN<br>#12-1-401 CHUNXIAOYUAN, GUIHUACHENG<br>WENXIN ROAD<br>HANGZHOU CITY ZHEJIANG PROVINCE    CHINA<br>Creditor: 6138 | CONTRACT TYPE: MOLDER'S AGREEMENT, CONFIDENTIALITY AGREEMENT<br>AND NON-COMPETE AGREEMENT |

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

In re : **NEXPAK CORPORATION**

Case No.:  **04-63816**

## Schedule G - Executory Contracts and Unexpired Leases

| Name and Mailing Address of Other Parties to Lease or Contract | Description of Contract or Lease and Nature of Debtor's Interest, State Whether Lease is for Nonresidential Real Property. State Contract Number of any Government Contract. |
|---|---|
| **Sub Schedule** | **MISCELLANEOUS CONTRACTS** |
| PERFORMANCE SALES GROUP<br>ATTN: MIKE FLOROS<br>25108 MARGUERITE PKWY, STE. B, #203<br>MISSION VIEJO  CA  92692<br>Creditor: 6155 | CONTRACT TYPE: REPRESENTATIVE'S AGREEMENT |
| PHILLIPS PETROLEUM COMPANY<br>K-RESIN SB COPOLYMERS<br>PO BOX 58966<br>HOUSTON  TX  77258-8966<br>Creditor: 6132 | CONTRACT TYPE: SALES AGREEMENT |
| POM GROUP, THE<br>ATTN: BRIAN ZISKIE, VP BUS. DEVELOP<br>2350 PONTIAC ROAD<br>AUBURN HILLS  MI  48326<br>Creditor: 6143 | CONTRACT TYPE: CONFIDENTIALITY AGREEMENT |
| PORT ERIE PLASTICS<br>ATTN: JOHN T. JOHNSON, PRESIDENT<br>909 TROUPE ROAD<br>HARBORCREEK  PA  16421<br>Creditor: 6147 | CONTRACT TYPE: MOLDER'S AGREEMENT AND CONFIDENTIALITY AGREEMENT |
| PRINTING PLANT, THE<br>1330 TENNESSEE AVENUE<br>CINCINNATI  OH  45229-1041<br>Creditor: 6130 | CONTRACT TYPE: SUPPLY AGREEMENT |
| QUADRANT SOFTWARE<br>PO BOX 200<br>MANSFIELD  MA  02048<br>Creditor: 6314 | CONTRACT TYPE: MAINTENANCE AGREEMENT<br>FASTFAX |
| RAINES, CINDY<br>1841 ROYAL HARBOR DR<br>KNOXVILLE  TN  37922<br>Creditor: 13923 | CONTRACT TYPE: SERVICES AGREEMENT |

# EXHIBIT M

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **NEXPAK CORPORATION,** | : | **Jointly Administered** |
| **a Delaware corporation, et al.,** | : | **Case No. 04-63816** |
| | : | |
| Debtors. | : | **Judge Russ Kendig** |

**STIPULATION AND AGREED ORDER BETWEEN DEBTORS AND
DEBTORS IN POSSESSION AND PORT ERIE PLASTICS, INC.
RESOLVING CERTAIN CLAIMS AND RELATED MATTERS
AND CONTROVERSIES RELATING TO THE TERMINATION
OF THE PARTIES' CONTRACTUAL RELATIONSHIP**

### Recitals

A.    On July 18, 2004 (the "Petition Date"), the above captioned debtors and

debtors in possession (collectively, the "Debtors") commenced their respective reorganization

cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code,

11 U.S.C. §§ 101-1330 (the "Bankruptcy Code").  By an order entered on July 19, 2004, the

Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being

administered jointly.

B.    The Debtors are continuing in possession of their respective properties and

are operating and managing their businesses, as debtors in possession, pursuant to sections 1107

and 1108 of the Bankruptcy Code.

C.    Port Erie and Debtor NexPak Corporation ("NexPak") are parties to a

Molder's Agreement dated February 21, 2002 (the "Molder's Agreement").  Pursuant to the

Molder's Agreement, Port Erie currently maintains possession of various molds, injection

molding machines and other production equipment that is owned by NexPak (collectively, the

CLI-1231570v14

"NexPak Equipment"). The NexPak Equipment is used by Port Erie to manufacture certain products that are sold to NexPak for resale to customers of NexPak.

