IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CSX TRANSPORTATION, INC. | ) | CIVIL ACTION |
| 500 Water Street | ) | |
| Jacksonville, FL  32202-4423 | ) | |
|             Plaintiff | ) | |
| | ) | |
|   v. | ) | CASE NO.:  05-139 Erie |
| | ) | |
| PORT ERIE PLASTICS, INC. | ) | |
| 909 Troupe Road | ) | |
| Harborcreek, PA  16421 | ) | RELATED DOCUMENT NO. 17 |
| | ) | |
|             Defendant | ) | ELECTRONICALLY FILED |

**DEFENDANT PORT ERIE'S BRIEF IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

**I.   QUESTION PRESENTED**

MUST THIS HONORABLE COURT GRANT SUMMARY JUDGMENT IN FAVOR OF DEFENDANT PORT ERIE, DENYING PLAINTIFF CSX'S CLAIM OF DEMURRAGE CHARGES, WHERE PORT ERIE PROFFERS UNREFUTED EVIDENCE THAT IT WAS NEITHER A PARTY TO THE TRANSPORTATION CONTRACT GOVERNING THE SUBJECT RAIL SHIPMENT OF RESIN, NOR CONSIGNEE OR OWNER OF THE RESIN?

**II.   BRIEF ANSWER**

YES.

    A.   PORT ERIE MUST PREVAIL WHERE, EVEN GRANTING EVERY REASONABLE INFERENCE IN FAVOR OF THE NONMOVING PARTY, CSX HAS FAILED TO PRODUCE ANY EVIDENCE TO RAISE A QUESTION OF MATERIAL FACT THAT DEFENDANT PORT ERIE WAS A PARTY TO ANY CONTRACT WITH CSX WITH REGARD TO THE DEMURRAGE FEES.

    B.    PORT ERIE MUST PREVAIL WHERE CSX FAILED TO PROVIDE NOTICE OF CONSTRUCTIVE PLACEMENT, VIOLATING THE TARIFF AND INVALIDATING ANY DEMURRAGE FEES ASSESSED TO PORT ERIE.

    C.    PORT ERIE MUST PREVAIL WHERE A PRINCIPAL TO THE TRANSPORTATION CONTRACT IS UNAMBIGUOUSLY DESIGNATED AS RESPONSIBLE FOR SHIPPING FEES.

## III. BACKGROUND

This case arises from "demurrage" charges erroneously assessed by plaintiff, CSX Transportation Inc. ("CSX") to defendant, Port Erie Plastics, Inc. ("Port Erie").[1] CSX filed the instant lawsuit by Complaint on May 10, 2005. CSX filed an amended Complaint on August 29, 2005. Port Erie is not liable to CSX because it did not have a business relationship with CSX. CSX, nonetheless, has attempted to create liability based solely on the fact that Port Erie and CSX simultaneously did business with (now bankrupt) NexPak Corporation ("NexPak"). This, therefore, necessitates a brief background discussion of the nature of the business transacted between Port Erie and NexPak.

Port Erie is an injection molded plastics company that manufactures a wide variety of plastic products at its Harborcreek, Pennsylvania facility. At all times relevant to the instant lawsuit, Port Erie was doing business with NexPak, a company that sells custom cases for, among other items, digital video discs (DVDs). Throughout the duration of this business relationship, Port Erie molded DVD cases for NexPak. On July 13, 2000, Port Erie and NexPak

---

[1] "Demurrage" is a charge exacted by a carrier from a shipper or consignee on account of a failure to load or unload cars within the specified time prescribed by applicable tariffs. <u>Union Pacific Railroad Co. v. Ametek, Inc.</u>, 104 F.3d 558, n. 2 (3d Cir. 1997). (Also, Ex. H, p. 11.) Such charges are authorized by federal statute. "Rail carrier providing transportation subject to the jurisdiction of the Board under this part shall compute demurrage charges, and establish rules related to those charges, in a way that fulfills the national needs related to: (1) freight car use and distribution; and (2) maintenance of an adequate supply of freight cars to be available for transportation of property. 49 U.S.C.A. § 10746.

entered into an agreement concerning the raw material polymer (plastic resin) needed to mold the cases. This agreement was memorialized in a jointly signed letter dated July 13, 2000. ("July, 2000 Agreement.")(Ex. A, Ex. C.)

