# EXHIBIT A

LEXSEE 2000 STB LEXIS 333

R. FRANKLIN UNGER, TRUSTEE OF THE INDIANA HI-RAIL CORPORATION, DEBTOR--PETITION FOR DECLARATORY ORDER--ASSESSMENT AND COLLECTION OF DEMURRAGE AND SWITCHING CHARGES

STB Docket No. 42030

SURFACE TRANSPORTATION BOARD

*2000 STB LEXIS 333*

**SERVICE DATE:** June 14, 2000

June 14, 2000

**OPINIONBY:** [*1]

MORGAN; BURKES; CLYBURN

**OPINION:**

DECISION

Pursuant to a referral from the United States Bankruptcy Court for the Southern District of Indiana, n1 R. Franklin Unger, Trustee of Indiana Hi-Rail Corporation (IHRC), filed a petition on May 13, 1998, seeking a declaratory order that IHRC is entitled to assess and collect from Wilson Fertilizer & Grain Company (Wilson) $ 126,100 in demurrage charges from June 1, 1995, to December 17, 1997, and $ 3,150 in extra switching charges from July 29, 1994, to December 17, 1997. n2 On August 24, 1998, Wilson filed a reply, and, on September 14, 1998, IHRC filed a motion for leave to file rebuttal. n3 We grant the petition in part, as discussed below.

> n1 Case No. 94-08502-B-V-11. In an informal, pre-hearing teleconference held March 9, 1998, Bankruptcy Judge Larry Lessen was asked to refer to the Board the dispute (regarding the legality of the demurrage and extra switching charges) in view of the Board's decision in Wilson Fertilizer & Grain Company--Petition for Declaratory Order--Certain Rates and Practices of Indiana Hi-Rail Corporation, No. 41671 (STB served Jan. 30, 1998) (Wilson Decision) (denying a prior petition for a ruling on the lawfulness of the disputed demurrage and switching charges). Counsel asserts that Judge Lessen concluded that a number of the issues exceeded the court's expertise and agreed to the referral, but no written order was issued and no transcript of the teleconference made. Verified Statement of Mr. Richard W. Lorenz (V.S. Lorenz) at 2, P5.

[*2]

> n2 Because IHRC did not initiate its collection action in the Bankruptcy Court until July 29, 1997, the Trustee acknowledges that the 3-year limitations period provided in *49 U.S.C. 11705*(a) bars the collection of unpaid charges that may have accrued prior to July 29, 1994. Additionally, the Trustee does not seek demurrage charges for traffic that moved from July 29, 1994, to May 31, 1995. See IHRC Petition for Declaratory Order (IHRC Petition) at 7 and Appendix B, Verified Statement of Mr. James R. Owens (V.S. Owens) at 2.
> n3 In a letter of July 1, 1998, Wilson requested that a modified procedure schedule be adopted. In a further letter of August 8, 1998, Wilson advised us that the Trustee had agreed that Wilson could late-file a reply to IHRC's petition by August 25, 1998. We accept both Wilson's late-filed reply and IHRC's rebuttal, thereby denying Wilson's motion to strike IHRC's rebuttal as a reply to a reply. To allow for a more complete record, we also accept Wilson's September 29, 1998 reply to IHRC's rebuttal and IHRC's October 8, 1998 reply to Wilson. As discussed below, we will not be establishing a modified procedure schedule in this proceeding.

[*3]


BACKGROUND

In 1993, IHRC obtained an exemption from our predecessor, the Interstate Commerce Commission (ICC), to lease from Norfolk and Western Railway Company (N&W) and operate the Rochester Line, a 13-mile line in Indiana between milepost I-95.6 at Rochester and milepost I-108.6 at Argos. n4 Wilson is the sole active shipper on the Rochester Line, and from its three facilities at Rochester, it tendered shipments of corn, beans or wheat for switching by IHRC to N&W's successor, the Norfolk Southern Railway Company (NS), for line-haul service to destination.