D.   Port Erie and NexPak are parties to a Confidentiality Agreement dated July 5, 2000 (the "Confidentiality Agreement"), pursuant to which, among other things, Port Erie agreed to keep confidential certain information disclosed to it by NexPak in the course of their business dealings.

E.   Port Erie and NexPak are parties to a series of agreements dated February 7, 2002, including, but not limited to, the following (collectively, as amended from time to time and together with other related purchase orders, agreements, understandings and courses of dealing, the "Production Agreement"): (a) two blanket purchase orders from NexPak to Port Erie dated February 7, 2002; (b) a document titled "February 7, 2002 Agreement NEXPAK & Port Erie Plastics;" and (c) the attachments thereto. Pursuant to the Production Agreement, NexPak agreed to purchase 533,000,000 DVD cases from Port Erie between February 7, 2002 and December 31, 2005 at certain agreed-upon prices, to be calculated pursuant to the pricing mechanisms set forth in the Production Agreement. Since the original execution of the Production Agreement, NexPak and Port Erie have agreed to amend the pricing provisions of the Production Agreement on a number of occasions. In addition, the Production Agreement provides that if NexPak does not purchase 533,000,000 DVD cases from Port Erie by December 31, 2005 (the "Minimum Amount"), NexPak is obligated to pay a cancellation charge to Port Erie equal to $0.0015 times the number generated by subtracting the number of DVD cases actually purchased by NexPak from the Minimum Amount (the "Minimum Quantity Payment").

-2-

F.       Through and including October 19, 2004, Port Erie has manufactured and

sold to NexPak 344,644,524 DVD cases under the terms of the Production Agreement. Because

NexPak desires to terminate the parties' relationship in favor of more cost-effective in-house

production, NexPak projects that it will not purchase the Minimum Amount of DVD cases from

Port Erie within the period required by the Production Agreement. As such, the Minimum

Quantity Payment ultimately would be payable to Port Erie. Based upon the number of DVD

cases purchased as of October 19, 2004, the Minimum Quantity Payment would be $282,533.21,

subject to reduction to the extent that additional DVD cases are purchased before the end of

2005.

G.       Port Erie and NexPak are parties to an Agreement for Purchase and Sale

of Equipment dated October 20, 2004 (the "Personal Property Sale Agreement"). Pursuant to the

Personal Property Sale Agreement, NexPak agreed to sell, and Port Erie agreed to purchase, six

Model SG150U-SYCAP MIIIA injection molding machines manufactured by Sumitomo Plastics

Machinery (the "Injection Molding Machines") for a total cash purchase price of $54,000. On

October 20, 2004, the Debtors filed a motion seeking approval of the Personal Property Sale

Agreement (D.I. 278) (the "Sale Motion"). A copy of the Personal Property Sale Agreement is

attached to the Sale Motion as Exhibit A thereto. The Sale Motion currently is scheduled to be

heard by the Court on November 9, 2004.

H.       Other than the Production Agreement, the Confidentiality Agreement, the

Molder's Agreement and the Personal Property Sale Agreement, there are no agreements

between Port Erie and any of the Debtors as of the date of this Stipulation and Agreed Order.

I.       On September 8, 2004, Port Erie filed proof of claim number 2105 as a

secured claim against NexPak's chapter 11 estate, asserting a claim in an unliquidated amount for

the Minimum Quantity Payment and any other damages that might arise from the Debtors' breach of the Production Agreement (the "Minimum Quantity Claim"). By the Minimum Quantity Claim, Port Erie asserts a security interest in the personal property owned by NexPak that presently is in the possession of Port Erie, including the NexPak Equipment, pursuant to the Commonwealth of Pennsylvania's Die, Mold and Form Forfeiture Act, 73 Pa. Stat. Ann. § 1880.1, et seq. (collectively, the "Collateral").

J.    In the ordinary course of business, pursuant to the Production Agreement, Port Erie purchases certain raw materials from NexPak or one of NexPak's suppliers, which Port Erie in turn utilizes in the manufacture of DVD cases to NexPak's specifications. In the ordinary course of business, Port Erie and NexPak regularly have setoff amounts owed by Port Erie to NexPak for such purchases against amounts owed by NexPak to Port Erie. Shortly after the Petition Date, Port Erie advised NexPak that it would not permit such ordinary course setoffs, including for certain goods delivered to Port Erie by NexPak or its suppliers in the weeks preceding the Petition Date, in the aggregate amount of $328,065.99 (the "July NexPak Raw Material Claims"). In addition to the July NexPak Raw Material Claim, NexPak, from time to time, holds claims against Port Erie for other raw materials delivered from NexPak or its suppliers to Port Erie (the "Additional NexPak Raw Material Claims" and, together with the July NexPak Raw Material Claims, the "NexPak Raw Material Claims"). As of October 19, 2004, the amount of the Additional NexPak Raw Materials Claims was $122,004.37.