By the terms of the July, 2000 Agreement, NexPak would supply the plastic resin to Port Erie to enable Port Erie to manufacture cases ordered by NexPak. Specifically, under this agreement, NexPak retained ownership of the bulk plastic resin throughout its transport and storage. The agreement stated that:

> [Port Erie] will be operating with the understanding that ownership of the resin will not transfer to Port Erie until the material is delivered to our facility in Harborcreek, PA. Therefore, ownership and all risk of loss will remain with NexPak, and or the shipping companies, while the resin is in transit or in storage. . . . .

(Ex. C.)

In February of 2002, NexPak sent two "blanket" purchase orders to Port Erie for the manufacture of DVD cases.[2] (Ex. A; Ex. D.) The President of Port Erie has declared in a sworn statement that the July, 2000 Agreement regarding the inventory system for raw materials was effective with regard to these purchase orders at all times relevant to this cause of action. (Ex. A.)[3]

According to documents produced by CSX, it is believed that NexPak purchased the plastic resin from BP Amoco, who shipped the material primarily from a facility in Texas. (Ex. F; Ex. G.) It is believed that all of the shipments originated on the Union Pacific Railroad.(Ex. F;

---

[2] The Purchase Orders, and subsequent amendments, provided price terms and the minimum quantity NexPak would order over the time periods covered by the P.O.'s. These Purchase Orders were effective at all times relevant to the instant cause of action. (Ex. D.)
[3] In a joint stipulation between Port Erie and NexPak, NexPak formally agrees to work to resolve the instant lawsuit involving its raw materials. (Ex. M.)

Ex. G.)[4]  At some point in transit, the plastic resin was transferred to the CSX rail system.  CSX would then complete the rail transport to Erie, Pennsylvania. (Ex. F; Ex. G.)

In e-mails produced by CSX between Port Erie and CSX, and in their response to interrogatories, CSX maintains that Port Erie is liable for demurrage charges because Port Erie was a consignee to NexPak's shipments of resin.  (Ex. E; Ex. K, No. 4.)  CSX also asserts that Port Erie received "notice of constructive placement" upon the arrival of the rail shipments in Erie. (Ex. E; Ex. K, No. 4.d)  Both assertions are wrong.

First, in a sworn statement, Port Erie declares that it never entered into any contract with CSX regarding the shipment of NexPak's plastic resin, nor did it ever consent to being a consignee for these shipments. (Ex. A.)  In fact, in spite of asserting that Port Erie is the contractual consignee, CSX now admits that it does not have any knowledge or evidence that Port Erie knew about or consented to any shipping contract with CSX or with any party concerning the rail cars that carried plastic resin to Erie, Pa. (Ex. P, Underwood depo., p. 7; Ex. K, No. 5.)

Nonetheless, as supposed evidence of Port Erie's alleged status as a consignee CSX points to a bill of lading in which "Port Erie Plastics" appears erroneously and inexplicably within a box on the form that is designated "Ship To (consignee)." (Ex. I.) Yet, two problems arise from this bill of lading.

First, the form itself creates ambiguity regarding whether a party listed in this box is merely a shipping address or is actually a consignee. (Ex. I.)  Second, while the name "Port Erie Plastics" is listed in the box, the address for Port Erie is stated as Montfort Terminal, a facility

---

[4] BP Amoco is designated on the waybills as the "shipper."(Ex. F; Ex. G.)  The bill of lading instructs that invoices are to be sent to BP Amoco. (Ex. I.)

4

owned and operated by Plastek Group (a corporation that is not a party in this litigation and not affiliated with Port Erie). (Ex. I.)  Port Erie did not own, lease or operate the Montfort Terminal, nor any rail sidings, for the receipt of NexPak's resin.  Therefore, it is not even clear which party was actually referenced in this box:  was it Port Erie or Montfort Terminal?[5]  Further, upon examination of the waybills produced by CSX, both those originated by Union Pacific and those generated by CSX, the waybills clearly designate BP Amoco as the guarantor of shipping fees. (Ex. F, Ex. G.)  Additionally, the bill of lading clearly instructs that all invoices are to be sent to BP Amoco. (Ex. I.) Therefore, by their own documentation, the demurrage fees were clearly designated as the responsibility of BP Amoco.  Finally, CSX admitted that all documentation that they rely upon in this case was originated at BP Amoco. (Ex. P, Underwood depo., p. 8.)  Port Erie had no knowledge that it was even referenced on these documents until well after the fact. (Ex. O, Witkowski depo., p. 44-45; Ex. N, Johnson depo. p. 14.)