> n4 See Indiana Hi-Rail Corporation--Lease and Operation Exemption--Norfolk and Western Railway Company Line Between Rochester and Argos, IN, and--Exemption From *49 U.S.C. 10761,* 10762, and 11144, Finance Docket No. 32162 (ICC served Mar. 31, 1993) (IHRC Exemption). In that decision, the ICC also exempted IHRC, under former *49 U.S.C. 10505,* from the rate-filing requirements of former *49 U.S.C. 10761*-62 and the recordkeeping requirements of *49 U.S.C. 11144* for the line. The Rochester Line was one of a pair of N&W lines that Central Railroad Company of Indianapolis (Central) leased. See Central Railroad Company--Lease & Operation Exemption--Line of the Norfolk and Western Railway Company, Finance Docket No. 31470 (ICC served July 25, 1989). IHRC operated over the Rochester Line under a trackage rights agreement with Central. See Indiana Hi-Rail Corporation--Trackage Rights Exemption--Central Railroad Company of Indianapolis, Finance Docket No. 31541 (ICC served Nov. 17, 1989), *54 FR 37840* (Nov. 17, 1989).

[*4]
IHRC filed for bankruptcy on November 15, 1994, but continued to operate the Rochester Line until December 17, 1997. n5 Wilson, complaining of IHRC's service during that period, filed a petition on December 26, 1995, to revoke the exemptions granted in IHRC Exemption and for a declaratory order that IHRC's assessment of demurrage and extra switching charges for the December 4, 1991 through September 30, 1995 period was unlawful. The Board denied that petition, but nevertheless indicated that it did "not appear that IHRC was the proper carrier to collect demurrage or any other charges." Wilson Decision at 8-9. Disagreeing, the Trustee initiated a collection action in Bankruptcy Court and, pursuant to the court's referral, filed its petition for a declaratory order here.

> n5 Fulton County, L.L.C., acquired the Rochester Line and commenced operations on December 18, 1997, under a reorganization plan approved by the Bankruptcy Court. See Fulton County, L.L.C.--Acquisition and Operation Exemption--Norfolk and Western Railway Company, STB Finance Docket No. 33477 (STB served Oct. 31, 1997), *62 FR 59027* (Oct. 31, 1997).

DISCUSSION AND CONCLUSIONS

The Trustee [*5] seeks a finding that IHRC was entitled to assess and collect demurrage and extra switching charges from Wilson, and that Wilson owes IHRC a total of $ 129,250 in unpaid charges. Wilson argues that the Trustee has not established a right to assess and collect demurrage charges, but that, even if he did so, IHRC itself was at fault for a portion of the demurrage and Wilson was not the proper party from whom to collect demurrage in any event. Wilson requests that we provide for discovery and evidentiary submissions under modified procedure.

Under *5 U.S.C. 554*(e) and *49 U.S.C. 721,* we may issue a declaratory order to terminate a controversy or remove uncertainty. We find that there is a sufficient record before us to resolve the issues of IHRC's entitlement to demurrage charges and the applicable demurrage rates. We will also set forth the framework upon which to evaluate Wilson's defenses. However, we believe that the court is better suited to develop and weigh the evidence on the collection and fault issues involved, particularly as they pertain to individual shipments. Therefore, we will deny Wilson's request [*6] for the submission of further evidence under modified procedure, decide those issues within our expertise that do not require further evidentiary development, and return those that do to the court with our guidance as to how to evaluate them.

1. IHRC's Entitlement To Demurrage From Wilson

Demurrage is a charge that both compensates rail carriers for the expenses incurred when rail cars are detained by shippers and serves as a penalty for undue car detention (to encourage the speedy return of rail cars to the rail network). See *Chrysler Corp. v. New York C.R. Co., 234 I.C.C. 755, 759 (1939).* n6 Demurrage is subject to the Board's regulation, under *49 U.S.C. 10702,* which requires railroads to establish reasonable rates and transportation-related rules and prac-

tices. Moreover, under *49 U.S.C. 10746*, rail carriers must compute demurrage charges in a way that will facilitate freight car use and distribution and promote car supply

> n6 Generally, carriers assess demurrage in one of two ways: straight demurrage or average demurrage. Straight demurrage is assessed on a per-day basis for detention in excess of the allowable free time (generally, 24 hours for loading and 48 hours for unloading), and the charge is due on the release of the car. Shippers get no credit for returning cars early but are not assessed demurrage if severe weather or other circumstances beyond their control prevent them from returning cars on time. Average demurrage, on the other hand, permits shippers to offset demurrage charges by earning credits for cars returned within the free time, but does not provide for reduced demurrage charges except for delay caused by floods, earthquakes, tornadoes, or hurricanes.