K.    Since the Petition Date, NexPak has paid Port Erie in advance for any goods purchased under the Production Agreement and intends to continue to do so after the Stipulation Date (as such term is defined in paragraph 1 below), in accordance with the terms and conditions of the Stipulation and Agreed Order. Accordingly, NexPak may, from time to

-4-

time, possess claims against Port Erie in the amount of such prepayments (the "Prepaid Goods Claims"). As of October 19, 2004, the amount of the outstanding Prepaid Goods Claims was $84,326.22. The amount of the Prepaid Goods Claims decreases as Port Erie transfers title to NexPak for such prepaid goods and increase as NexPak prepays for goods in the ordinary course of business.

L.    As of September 24, 2004, Port Erie maintained possession of various spare parts and other supplies that are utilized in connection with the manufacturing of DVD cases pursuant to the Production Agreement (collectively, the "Spare Parts and Materials"). An itemization of the Spare Parts and Materials is set forth in the purchase order attached hereto as Exhibit A (the "Spare Parts and Materials Purchase Order"). In addition, as of October 19, 2004, Port Erie held certain production materials, raw materials and accessories (other than the Spare Parts and Materials), utilized in connection with the manufacturing of DVD cases pursuant to the Production Agreement, as set forth on the Schedule attached hereto as Exhibit B (collectively, the "October 19, 2004 Production Materials"). The October 19, 2004 Production Materials have an aggregate value of $265,343.81, with the value of particular materials itemized on the attached Exhibit B. From and after October 19, 2004, Port Erie has been required to purchase additional materials (the "Subsequent Production Materials") to fulfill its obligations to NexPak under the Production Agreement.

M.    As of the close of business on October 19, 2004, Port Erie was in possession of 1,259,312 finished DVD cases that had been manufactured at the request of NexPak, but that had not yet been purchased from Port Erie by NexPak (the "October 19, 2004 Port Erie Inventory"). In addition, since October 19, 2004, Port Erie has manufactured or finished additional DVD cases at the request of NexPak pursuant to the Production Agreement

(the "Subsequent Port Erie Inventory"). Further, Port Erie was in possession of a number of DVD cases that had been manufactured at the request of NexPak and for which NexPak has paid Port Erie (the "NexPak Inventory") and remain subject only to the warehouse storage charges due to Port Erie at the time of their removal, consistent with the parties' past practices (the "Warehouse Storage Charges"). The Warehouse Storage Charges owed by NexPak to Port Erie as of September 30, 2004 was $7,430.92.

N.    As of October 19, 2004, NexPak did not owe Port Erie any amounts for goods manufactured by Port Erie that have been either (a) shipped to customers of NexPak since the Petition Date; or (b) constitute NexPak Inventory.

O.    CSX Transportation ("CSX") has advised Port Erie that Port Erie is liable for certain demurrage charges (the "CSX Charges"), which allegedly result from the extended use of railway assets in connection with the delivery of raw materials to Port Erie from NexPak's suppliers. The asserted amount of the CSX Charges currently is $115,560. Port Erie and NexPak each deny liability for the CSX Charges.

P.    The Debtors and Port Erie wish to fully resolve the Minimum Quantity Claim and the NexPak Raw Material Claims, terminate the Production Agreement, complete the sale of the Spare Parts and Materials and certain October 19, 2004 Production Materials to NexPak, provide for the removal of the NexPak Equipment, provide for Port Erie's future production of goods for NexPak, provide for the winding down of the parties' obligations under the Molder's Agreement and resolve certain related matters, including the respective financial liabilities between the parties, all upon the terms and subject to the conditions set forth herein.

Q.    On November 8, 2004, the Debtors will file a motion to approve this Stipulation and Agreed Order (the "Motion"). The Court has jurisdiction over the Motion

-6-

CLI-1231570v14

pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2).