When the entire record is examined, several key unrefuted facts emerge.  First, Port Erie never signed a contract with CSX, or any other rail carrier, with respect to the subject resin shipments. (Ex. A; Ex. P, Underwood depo., p. 7.)   Second, Port Erie never consented to a designation as consignee for the subject shipments.  (Ex. A; Ex. P, Underwood depo., p. 7.) Third, Port Erie never knew it was even listed on the bill of lading.   (Ex. N, Johnson depo, pp. 13-14; Ex. O, Witkowski depo., pp. 44 -45.)  Finally, any reference to Port Erie in any of the shipping documents did not result from any communication between Port Erie and CSX or between Port Erie and any other party.(Ex. A; Ex. O, Witkowski depo., p. 44-45; Ex. P, Underwood depo., p. 8.)  In fact, BP Amoco was the originator of all such documents. (Ex P,

---

[5] Given the fact that Presque Isle Trucking, which is affiliated with Montfort Terminal (Ex. Q, Bartosik depo., p. 10), received notice of constructive placement (See *infra.*, pp. 5-7.), the evidence actually points to Montfort Terminal as the party properly designated in this box, rather than Port Erie.

Underwood depo., p. 8.) In light of these undisputed facts, an erroneous and confusing reference to Port Erie on an ambiguously formatted bill of lading is not, by itself, a reasonable basis to infer that Port Erie may be liable for the claimed demurrage fees.

CSX next asserts that Port Erie received notice of constructive placement regarding NexPak's resin shipments.[6] (Ex. E.) The CSX Tariff (which Port Erie received during discovery) and CSX representatives state that receipt of notice of constructive placement signifies the moment when demurrage charges begin to accrue. (Ex. E; Ex. H, pg. 11, 13.)[7]  Yet, Port Erie states clearly that, at all times relevant to the present cause of action, Port Erie did not receive any notice of constructive placement relevant to the instant claim. (Ex. O, Witkowski depo., p. 52.)  Port Erie remained, at all times relevant to this cause of action, unaware of any notice of constructive placement issued by CSX with regard to the plastic resin purchased by NexPak. (Ex. A.)  In fact, at deposition, the designated CSX representative now admits that CSX did not send notice of constructive placement to Port Erie.  (Ex. P, Underwood depo., p. 25.)  Rather, CSX admits that it sent the notices to Presque Isle Trucking, a truck-freight company associated with the Montfort Terminal that hauled resin from the Montfort Terminal to Port Erie's Harborcreek facility.  (Ex. P, Underwood depo., p. 25.)

CSX now appears to be claiming that its provision of notice of constructive placement to Presque Isle Trucking was sufficient to constitute notice to Port Erie.  Yet, CSX has failed to produce any admissible evidence that raises even a reasonable inference that such notice actually (legally or factually) reached Port Erie. (Ex. P, Underwood depo., *supra*.)  In deposition, Steve Bartosik, of Presque Isle Trucking, did not provide any testimony indicating that Presque Isle

---

[6] It is Port Erie's position that there is no legal basis to conclude that receipt of a notice of constructive placement alone assigns liability to the recipient of such notice.
[7] CSXT 8100 Tariff, Demurrage Section VIII, ¶8010. (Ex. H. )

was designated by Port Erie to act as its agent in the receipt of notice of constructive placement. (Ex. Q, Bartosik depo., *supra*.) In fact, he stated that he does not have any actual knowledge that Port Erie ever received notice of constructive placement from CSX. (Ex. Q, Bartosik depo., p. 53.)[8]

Even further, Port Erie has testified that awareness of rail shipments of plastic resin arose, in the normal course of business, from orders placed by NexPak. (Ex. N., Johnson depo., p. 10-11.) Orders from NexPak would initiate communications between Port Erie and Presque Isle Trucking to arrange for the specified resin to be trucked from the rail yard to Port Erie's Harborcreek facility. (Ex. O, Witkowski depo., p. 23-24.) Importantly, NexPak held title to the resin in the rail cars, even during its truck shipment to and storage at Port Erie's Harborcreek facility. (Ex. A; Ex. C.)[9] Therefore, in the normal course of business, Port Erie had Presque Isle Trucking haul resin to its facility only at the behest of NexPak. (Ex. A; Ex. O, Witkowski depo., p. 22.)[10]

In deposition, John Johnson (President of Port Erie) described the character of the business relationship with NexPak in the following manner:

> Q. So you would get information from NexPak that railcars -- had just arrived?