[*7]
Demurrage charges are generally assessed and retained by the railroad on whose line the cars are detained. See *South Carolina Rys. Com. v. Seaboard Coast L.R., 365 I.C.C. 274, 277 (1981)* (South Carolina). In the Wilson Decision at 9, we stated, based on the record then before us, that IHRC did not appear to be the proper party to collect demurrage because it operated the Rochester Line as a switching carrier and its charges were included in the line-haul rates published by, and paid to, N&W. However, it is now clear that IHRC, under its interchange agreement with N&W, had the right to assess and collect demurrage in connection with its operation of the Rochester Line. That agreement expressly stated: n7

> n7 See IHRC Petition at 3-4 and Appendix A, Exhibit 1, IHRC/N&W Interchange Agreement, October 23, 1989, section 10. Thus, N&W assigned its right to collect demurrage from Wilson to IHRC. Id. at 12. In contrast, in South Carolina, the linehaul carrier had not agreed to allow the switching carrier to collect demurrage charges and, in fact, contested its collection. *365 I.C.C. at 277-78*.

All payments for demurrage on cars [*8] originating or terminating on the [Rochester] Line and interchanged pursuant to this Agreement will accrue to IHRC, and it will be the obligation of IHRC to bill customers for and collect all such payments.

Wilson argues that the obligation to pay demurrage charges arises out of the contract of carriage for the freight itself, and that this obligation must therefore be evidenced on the bill of lading. n8 We disagree. While a bill of lading may be used to establish when the shipper releases rail cars to the carrier (by the bill of lading's time and date) so as to determine when demurrage charges for loading cease to accrue, it is not determinative of a party's responsibility for demurrage. n9 A bill of lading must contain certain prescribed terms (see 49 CFR 1035), but does not address demurrage. Rather, Wilson's obligation to pay demurrage charges arises out of IHRC's lawful establishment of such charges as detailed below.

> n8 A bill of lading is a negotiable document by which a carrier acknowledges receipt of freight and contracts for its movement. Railway Statistical Manual (4th reprinting, Accounting Division of the Association of American Railroads, 1970).
> n9 Indeed, as the Trustee points out, it is not customary in the rail industry for switching carriers such as IHRC to be listed on bills of lading for linehaul transportation. This does not detract from the ability of the switching carrier to assess charges for demurrage or for the switching services that it provides.

[*9]
Wilson further argues that it cannot be held liable for demurrage because it acted only as an agent for the various consignees (the purchasers of its products) who were responsible for the payment of transportation charges, under rail transportation contracts entered into with NS pursuant to *49 U.S.C. 10909* (formerly *49 U.S.C. 10713*), n10 citing Ametek, Inc.--Petition for Declaratory Order, No. 40663, et al. (ICC served Jan. 29, 1993) (Ametek), aff'd sub nom. *Union Pacific R. Co. v. Ametek, Inc., 104 F.3d 558 (3d Cir. 1997)* (UP/Ametek). Wilson Reply at 5-6. The NS waybills n11 submitted by Wilson to support that argument do not establish that Wilson was acting as the consignees' agent. n12 They contain no language that is commonly understood to refer to an agency relationship or establish any other reason to infer that Wilson may have been acting as an agent for a designated principal. n13

n10 We reject Wilson's contention that IHRC was required to have a demurrage charge amendment added to the transportation contracts between the consignees and NS. See Wilson Reply at 5-6. Because IHRC was not a party, it had no right to insist on an amendment to those contracts. Moreover, the matter of car detention by Wilson was a matter between Wilson and IHRC, and did not involve either party to the contract (NS and the consignee).

[*10]

n11 A waybill is a document covering the movement of a shipment and showing the forwarding and receiving station, the names of the consignor and consignee, the car initials and number, the routing, the description and weight of the commodity, instructions for special services, the rate, advances and waybill reference for previous services, and the amount prepaid. Railway Statistical Manual (4th reprinting, Accounting Division of the Association of American Railroads, 1970). The waybills provided by Wilson applied to shipments that were assessed charges on IHRC's November 1995 demurrage invoice. Wilson Reply, Exhibit 1. Both waybills applied to shipments that moved via NS under rail transportation contracts and listed "Wilson's Fertilizer & Grain, Inc." as the shipper. Wilson maintains that the consignees, Countrymark Co-Op of Indianapolis, IN (Countrymark) and Fieldale Farms Corp. of Baldwin, GA (Fieldale), were responsible for the freight charges on the waybills, pursuant to their respective transportation contracts with NS, and that, as a result, Wilson acted only as the consignees' agent concerning this traffic.