<u>**Stipulation and Agreed Order**</u>

In light of the factual recitals set forth above, the parties hereto, through their

undersigned counsel, stipulate and agree as follows:

1.    The Production Agreement is hereby terminated effective as of the date

this Stipulation and Agreed Order is signed by both of the parties (<u>i.e.</u>, November 5, 2004) (the

"Stipulation Date"), subject to the terms and conditions set forth herein.  As of the Stipulation

Date, the relationship between the Debtors and Port Erie shall be governed solely by the terms

set forth herein, which shall be enforceable by and against the parties.  NexPak and Port Erie

shall have no other or further obligations under the Production Agreement.

2.    Notwithstanding the termination of the Production Agreement, through

January 31, 2005, Port Erie shall make itself available to manufacture DVD cases for NexPak, at

the request of NexPak (<u>i.e.</u>, DVD cases in addition to the October 19, 2004 Port Erie Inventory)

on the terms and conditions set forth herein.  From November 30, 2004 through January 31,

2005, upon issuance and acceptance of a purchase order from NexPak to Port Erie requesting the

manufacture of DVD cases by Port Erie for sale to NexPak (a "Future Purchase Order"), Port

Erie shall fulfill the requirements of such accepted Future Purchase Orders.  Nothing herein shall

be construed to obligate NexPak to issue Future Purchase Orders or otherwise seek to utilize Port

Erie for manufacturing purposes at any time from and after the date of this Stipulation and

Agreed Order, nor shall Port Erie be required to manufacture DVD cases under any purchase

order whatsoever after January 31, 2005.

3.    Upon the issuance of a Future Purchase Order:  (a) for goods that have

been or are shipped to NexPak or a customer of NexPak from October 19, 2004 through

-7-

November 28, 2004, the transaction terms and price to be paid by NexPak to Port Erie shall be the terms and prices in effect as of October 19, 2004 under the terms of the Production Agreement (collectively, the "Production Agreement Price"); and (b) for goods that are shipped to NexPak or a customer of NexPak from November 29, 2004 and thereafter, the price to be paid by NexPak to Port Erie shall be the Production Agreement Price less $0.0015 per unit; provided, however, that Port Erie and NexPak shall agree upon appropriate adjustments to the price paid from November 29, 2004 through January 31, 2005 to account for any increases or decreases in the cost of raw materials. Notwithstanding the above, Port Erie and NexPak agree that the labor costs and press rates in effect as of October 19, 2004 shall continue in effect through January 31, 2005. Furthermore, the prices in effect after October 19, 2004 shall continue to be inclusive of the $0.002 per unit equipment maintenance charge. Accordingly, Port Erie shall continue to be responsible for normal maintenance on the NexPak Equipment up to $10,000 per item. The term "shipped," in this paragraph 3 and in paragraph 10 below, shall include transactions in which no goods are physically moved but for which NexPak obtains ownership of the goods that remain located at Port Erie's facility. From and after the Stipulation Date, payment terms for Future Purchase Orders shall be payment upon delivery, either by cash or by setoff.

4.    NexPak agrees that it will purchase a sufficient amount of the October 19, 2004 Port Erie Inventory from Port Erie on an ongoing basis such that the amount of October 19, 2004 Port Erie Inventory at the end of a given calendar week shall be equal to or less than the amount set forth on the schedule attached hereto as Exhibit C. No later than January 1, 2005, NexPak shall have purchased all of the October 19, 2004 Port Erie Inventory from Port Erie. No later than the date that is 30 days after the date that Port Erie ceases manufacturing DVD cases for NexPak (the "Production Termination Date"), NexPak shall purchase all Subsequent Port

-8-

Erie Inventory from Port Erie. The prices to be paid by NexPak to Port Erie on account of the October 19, 2004 Port Erie Inventory and the Subsequent Port Erie Inventory shall be governed by paragraph 3 above.

       5.     Until the Production Termination Date, Port Erie shall be required to store the NexPak Inventory and the Subsequent Port Erie Inventory in space not to exceed 2,000 square feet, and NexPak shall pay Warehouse Storage Charges for space utilized in excess of that amount at a rate no greater than $4 per square foot per annum. From and after the Production Termination Date, NexPak and Port Erie shall be free to agree, in the ordinary course of NexPak's business, to have Port Erie store NexPak Inventory at an agreed-upon cost.

       6.     If Port Erie is required to pay any amounts to CSX on account of the CSX Charges pursuant to a settlement, judgment from a court of competent jurisdiction or otherwise, then Port Erie shall immediately forward proof of such payment to NexPak. Within 10 business days of receipt of proof of such payment from Port Erie, NexPak shall reimburse Port Erie for 25% of the amount of the CSX Charges paid by Port Erie to CSX. The amount payable by NexPak to Port Erie pursuant to this paragraph 6 shall be capped at, and shall not exceed, $29,000.