---

[8] Mr. Bartosik did hypothesize that his drivers might have carried the notice of constructive placement with them on deliveries to Port Erie, but his testimony provides no first hand knowledge of this. (Ex. Q, Bartosik depo, p. 46.) Additionally, he provides no evidence that he was authorized by Port Erie to receive such notice on their behalf. (Ex. Q, Bartosik depo., p. 53.) Port Erie specifically denies that it received notice of constructive placement from any source. (Ex. A; Ex. O, Witkowski depo., p. 52.)

[9] A representative of Port Erie made a misstatement in an e-mal to CSX regarding the transfer of title to the resin. In a sworn statement, Mr. James Witkowski clarifies that his statement was erroneous, and that the July 2000 Agreement was applicable through all times relevant to the present cause of action. (Ex. B.)

[10] This arrangement was consistent with the nature of the entire business relationship between NexPak and Port Erie Port Erie's manufacture of the DVD cases was quite dependent upon NexPak's material and equipment. NexPak owned both the presses and the injection molds used in the formation of the plastic cases. (See e.g. Ex. L.) Further, other materials needed in the production of the DVD cases were subject to the same ownership arrangements. (Ex. A.)

      A.      They would just -- say "I've got enough coming, don't worry about it," and we wouldn't know a specific railcar's timing or whatever. They would just give us comfort [sic] feeling that, "There's going to be enough resin available for what I'm going to ask you to run."

(Ex. N., Johnson depo., pp. 11-12.) [11]

      The record demonstrates that there is no dispute about the fact that Port Erie never received notice of constructive placement from CSX. (Ex. A; Ex. P, Underwood depo, p. 25.) Further, CSX has not produced any evidence to even reasonably infer that Port Erie authorized Presque Isle Trucking to receive notice of constructive placement on its behalf, that it actually received such notice from any source or the fact that Erie was ever a party to the shipping contract. (Ex. P, Underwood depo, *supra*.) In light of CSX's admission with regard to notice, and the unrefuted statements of Port Erie, CSX has failed to produce evidence sufficient to reasonably infer that Port Erie is liable for demurrage charges through receipt of notice of constructive placement.

      Beyond the lack of contractual relationship between Port Erie and CSX, the underlying arrangements regarding the resin shipments in question lead to the conclusion that Port Erie was not even remotely involved in the rail shipments of the resin. As stated above, the letter between Port Erie and NexPak memorializing their resin inventory arrangements makes it clear that Port Erie did not own the resin being shipped by NexPak and BP Amoco. (Ex. C.) However, as indicated above by the words of Mr. Johnson, the rail shipment of the resin was structured by NexPak in such a way that it was outside of Port Erie's control, and even their awareness. (Ex. N., Johnson depo., pp. 11-12.)

---

[11] Port Erie's purchase of the plastic resin was accounted as an offset against the invoice it sent to NexPak for completed product orders. (Ex.A.)

A clear example of the veracity of this declaration is recalled by the President of Port Erie, and the former Controller of Port Erie. In sworn statement, Mr. Johnson (President of Port Erie) recalls that, on at least one occasion, in a time relevant to this cause of action, he learned well after the fact that NexPak had pulled rail cars loaded with resin from the rail siding at the Montfort Terminal in Erie and sent them to a NexPak facility in Atlanta, Georgia. (Ex. A.) Similarly, in sworn statement by the former controller of Port Erie, Mr. Brian Fahey recalls that, within the time period referenced in the instant lawsuit, he learned, after the fact, of an instance when NexPak ordered CSX to divert a number of rail cars already in route to Erie, Pennsylvania to another NexPak facility in Canton Ohio. (Ex. J.) Both of these accounts establish that NexPak was able to exercise complete control of the rail cars, both those already in Erie and those in mid-transit, without either Port Erie's consent or even their awareness. This is dramatic evidence that the rail transit of the resin was completely under the control of BP and NexPak. By implication, these instances also demonstrate that CSX recognized NexPak's controlling authority over these shipments.