n12 Waybills are not, as Wilson suggests, bills of lading, and Countrymark's typewritten name on one of the waybills is not a "Section 7 clause" that absolves Wilson of demurrage liability. Wilson Reply at 6 and Exhibit 1. A Section 7 clause is a non-recourse provision on the face of a bill of lading that, if signed, releases the consignor (originating shipper) of any obligation to pay the transportation charges. See 49 CFR Part 1035, Appendix B. A Section 7 clause must be endorsed on the bill of lading, and the proffered waybills do not constitute bills of lading under our rules. A bill of lading must be either a "Uniform Order Bill of Lading," 49 CFR 1035.1(a)(1), or a "Uniform Straight Bill of Lading," 49 CFR 1035, Appendix A. But Wilson's waybills, entitled "Freight Waybill--Copy--Auditor," fail to conform to either type of bill of lading, fail to meet the modified front of a uniform bill of lading allowed under 49 CFR 1035.2, and fail to contain or reference the required "Contract Terms and Conditions" of a bill of lading. See 49 CFR 1035, Appendix B.

[*11]

n13 While Ametek and other cases have held that demurrage and detention charges (the motor carrier equivalent of demurrage charges) do not apply to agents acting for the principal parties to the transportation--but only to the principals themselves--those cases require that any agency relationship must be disclosed. See Ametek at 6, 13-16 (the naming of the consignors and consignees on the shipments sent "in care of" Ametek alerted the carrier that there was a disclosed principal and that Ametek functioned as the agent); *UP/Ametek, 104 F.3d at 563*, see also *Middle Atlantic Conference v. ICC, 353 F. Supp. 1109, 1120-21 (D.D.C. 1972)*. Here, neither of the waybills contain any language that would clearly establish or refer to an agency relationship. Moreover, it appears beyond question that Wilson was the consignor on shipments from Rochester; it admitted such previously (in the Wilson Decision proceeding, in Wilson's Petition to Revoke, at 3-5) and that it was a principal party to the transportation at issue, not an agent of the consignee.

Finally, the party responsible for the linehaul freight charges--here, the consignees [*12] under their rail transportation contracts with NS--is not necessarily responsible for demurrage charges. Demurrage charges, which are both rental and penalty payments to promote better rail car utilization, are generally assessed against the shipper that unduly retains cars. See Exemption of Demurrage From Regulation, Ex Parte No. 462 (STB served Mar. 29, 1996), slip op. at 1; see also generally *Car Demurrage Rules Nationwide, 350 I.C.C. 777 (1975)*. Thus, the fact that Wilson did not pay the linehaul freight charges to NS does not alleviate its responsibility for demurrage to IHRC.

Accordingly, we find that IHRC was entitled to assess and collect any applicable demurrage charges from Wilson.

2. Applicable Charges

a. Demurrage. From July 29, 1994, through December 17, 1997, IHRC billed Wilson demurrage charges (totaling $ 59,640) at rates set forth in its Demurrage Policy (effective January 1, 1994). n14 The Trustee claims that the bills for demurrage incurred on and after June 1, 1995, were in error because on that day the charges in IHRC's Demurrage Policy were superseded by the charges incorporated by published Freight Tariff IHRC 8000-C. n15 Although [*13] IHRC continued to bill Wilson at the Demurrage Policy level, the Trustee now asserts that Wilson actually is liable for a total of $ 126,100 in demurrage charges under published Tariff IHRC 8000-C for the June 1, 1995, through December 17, 1997 period. n16 We disagree.