       7.     NexPak agrees to purchase the Spare Parts and Materials from Port Erie for an aggregate purchase price of $73,934.10. The purchase and sale of the Spare Parts and Materials shall be consummated pursuant to the Spare Parts and Materials Purchase Order, and such sale shall be consummated within 30 days after the entry of this Stipulation and Agreed Order.

       8.     Port Erie and NexPak recognize that Port Erie will purchase Subsequent Production Materials from and after October 19, 2004. NexPak agrees that, within 30 days of

CLI-1231570v14

the Production Termination Date, NexPak will, in the ordinary course of its business, purchase any remaining October 19, 2004 Production Materials from Port Erie at cost, provided that the materials in question are not damaged and otherwise meet NexPak's production specifications. In addition, within 30 days of the Production Termination Date, NexPak will, in the ordinary course of its business, purchase any Subsequent Production Materials, but only if: (a) a specified NexPak employee (who shall be John Kirkham or Kevin Kirtz or any other party expressly designated by NexPak in writing) has signed the purchase order pursuant to which the Subsequent Production Materials in question were purchased by Port Erie; (b) the Subsequent Production Materials were purchased by Port Erie from or after October 19, 2004; and (c) the Subsequent Production Materials in question are not damaged and otherwise meet NexPak's production specifications. Port Erie shall have the responsibility to establish that the above conditions have been satisfied before it may require NexPak to purchase October 19, 2004 Production Materials or Subsequent Production Materials.

9. On or after the Stipulation Date, NexPak shall be permitted to setoff $50,000 of the July NexPak Raw Material Claim against any amounts due and owing Port Erie. On or after December 1, 2004, NexPak shall be authorized to setoff $125,000 of the July NexPak Raw Material Claim against amounts due and owing to Port Erie. On December 15, 2004, NexPak shall be authorized to setoff $100,000 of the July NexPak Raw Material Claim against amounts due and owing to Port Erie. On December 30, 2004, NexPak shall be authorized to setoff the remainder of the July NexPak Raw Material Claim against any amounts due and owing to Port Erie. In addition, from and after the Stipulation Date, NexPak, in the ordinary course of its business, shall continue to be permitted to setoff immediately Additional NexPak Raw Materials Claims against amounts owed to Port Erie. Nothing set forth herein shall prevent or

CLI-1231570v14

limit NexPak from asserting and collecting from Port Erie valid NexPak Raw Material Claims, or from setting off such amounts against amounts payable by NexPak to Port Erie in accordance with this paragraph 9. Relief from the automatic stay under section 362 of the Bankruptcy Code is hereby granted to the extent necessary to permit the setoffs described in this paragraph 9, and all such setoffs are hereby authorized pursuant to section 553 of the Bankruptcy Code and under other applicable law.

10.     The Minimum Quantity Claim shall be reduced and allowed as a secured claim in an amount to be calculated pursuant to this paragraph 10. Specifically, the amount of the Minimum Quantity Claim shall be equal to $282,533.21 less the dollar amount derived by multiplying $0.0015 by the number of DVD cases shipped by Port Erie to NexPak or to a customer of NexPak from October 20, 2004 through November 29, 2004. The Minimum Quantity Claim shall be satisfied in accordance with paragraph 12 below.

11.     Notwithstanding anything to the contrary in this Stipulation and Agreed Order, the Molder's Agreement or nonbankruptcy law, NexPak shall be permitted, upon payment of disconnect charges that are consistent with the parties' past practice, to remove the NexPak Equipment from Port Erie's possession in accordance with the schedule attached hereto as Exhibit D (the "NexPak Equipment Removal Schedule"). NexPak or a third party engaged by NexPak (that is bonded and insured to the reasonable satisfaction of Port Erie) shall be permitted to enter Port Erie's facility to uninstall and remove the NexPak Equipment. By January 15, 2005, Port Erie shall permit NexPak to remove all of the NexPak Equipment in accordance with the NexPak Equipment Removal Schedule. NexPak may remove the NexPak Equipment later than provided under the NexPak Equipment Removal Schedule; provided, however, that (a) all of the NexPak Equipment shall be removed by NexPak no later than June 30, 2005; and (b) to the

-11-

extent that NexPak Equipment is stored from and after January 15, 2005, Port Erie may assert, and NexPak will pay, Warehouse Storage Charges for such equipment at a rate no greater than $4 per square foot per annum.  The earlier of the date that the last piece of NexPak Equipment is removed, or June 30, 2005, shall be defined as the "NexPak Equipment Removal Date."