Port Erie recalls that its first knowledge that demurrage fees were accruing relative to the resin shipments was an invoice it received from CSX. (Ex. O, Witkowski depo., pp. 54-55.) Upon receiving the invoice, Port Erie made inquiry with CSX explaining that it was not a party to any agreement with CSX regarding the NexPak shipments. (Ex. O, Witkowski depo., pp. 56-57; Ex. A.) Port Erie states that it repeatedly communicated to CSX that it was not a party to any transportation agreement with CSX, nor was the resin transported by CSX even owned by Port Erie. (Ex. O, Witkowski depo., pp. 56-57; Ex. A.) Accordingly, it could not be subject to any charges from CSX. (Ex. O, Witkowski depo., pp. 56-57; Ex. A.) CSX has refused to acknowledge the legitimacy of Port Erie's claim.

As demonstrated by the discussion above, not only has CSX failed to proffer sufficient evidence to reasonably infer that Port Erie is liable for demurrage charges, Port Erie has provided ample proof that CSX's claim is completely without merit.  The following facts are not in dispute.  Port Erie never owned or controlled the resin at any time that CSX was involved in the transport of the resin. (Ex. A; Ex. C.) Port Erie was never a party to the underlying rail transportation contract, and never gave consent to be designated on any bill of lading. (Ex. A; Ex. C; Ex. P, Underwood depo, p. 7.)  Finally, Port Erie never received notice of constructive placement, and never designated an agent to receive such notice on its behalf. (Ex. A; Ex. O, Witkowski depo., p. 52; Ex. P, Underwood depo., p. 25.)  As a result of these facts, as will be evident in the legal argument that follows, Port Erie's Motion for Summary Judgment on CSX's claim of liability for demurrage charges must be granted.

**III.    STANDARD OF REVIEW**

Rule 56 of the Federal Rules of Civil Procedure must be construed not only with due regard for the rights of plaintiffs asserting claims, but also for the rights of defendants who demonstrate, in the manner provided by the Rule, that the claims are insufficient and should be dismissed without consuming public and private resources at trial.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555 (1986).  See also <u>In Re School Asbestos Litigation</u>, 977 F.2d 764, 794 (3d Cir. 1992).  As stated by the United States Supreme Court:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action."

<u>Celotex Corp.</u>, 477 U.S. at 327, 106 S. Ct. at 2555; Fed. R. Civ. P. 1, 56.

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment must be granted with respect to a claim:

> . . . if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 884, 110 S. Ct. 3177, 3186 (1990); Celotex Corp., 477 U.S. at 322, 106 S. Ct. at 2552; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 2509-2510 (1986); Fed. R. Civ. P. 56(c).

Only a genuine issue of material fact will defeat a motion for summary judgment. A disputed fact is "material" only if it would affect the outcome of the suit as determined by substantive law. Anderson, 477 U.S. at 248, 106 S. Ct. at 2510; Grassinger v. Welty, 818 F. Supp. 862, 864 (W.D. Pa. 1992), aff'd, 993 F.2d 224 (3d Cir. 1993). Factual disputes which are irrelevant or unnecessary will not be considered. Anderson, 477 U.S. at 248, 106 S. Ct. at 2510. Furthermore, an issue of fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248, 106 S. Ct. at 2510; Grassinger, 818 F. Supp. at 864

## IV.    ARGUMENT

### A.    Port Erie cannot be held liable for demurrage charges because Port Erie was not a party to the underlying transportation contract, and because Port Erie was erroneously designated by CSX as a consignee to the shipments of resin.

**Port Erie Was Not a Party to the Underlying Contract**

In a case that closely parallels the instant lawsuit, the Third Circuit adopted a long-standing precedent of the former Interstate Commerce Commission (now "Surface Transportation Board") in stating that it is unlawful to impose liability for demurrage charges upon a person who is not a party to the underlying transportation contract. Union Pacific Railroad Co. v. Ametek, Inc., 104 F.3d 558, 563-4 (3d Cir. 1997). Given the closely related facts of Ametek, a fuller discussion of this case is in order.

Ametek processed plastic resin that was sent by a resin manufacturer on rail cars. Ametek would receive inbound rail cars loaded with resin, offload the resin for processing at its facility, and then reload the processed resin onto rail cars for shipment to the original manufacturer's customers. Ametek, 104 F.3d at 559-60. The original manufacturer had the practice of notifying Ametek of which rail cars should be received immediately, and which should be held on the railroad's tracks for later delivery. Id.