> n14 See IHRC Petition, Appendix A, Verified Statement of Mr. Timothy A. Yeager (V.S. Yeager) at 3 and Exhibit 4, and Appendix B, V.S. Owens at 2. IHRC's Demurrage Policy, Item 10, allowed 24 hours free time for loading, and 48 hours free time for unloading, each car. Free time is computed from the first 7:00 a.m. following actual or constructive placement, including Saturdays, Sundays, and holidays (except as noted). Under Item 20 of the Demurrage Policy, upon expiration of the allotted free time, demurrage charges were assessed at a rate of $ 20 per car for each 24-hour period or portion thereof for the first 5 days and $ 50 per car for each additional day. See IHRC Petition, Appendix A, Exhibit 2.
> n15 IHRC Petition, Appendix A, Exhibits 2, 3, and 5. Item 85 of IHRC 8000-C incorporated the nationwide demurrage provisions of Demurrage Tariff RPS 6004-Series. Item 610 of Tariff RPS 6004-P allowed 24 hours of free time for the complete or partial loading of a car, and 48 hours for the complete or partial unloading of a car, as defined in Item 1100. Free time was computed from the first 7:00 a.m. following actual placement or proper notification (Saturdays, Sundays, and holidays excluded). Under Item 900, after the expiration of the allotted free time, demurrage charges accrued at $ 20 per car per day for each day or fraction of a day for the first 4 days, $ 30 per car per day for each day or fraction of a day for each of the next 2 days, and $ 60 per car per day for each day or fraction of a day for each subsequent day. See IHRC Petition, Appendix A, Exhibit 2.

[*14]

> n16 See IHRC Petition, Appendix A, V.S. Yeager at 4 and Appendix B, V.S. Owens at 2-3. The Trustee asserts that there are no outstanding demurrage charges for traffic that moved between July 29, 1994 and May 31, 1995 (the day before Tariff IHRC 8000-C became effective). Id. at 7 and Appendix B, V.S. Owens at 2.

As already noted, see supra note 4, IHRC was exempted from the requirement to publish and file tariffs with the ICC (49 U.S.C. 10761-62) in the same decision that exempted its lease and operation from the requirements of 49 U.S.C. 11343. n17 IHRC's tariff-filing exemption survived the elimination of the tariff-filing requirements by the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (1985) (ICCTA), and served to exempt IHRC from any rate disclosure requirements of 49 U.S.C. 11101. See 49 CFR 1300.1(d). With its exemption, IHRC was thus not bound by any filed tariff and was free to apply whatever charges it deemed appropriate at the time of billing.

> n17 IHRC Exemption at 6-7. The ICC found that exempting IHRC from the tariff-filing requirement would allow IHRC to respond to demands of the market more effectively and thereby work to keep its rates low to be competitive with other modes; reduce its overhead costs by eliminating filing expenses; and enable IHRC to provide innovative price and service options, as there would be no need to reflect every rate change in a filed tariff. Id.

[*15]
Here, IHRC elected to publish (but not file) its demurrage charges in both its Demurrage Policy and Tariff IHRC 8000-C, the latter incorporating filed Tariff RPS 6004-P for applicable demurrage provisions. Having chosen to assess charges under its Demurrage Policy, the Trustee cannot now rely on either the filed rate requirements that existed prior to the ICCTA or the current disclosure requirements that were enacted into law by the ICCTA to retroactively collect additional charges above what was already assessed. n18

> n18 Even if there had been no exemption, the Trustee could not in any circumstances collect the demurrage charges contained in Tariff IHRC 8000-C (and by incorporation Tariff RPS 6004-P) after July 31, 1996. Our review of the tariffs and other rate publications for the July 29, 1994 through December 17, 1997 period shows

that IHRC's participation in Tariff RPS 6004-P was canceled by Supplement 46 to that tariff, effective August 1, 1996

b. Extra Switching Charges. The Trustee also seeks to collect $ 3,150 in extra switching charges for the July 29, 1994 through December 17, 1997 period, based upon Item 1300 of Tariff IHRC 8000-B, effective February 1, 1990 [*16] (and later Tariff IHRC 8000-C), which made applicable a $ 450 charge when an extra switch was requested and a separate crew and engine call were required. Unlike demurrage, the parties do not dispute which tariff is applicable. Moreover, Wilson agreed, effective February 11, 1993, to a $ 450 charge for each extra switch when less than five loaded revenue cars per round trip were included. In return, IHRC agreed to forgo the surcharge it had imposed on inbound loaded rail cars destined to Wilson. n19 Wilson admits that it entered into the contractual agreement to pay supplemental switching charges and that it is obligated to do so to the extent those switches were provided in a timely and proper fashion. n20 The charges set forth in this agreement were thus applicable, and it does not appear that Wilson disputes them.

> n19 IHRC Petition, Appendix A, V.S. Yeager at 5-6 and Exhibit 7.
> n20 See Wilson Reply at 6.