      12.    As a form of adequate protection pursuant to sections 361 and 363(e) of the Bankruptcy Code to protect Port Erie's interest in light of the planned removal of the NexPak Equipment, which serves as collateral securing Port Erie's secured claim, pursuant to the NexPak Equipment Removal Schedule and otherwise in complete satisfaction of the secured Minimum Quantity Claim, NexPak shall make payments to Port Erie as follows:  (a) on December 1, 2004, NexPak shall pay $100,000 to Port Erie by wire transfer or by setoff; (b) on December 15, 2004, NexPak shall pay $100,000 to Port Erie by wire transfer or by setoff; (c) on December 30, 2004, NexPak shall pay the balance of the Minimum Quantity Claim to Port Erie by wire transfer or setoff.

      13.    Within ten days after payment of the Final Minimum Quantity Payment, Port Erie shall execute, file and record release documents and take such other steps as are reasonably necessary or appropriate to release and discharge any and all liens, claims or interests that Port Erie has in any and all property owned by the Debtors, wherever located.  Port Erie shall promptly provide copies of such release documents to the Debtors.

      14.    From and after the Stipulation Date, NexPak shall have no other or further obligations under the Molder's Agreement.  Port Erie's obligations under the Molder's Agreement shall remain in full force and effect until the NexPak Equipment Removal Date, notwithstanding the parties' execution of this Stipulation and Agreed Order.

-12-

15.    The Confidentiality Agreement shall remain in full force and effect and shall survive the execution of this Stipulation and Agreed Order.

16.    Port Erie shall have no other allowed claims of any type or classification, whether secured, unsecured or otherwise, in the Debtors' chapter 11 cases, except for the following claims arising or payments to be made under the terms and conditions set forth above (collectively, the "Port Erie Retained Claims"):  (a) payments to be made pursuant to a Future Purchase Order; (b) the Minimum Quantity Payment (as reduced and allowed herein); (c) claims under the Personal Property Purchase Agreement; (d) payments to be made under the Spare Parts and Materials Purchase Order; (e) payments to be made for the purchase of October 19, 2004 Port Erie Inventory and Subsequent Port Erie Inventory; (f) Warehouse Storage Charges; and (g) the reimbursement obligations of NexPak to Port Erie as specifically set forth in paragraph 6 above.

17.    Port Erie agrees that, other than the Port Erie Retained Claims, any and all claims, actions, causes of action, suits, damages, demands, losses, claims for attorneys' fees, liabilities and expenses of any and every nature whatsoever that it may have or assert against any of the Debtors, the Debtors' chapter 11 estates or any of their respective affiliates, subsidiaries, predecessors, successors, employees, agents, attorneys, directors, officers, stockholders, personal representatives and assigns (collectively, the "Covered Parties"), whether known or unknown, existing or occurring at any time before the Stipulation Date, including, but not limited to, any claims or causes of action relating to or arising from the Production Agreement or the Molder's Agreement, any proofs of claim that have heretofore been filed and any claims asserting an entitlement to interest, late charges, attorneys' fees or other charges that otherwise might be payable pursuant to section 506 of the Bankruptcy Code, are hereby waived, discharged and

-13-

released as to the Covered Parties.  Port Erie further agrees not to commence a lawsuit or other

proceeding against or sue the Covered Parties in this Court or any other forum for any claims or

causes of action released by this paragraph 17, other than to enforce its rights under this

Stipulation and Agreed Order.

18.    Further, Port Erie shall not assert any further or additional claims for

prepetition or postpetition liability in these chapter 11 cases.  Any additional proofs of claim or

requests for payment of administrative expense filed by Port Erie in these chapter 11 cases shall

be deemed disallowed in their entirety and expunged in all respects pursuant to section 502 of the

Bankruptcy Code without further action by the parties or the Court.

19.    Port Erie represents and warrants that:  (a) it is the only party presently

entitled to payment from NexPak on account of any of the Port Erie Retained Claims; (b) it is

authorized to provide the release set forth in paragraph 17 above; and (c) it has not assigned or

transferred or purported to assign or transfer voluntarily, involuntarily or by operation of law,

any claim addressed in this Stipulation and Agreed Order, or any part or portion thereof.  Port

Erie hereby agrees to indemnify, defend and hold the Covered Parties harmless from and against

any and all costs, damages and losses suffered or incurred by any Covered Party arising from a

breach of its representations and warranties set forth in this paragraph 19.