At one point, Ametek anticipated a large surge in rail cars that would be set aside for delayed delivery, and negotiated a lease with the railroad for space on rail sidings where the rail cars would sit. Id. For unknown reasons, the siding lease was never executed. Beyond this unexecuted lease, Ametek did not have any contractual relationship with the railroad. Id. at 563-64. The court noted that "generally" Ametek was not listed as a shipper or consignee on the bill

12

of lading. Id. at 560. Though not explicitly stated, it is inferred that there were instances in which Ametek was designated as such. (Id., *supra.*)

After financial difficulties arose in the railroad company, it attempted to bill Ametek for $292,270 in demurrage fees for a thirty-one month period. Ametek refused to pay the fee, but countered that it would be willing to pay the $29,664 that it would have paid if the unexecuted lease had been operative. The railroad declined this offer. Id. at 560.

The railroad's claim (pursued then by six railroads that bought portions of the defunct railroad) was brought before the Federal District Court of the Middle District of Pennsylvania. The matter was stayed, and referred to the Interstate Commerce Commission (ICC). The ICC, citing a long history of its own decisions on the subject, found that it was unlawful to assess demurrage fees against a person who was not a party to the underlying transportation contract. Id. at 563.

On appeal, the plaintiff railroads made two arguments. First, they asserted that Ametek was an agent to the principals of the contract. They also argued that Ametek had separately agreed to accept liability for the demurrage charges. Id. The agency argument apparently arose from the fact that Ametek routinely communicated with the local railroad yard in the movement of rail cars for its customers. Id. The second claim that a contract existed arose from Ametek's alleged participation in negotiations with a plaintiff railroad to lease a track siding to ultimately reduce demurrage charges. Id.

The Third Circuit rejected both of plaintiff's arguments. Citing a district court case from the District of Columbia, the court held it was unlawful to impose liability for demurrage charges upon an agent that was not a party to the transportation contract. Id. citing Middle Atlantic Conference v. United States, 353 F. Supp. 1109 (D.D.C. 1972). The court dismissed the second

argument for lack of evidence of any actual agreement by Ametek to assume the demurrage charges. Id.

As in Ametek, Port Erie was, at most, an agent of NexPak in the transport of plastic resin from the rail yard to Port Erie's Harborcreek facility. As the court stated in Ametek, an agent who is not a party to the contract cannot be liable for demurrage fees. CSX admits that it is not aware of any writing memorializing any agreement between CSX or any other rail carrier and Port Erie with regard to the subject transportation agreement. Further, Port Erie has produced an agreement authenticated by the signing parties that explicitly places ownership and control of the resin in the hands of NexPak at every stage of CSX's transport of the resin.

Like Ametek, Port Erie did not pay for the shipments, nor did it did not own the product being shipped; nor did it own or control the product even as it was being removed from the rail car. Yet, going even further than the fact pattern in Ametek, Port Erie did not control any aspect of the rail shipment, and never directed the movement of any rail car. The agency relationship, if it even can be called that, between Port Erie and NexPak gave Port Erie no authority over or responsibility for the rail shipments. Therefore, it is quite reasonable to conclude, as in Ametek, that the agent Port Erie cannot be held liable for demurrage charges because it was not a party to a transportation contract.

**Port Erie was not a Consignee to the Shipment**

It is anticipated that CSX will attempt to argue that the bill of lading discussed above (see *infra* pp. 4-6.) that erroneously lists Port Erie is, itself, sufficient evidence of Port Erie's liability for demurrage. Yet, this precise issue has been examined and dismissed by other courts. A Louisiana court, finding no evidence that the agent actually contracted with the shipper stated:

"The fact that [the shipper] erroneously put defendant's name on the bill of lading . . . hardly provides a basis for a contract between defendant and plaintiff." City of New Orleans By and Through Public Belt R. R. Commission of City of New Orleans v. Rapid Truck Leasing, Inc., 348 So.2d 1299 (1977), *1300 -1301 (La.App. 1977). The Seventh Circuit has twice reached the same conclusion, noting that the mere fact that a party was listed on a bill of lading does not, of itself, create a contract. Evans Products Co. v. I.C.C. 729 F.2d 1107, *1113 (C.A.7,1984); Illinois Cent. R. Co. v. South Tec Development Warehouse, Inc., 337 F.3d 813, *821 (C.A.7 (Ill.),2003).[12]