3. Issues Returned To The Court

a. Computation of Applicable, Unpaid Charges. To support his claim, the Trustee submitted copies of 23 sets of IHRC's monthly demurrage invoices and worksheets and copies of 5 switching invoices. n21 Wilson challenges the accuracy [*17] of the computerized record system used to prepare the demurrage worksheets. It contends that the number of billable demurrage days was recomputed by hand in most instances and argues that the accuracy of the worksheets can only be verified by checking them against the information IHRC crews recorded on the placement and release cards and the switch tickets. We have examined the invoices and worksheets and find that the handwritten margin calculations are inadequate for determining how the charges were computed in each instance. IHRC must provide more details to clarify how each demurrage charge has been computed and should submit that evidence to the Bankruptcy Court, rather than the Board, as the court is better suited to determine the exact amount Wilson must remit.

> n21 See IHRC Petition, Appendix A, Exhibit 6. The monthly demurrage invoices began with July 1995 and ended with November 1997, but excluded invoices for 3 months in 1996 (June, September, and October) and 3 months in 1997 (March, May, and October). The worksheet figures were calculated using the Demurrage Policy and were manually added; the totals were carried forward to the related invoices. Because we have determined that the rates under the Demurrage Policy applied here, the Trustee's recalculations are not relevant.
>
> Mr. Yeager asserts that he used the demurrage worksheets to make the appropriate deductions for free time, calculate how many days the held cars were subject to demurrage, and apply the demurrage charge for those days. See IHRC Petition, Appendix A, V.S. Yeager at 4-5. Mr. Yeager then calculated the total demurrage charges that IHRC generated and prepared a monthly invoice that accompanied the demurrage worksheet sent out to Wilson each month. Id. A customer service representative at IHRC entered data into the computer system about the placement and release of Wilson's traffic on a daily or weekly basis as necessary, and used the data to generate, at the end of each month, a demurrage worksheet listing the number of days Wilson had held cars. Id. and Exhibit 6 (copies of the invoices and accompanying demurrage worksheets). The switching invoices listed 7 switches from November 12, 1994, through September 24, 1997. See IHRC Petition, Appendix A, Exhibit 9.

[*18]
b. Fault. Wilson complains that IHRC was at fault for some portion of the assessed demurrage. n22 In those instances where demurrage charges were properly assessed, the burden is on Wilson to establish that it was not at fault or had met the due diligence standard and therefore is entitled to waiver of the penalty portion of the demurrage charges. See *Prince Manufacturing Co. v Norfolk and Western, 356 I.C.C. 702, 707 (1978)* (Prince). n23 Because the Bankruptcy Court will be examining the facts on an individual car basis, the court will be in the best position to determine in the first instance whether waivers are justified as to any specific instances.

n22 Wilson refers to the facts set forth in its pleading in the Wilson Decision proceeding. Wilson Reply at 1-2. There, Wilson argued that: (1) IHRC's crews were not available on a consistent basis; (2) they would be 1, 2 or 3 days late, and in one instance nearly 6 days late; and (3) IHRC failed to promptly spot, unload, and return equipment to the N&W interchange. Wilson Petition to Revoke at 3-4.

n23 Traditionally, the ICC held shippers to a very strict standard when ruling on demurrage disputes See *Chrysler v. New York Central R. Co., 234 I.C.C. 755, 758 (1939)* Thus, a shipper is liable for demurrage unless it can clearly show that it was not the proximate cause of the rail car detention and that it exercised due diligence to avoid or abate demurrage See *Prince, 356 I.C.C. at 707* Due diligence is determined in part by the shipper's use of prudent foresight in the particular circumstances, including special efforts to minimize detention

[*19]
This action will not significantly affect either the quality of the human environment or the conservation of energy resources.

It is ordered:

1 Wilson's motion to strike is denied, and IHRC's rebuttal statement is accepted into the record.

2 The Trustee's request for a declaratory order is granted to the extent specified above, and this proceeding is discontinued

3 This decision is effective 30 days after the service date of this decision.

4 A copy of this decision will be mailed to:

The Honorable Larry Lessen

United States Bankruptcy Court

for the Southern District of Indiana

46 East Ohio Street, Room 116

Indianapolis, IN 46204

Re: No 94-08502-B-V-11

```
                                                                    12366J
**********  Print Completed  **********

Time of Request:    February 22, 2006   01:36 PM EST

Print Number:       1822:85332227
Number of Lines:    279
Number of Pages:




















Send To:  HOWARD, CHARLES
          JANSSEN & KEENAN
          2005 MARKET ST STE 2050
          PHILADELPHIA, PA 19103-7012
```