20.    NexPak shall retain its rights to assert claims against Port Erie

(collectively, the "NexPak Retained Claims"):  (a) relating to or arising from the manufacture of

defective or improper merchandise by Port Erie, or any breach of any warranty in existence

under the agreements of the parties or under applicable state or federal law, but only (i) with

respect to the Amaray pages that presently reside at DADC that are subject to investigation or for

any other goods manufactured by Port Erie under the Production Agreement from and after

-14-

August 1, 2004 and (ii) to the extent that NexPak notifies Port Erie in writing of its intent to assert a claim of this nature by March 31, 2005; (b) arising from any past or future breach of the Personal Property Sale Agreement, the Molder's Agreement or Confidentiality Agreement, including any costs of repairs to the NexPak Equipment; (c) for any NexPak Raw Material Claims, including the July NexPak Raw Material Claims and the Additional NexPak Raw Material Claims; (d) any Prepaid Goods Claims for prepayments made after October 19, 2004; (e) with respect to NexPak's ownership of the NexPak Inventory; (f) with respect to any rights granted to or retained by NexPak under this Stipulation and Agreed Order, including claims relating to a breach by Port Erie of its obligations under this Stipulation and Agreed Order; and (g) any claims arising from damage to the NexPak Equipment; provided, however, that for each piece of NexPak Equipment, Port Erie shall have no responsibility for any damages from and after the time that the piece of equipment is transferred to NexPak or its agents, including shippers. NexPak agrees that, other than the NexPak Retained Claims, NexPak shall not assert any further or additional claims against Port Erie in existence as of the Stipulation Date. Furthermore, NexPak hereby releases Port Erie of all claims other than the NexPak Retained Claims and claims first arising on or after the Stipulation Date.

21.    To the extent that the terms of this Stipulation and Agreed Order conflict with the terms of Sections 3.2, 3.3 or 3.4 of the Personal Property Sale Agreement, the terms of this Stipulation and Agreed Order shall apply.

22.    The Debtors, the Debtors' claims and noticing agent, Logan & Company, Inc., and the Clerk of this Court are authorized to take all actions necessary or appropriate to give effect to this Stipulation and Agreed Order.

CLI-1231570v14

23.    This Stipulation and Agreed Order shall not be modified, altered, amended or vacated without the prior written consent of all parties hereto.  No statement made or action taken in the negotiation of this Stipulation and Agreed Order may be used by any party for any purpose whatsoever.

24.    This Stipulation and Agreed Order is the entire agreement between the parties in respect of the subject matter hereof, and may be signed in counterpart originals.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

CLI-1231570v14

25.    This Stipulation and Agreed Order shall be binding upon the parties hereto prior to its being "So Ordered."

Dated:  November ___ 8, 2004                    Dated:  November___, 2004


_____          _____
Richard J. Parks, Esq.                              Ryan T. Routh (OH 0071786)
MacDonald, Illig, Jones & Britton LLP      rrouth@jonesday.com
100 State Street, Suite 700                         Shana F. Klein (OH 0074330)
Erie, Pennsylvania  16507-1459               sfklein@jonesday.com
Telephone:  (814) 870-7600                      JONES DAY
Facsimile:  (814) 454-4647                        North Point
                                                                      901 Lakeside Avenue
ATTORNEYS FOR PORT ERIE             Cleveland, Ohio  44114
PLASTICS, INC.                                       Telephone:  (216) 586-3939
                                                                      Facsimile:  (216) 579-0212

                                                                      Jeffrey B. Ellman (OH 0055558)
                                                                      jbellman@jonesday.com
                                                                      JONES DAY
                                                                      1420 Peachtree Street, N.E.
                                                                      Suite 800
                                                                      Atlanta, Georgia  30309-3053
                                                                      Telephone:  (404) 521-3939
                                                                      Facsimile:  (404) 581-8330

                                                                      ATTORNEYS FOR DEBTORS AND
                                                                      DEBTORS IN POSSESSION


SO ORDERED this _____ day of _____, 2004.