In the present case, CSX admits that it did not have a written contract with Port Erie, and admits that it does not have knowledge of any contractual relationship between Port Erie and any rail carrier relevant to this cause of action. (Ex. P, Underwood depo. p. 7; Ex. K, No. 5.) Further, Port Erie has provided a sworn statement that it was not a consignee, and that it never consented to being designated as such. In support of its allegation, CSX has only produced an ambiguously formatted bill of lading with Port Erie's name listed, along with Montfort Terminal, in a box. The mere listing, by itself, does not establish Port Erie as a consignee. Yet, going beyond the fact patterns of Rapid Truck and South Tec, the bill of lading in question here by no

---

[12] The Seventh Circuit also debunked a potential red herring that might be thrown into the present case by plaintiffs in their attempt to impose liability. 49 U.S.C. § 10743(a)(1) states: "When the shipper or consignor instructs the rail carrier transporting the property to deliver it to a consignee that is an agent only, not having beneficial title to the property, the *consignee* is liable for rates billed at the time of delivery for which the consignee is otherwise liable, but not for additional rates that may be found to be due after delivery if the consignee gives written notice to the delivering carrier before delivery of the property-- (A) of the agency and absence of beneficial title; and (B) of the name and address of the beneficial owner of the property if it is reconsigned or diverted to a place other than the place specified in the original bill of lading." However, the Seventh Circuit, following the analysis of Middle Atlantic, stated the statute applies only to agents who are also consignees, and not to agents who are *not* consignees. See Middle Atl. Conference v. United States, 353 F.Supp. 1109, 1120 (D.D.C.1972) (three judge panel) (noting that "a careful reading of [a predecessor of § 10743] ... speaks only to ... certain narrow situations of warehousemen ... who appear as *consignees* on the bill of lading, but in no way can be read to impose liability on an agent not a party to the contract.")

means even clearly infers that Port Erie is a consignee.[13]  Nonetheless, like Rapid Truck and South Tec, the erroneous placement of Port Erie on a bill of lading is not sufficient, by itself, to create liability for demurrage fees.

Particularly in light of the evidence demonstrating Port Erie's lack of ownership and control of the shipments and the resin itself, as well as the evidence that Port Erie was not a party to the contract, it is beyond any legal doubt that this seriously flawed bill of lading cannot be a basis to make a reasonable inference of liability.  For all of the above reasons, this Court must grant Port Erie's motion for summary judgment, denying CSX's claim that Port Erie is liable for demurrage charges.

**B.    Even if the court finds that questions of material fact remain regarding the status of Port Erie vis a vis the rail shipments, Port Erie never received notice of constructive placement and therefore cannot be liable for the charges.**

The CSXT 8100 Tariff which was obtained only after the fact, regulates the terms and conditions of charges that apply to the shipment of freight upon CSX lines.  By its own terms, CSX states that demurrage begins upon tender of notice of constructive placement. (Ex. H, pp. 11, 13.)  Based upon past communications, it is anticipated that CSX intends to argue that Port Erie accepted notice of constructive placement (either as consignee or agent), and therefore

---

[13] Given that the bill of lading clearly lists NexPak as the purchaser of the resin, the bill of lading is most properly interpreted as listing Port Erie and/or Montfort Terminal as merely a shipping address.  This interpretation can be made only, however, if the inaccuracy of listing Port Erie as having a Montfort Terminal address is overlooked.  As stated above, when coupled with evidence relevant to the notice of constructive placement, the best interpretation of the bill of lading is that Montfort Terminal is the actual party referenced in the bill of lading, not Port Erie.

accepted liability for demurrage.[14]  Yet, Port Erie has proffered sworn statements declaring that it never received such notices.  CSX states that it does not have any evidence that it gave notice to Port Erie.  Instead, CSX now admits that it gave notice to Presque Isle Trucking, not Port Erie.  In light of this admission, CSX has the burden of providing sufficient evidence to infer that Presque Isle Trucking was authorized by Port Erie to receive these notices on its behalf.  It has not done so.  Further, upon the deposition of Steve Bartosik, who managed Presque Isle Trucking at all times relevant to the present cause of action, there exists not one shred of evidence that such authorization existed.  In fact, Mr. Bartosik admitted that he does not have any direct knowledge that Port Erie actually received any notices of constructive placement.