_____
UNITED STATES BANKRUPTCY JUDGE

-17-

CLI-1231570v14

# EXHIBIT A

## Spare Parts and Materials Purchase Order

## EXHIBIT B

## Schedule of October 19, 2004 Production Materials

| Description | UOM | Std Cost | On Hand | Total Cost |
|---|---|---|---|---|
| KV0035 NEXPAGE 100 CT MASTER CTN | EACH | $0.160000 | 150.00 | 24.00 |
| 220486 DVD PAGES | EACH | $0.370000 | 1,479.00 | 547.23 |
| 220029 DVD PAGE PAD | EACH | $0.080000 | 1,500.00 | 120.00 |
| PV0442 3" x 3" x .200 x 43.125" | EACH | $0.421180 | 20,682.42 | 8,711.02 |
| PV0420 46-3/8 x 38-1/2 x 7 NEW STYL | EACH | $1.560000 | 6,543.65 | 10,208.09 |
| PV0810 10" SHRINK BUNDLING FILM | LBS | $0.990000 | 7,982.49 | 7,902.67 |
| PV0229 POLY BAG | EACH | $0.060500 | 3,515.00 | 212.66 |
| 201113 DVD 100 MICRON FILM 7.25" | LBS | $0.820000 | 38,068.42 | 31,216.10 |
| PALLET 230008 48" x 42" 4-WAY RED | EACH | $7.990000 | 672.76 | 5,375.35 |
| | | | | **$64,317.13** |
| | | | | |
| RM0093 & RM0097  65/35 BLEND | LBS | $0.580000 | 5,000.00 | 2,900.00 |
| RM0093 AMOCO 8941X | LBS | $0.580000 | 87,173.24 | 50,560.48 |
| RM0097 AMOCO 8931X | LBS | $0.580000 | 217,207.43 | 125,980.31 |
| MIPS & MIXED CRYSTL REGRIND 200005 | LBS | $0.427500 | 5,485.00 | 2,344.84 |
| MIXED CRYSTAL REGRIND  RM0002 | LBS | $0.000000 | 80,000.00 | 0.00 |
| MIXED HIPS REGRIND | LBS | $0.000000 | 7,855.00 | 0.00 |
| 82-1283-1 DVD GRAY .4%  CL0504 | LBS | $1.500000 | 8,097.67 | 12,146.51 |
| 82-1466-1DVD GRY.5% FOR MIPS CL0514 | LBS | $1.950000 | 699.00 | 1,363.05 |
| 84-1813-1MIRCOSOFT GREEN.23% CL0511 | LBS | $11.400000 | 385.00 | 4,389.00 |
| 81-1136-2 DVD WHT .9% LIQUID C00231 | LBS | $1.500000 | 895.00 | 1,342.50 |
| | | | | **$201,026.68** |
| | | | | |
| | | | | **$265,343.81** |





EXHIBIT C

Inventory - Equip. Move - PEP

CLI-1231570v14

## EXHIBIT D

## Equipment Removal Schedule

| DATE | EQUIPMENT | DESCRIPTION |
|---|---|---|
| 10/27/2004 | W633-5316 to Wittmann | 1 robot |
| 10/28/2004 | Press 78 | Synergy 4200 |
| 11/10/2004 | 877 | Sealer |
| 11/15/2004 | V315-2, V315-3, V315-5, V315-6, V370-1, V370-2 | (6) Amaray Page molds |
| 11/15/2004 | V438, V438-2, V438-3, V438-5, V438-6, V438-7, V438-9, V438-10, V438-15 | (9) Nexcase Molds |
| 11/16/2004 | Press 79 | Synergy 4200 |
| 11/19/2004 | Page End-Of-Arm Tooling set 1, 2, 3 | (3) End-arm robotic fixtures |
| 11/27/2004 | Press 81 | HP-3500 |
| 12/1/2004 | Wittmann robot #2 and #3 | (2) Wittmann robots |
| 12/6/2004 | 6M, 15M, 16M, 884, 884 | (3) Manner molds, (2) sealers |
| 12/27/2004 | 877,888 | (2) Sealers, bundler |
| 12/28/2004 | 877 | Sealer |
| 1/15/2004 | V249, V248, V250, V247 | (4) Accurate Molds |
| 1/15/2004 | V468-1 | Nexlok mold |
| 1/15/2004 | V403, V403-2, V403-3, V403-4 | (4) Nexpage molds |
| 1/15/2004 | 510 | Manner mold |
| 1/15/2004 | Wittmann robots #4, 5 and 6. | (3) Wittmann Robots |
| 1/15/2004 | Presses 66, 72, 73, 74, 75, 80 | (6) HP3000 |
| 1/15/2004 | Blender | 4 station ConAir Blender |