   This lack of notice is significant for two reasons.  First, it further undermines any argument that Port Erie acted as either a consignee or agent of NexPak in accepting the notice.  Second, CSX's tariff dictates the terms by which demurrage is assessed.  CSX defines "demurrage day" as "a twenty four hour period (calendar day) or part thereof, commencing 001 after tender." (Ex. H, p. 11.)  The tariff defines tender as "the notification, actual or constructive placement, of an empty or loaded car(s)." (Ex. H, p. 13.)  As a result, demurrage charges begin to accrue upon "tender."

   By sworn statement, Port Erie declares that it never received notice of constructive placement from CSX with regard to any of the rail shipments in question.  This is admitted by CSX.  Therefore, "tender" never occurred.  The tariff defines the means by which contractual fees are assessed.  As a result, even if this Court were to find that questions of material fact remain with regard to the contractual status of Port Erie, CSX has failed to raise sufficient

---

[14] It is Port Erie's position that there is no legal basis to conclude that receipt of a notice of constructive placement alone assigns liability to the recipient.

evidence to even reasonably infer that Port Erie actually or constructively received notice of constructive placement from CSX. By the terms of the CSX tariff, the absence of tender of notice of constructive placement eliminates the possibility that fees can be assessed. For this reason, this Court must grant Port Erie's motion for summary judgment, denying CSX's claim for demurrage fees. This result is particularly logical in light of Port Erie's consistent restatement of the fact that, even upon receiving an invoice for demurrage, and follow up calls with CSX, it remained unaware of the reason that CSX erroneously believed Port Erie was liable. It is axiomatic that a person must have some awareness that it is consenting to or forming a contract before it can be subjected to its obligations.

### C. Port Erie cannot be held liable for demurrage charges where the shipper, BP Amoco, is designated on the bill of lading as the payor.

Finally, in this case, the bill of lading and waybills produced by third party Union Pacific clearly designates BP Amoco as the shipper <u>and</u> the party responsible for payment of shipping charges, and lists NexPak as the purchaser of the materials. (Ex. F; Ex. G; Ex. I.) Given that the CSX Tariff does not uniformly assign demurrage to the consignor, (Ex. H, *supra*.) it is apparent from the face of the bill of lading that it is BP Amoco, not Port Erie, who is responsible for these charges. (Ex. I.) As noted in a 2000 decision of the Surface Transportation Board (successor to the ICC), "Demurrage charges . . . are generally assessed against the shipper that unduly retains the cars." <u>R. Franklin Unger, trustee</u>, 2000 WL 769738, *3 (STB, 2000). Such a result is consistent with the federal statute that authorizes demurrage, where the stated purpose of demurrage is to encourage shippers to keep as many rail freight cars available for shipment as possible, and to discourage shippers from using rail cars as *de facto* warehouses. <u>Id.</u>

It is undisputed that BP Amoco accepted responsibility for the fees for the shipments in the instant case. CSX has failed to provide any evidence that Port Erie consented to assuming liability for these fees in place of BP Amoco. As a result, CSX has failed to proffer evidence sufficient to even reasonably infer that Port Erie, rather than BP Amoco, should be held liable for the demurrage charges.

### V. CONCLUSION

For the above stated reasons, this Court must grant summary judgment in favor of defendant Port Erie, denying the claim of liability for demurrage charges brought by plaintiff CSX.

Respectfully submitted,

s:/ *Richard J. Parks*
Richard J. Parks
Pa. Bar I.D. 40477
Scott T. Stroupe
P.A. Bar I.D. 89496
MacDONALD, ILLIG, JONES & BRITTON LLP
100 State Street, Suite 700
Erie, Pennsylvania 16507-1459
(814) 870-7754
FAX (814) 454-4647
rparks@mijb.com

Attorneys for Defendent
 Port Erie Plastics, Inc.

938654

**CERTIFICATE OF SERVICE**

I hereby certify that copies of the foregoing Brief in Support of the Motion for Summary Judgment on Behalf of Defendant Port Erie Plastics, Inc. was served upon the following attorney of record, via First-Class United States Mail addressed as follows, this 20th day of February, 2006:

>Attorney for Plaintiff CSX Transportation, Inc.
>
>Charles L. Howard, Esq.
>Janssen Keenan, P.C.
>One Commerce Square
>2005 Market Street, Suite 2050
>Philadelphia, PA  19103

>*s:/ Richard J. Parks*
>Richard J. Parks, Esq.