IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CSX TRANSPORTATION, INC. | ) | CIVIL ACTION |
| 500 Water Street | ) | |
| Jacksonville, FL  32202-4423 | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CASE NO.:  05-139 Erie |
| | ) | |
| PORT ERIE PLASTICS, INC. | ) | |
| 909 Troupe Road | ) | |
| Harborcreek, PA  16421 | ) | RELATED DOCUMENT NO.  20 |
| | ) | |
| Defendant | ) | ELECTRONICALLY FILED |

**DEFENDANT PORT ERIE PLASTICS' BRIEF IN OPPOSITION TO
CSX TRANSPORTATION'S MOTION FOR SUMMARY JUDGMENT**

AND NOW, comes defendant Port Erie Plastics, Inc., and files this brief in opposition to plaintiff CSX's Motion for Summary Judgment, and states the following.

I.    **BACKGROUND**

CSX Transportation, Inc. ("CSX") filed a complaint on May 10, 2005 and an amended complaint on August 29, 2005, claiming Port Erie Plastics, Inc. (Port Erie) was liable for demurrage fees relating to certain shipments of plastic resin. (Demurrage is a fee assessed to a party to the rail transportation contract [or shipping contract] in the event that a party retains a rail car on the railroad's tracks beyond a certain number of days from the time it has been delivered to its destination.) Discovery in this case closed on February 1, 2006.  Port Erie Plastics filed a Motion for Summary Judgment on February 20, 2006.  CSX also filed a Motion for Summary Judgment on February 23, 2006.  Port Erie opposes the motion for summary

judgment filed by CSX.  Accordingly, Port Erie files this brief in opposition to plaintiff CSX's motion for summary judgment.


II.     **ARGUMENT**

    A.     <u>**Introduction**</u>

    In CSX's motion, and during discovery, CSX admits that Port Erie did not contract with CSX, (Port Erie Ex. P, Underwood depo., p. 7; Port Erie Ex. K, No. 5.), and did not negotiate, or consent to a contract, with CSX. (Port Erie Ex. P, Underwood depo., p. 7; Port Erie Ex. K, No. 5).  Further, in spite of the fact that CSX requires delivery of "notice of constructive placement" (a notice to a party of the transportation contract that a particular rail car has reached its destination) before demurrage can be assessed (Port Erie Ex. E; Port Erie Ex. H, pp. 11, 13), CSX admits that it never gave such notice to Port Erie. (Port Erie Ex. P, Underwood depo., p. 25).  Yet, in spite of all of these admissions, CSX boldly continues to assert that Port Erie is liable for demurrage fees, stating "none of that, however, matters." (CSX brief in support of motion for summary judgment, ["CSX brief"] p. 8.).  CSX simply asks this Court to ignore the facts.

    By defiantly dismissing the significance of all of these factual admissions, CSX unambiguously grounds its claim for demurrage fees against Port Erie upon two erroneous suppositions.  First, CSX believes that the mere appearance of a person's name on a bill of lading is, contrary to case law under CSX's Tariff, a sufficient legal basis to hold that person liable for demurrage fees. Second, CSX believes that, in spite of the requirements of its own Tariff, a person may be held liable for demurrage fees even where that person never received notice of

constructive placement.  CSX's arguments, however, ignore not only their own admissions and case law, but also the common law of contracts upon which the CSX tariff rests.

**B.    CSX fails to demonstrate that Port Erie had a contractual obligation to CSX.**

**1.    CSX ignores, and fails to produce any evidence of, a fundamental requisite of contract formation:  consent to the transportation contract by Port Erie.**

CSX devotes almost two pages of its brief, and cites to eleven cases (though none are from the Third Circuit) to argue that CSX has an obligation to impose demurrage charges for the untimely handling of railcars. (CSX brief, pp. 3-4).  It is an indication of the singular focus that CSX has upon the rights given to rail carriers to collect demurrage fees. CSX appears to be oblivious to the fact that the issue is not, nor has it ever been, the general right of CSX to collect demurrage fees.  Further, Port Erie is not challenging the validity of the CSX's tariff.  Rather, Port Erie's principle dispute with CSX is that, using the fundamental common law of contracts to which the tariffs are subject, Port Erie was not a contractual party to the shipments at issue, and therefore is not liable for the demurrage fees.

As Port Erie states in its motion, and CSX fails to acknowledge, the Third Circuit holds that it is unlawful to impose liability for demurrage charges upon a person who is not a party to the transportation contract. Union Pacific Railroad Co. v. Ametek, Inc., 104 F.3d 558, 563-4 (3d Cir. 1997).  In Union Pacific, the Third Circuit examined, and ultimately relied upon the reasoning and analysis of the federal district court of the District of Columbia.  Middle Atlantic Conference v. United States, 353 F. Supp. 1109 (D.D.C. 1972).[1]  While CSX refers to Middle

---

[1] Port Erie has provided a full discussion of Union Pacific, in the Brief in Support of Motion for Summary Judgment filed on February 20, 2006 (Defendant's Brief in Support of the Motion for Summary Judgment, pp 12-14.)

Atlantic (CSX brief p. 7), it misrepresents the gist of that court's holding.  Therefore, a fuller discussion of this case is in order.

In Middle Atlantic, transportation associations were challenging the federal government's rejection of efforts by members of these associations to amend their tariffs to expand the base of persons liable for demurrage charges.  The specific issue raised in Middle Atlantic was whether certain categories of persons (such as warehousemen and other agents) could be held liable for demurrage charges "by [the associations'] unilateral redefinition of consignors and consignees" in their tariffs.  Middle Atlantic, 353 F. Supp. at 1112.    The Interstate Commerce Commission ("ICC") ruled that this expansion of demurrage liability was not permitted. Middle Atlantic, 353 F. Supp. at 1109.    The district court affirmed the ICC's decision.  Middle Atlantic, 353 F. Supp. at 1109.  It is the analysis of the district court (ignored by CSX ) that provides the legal analysis apropos to the instant lawsuit.

The court generally stated that "before such transportation-related assessments as detention charges can be imposed on a party on a prescribed basis there must be some legal foundation for such liability outside the mere fact of handling goods." Middle Atlantic, 353 F. Supp. at 1109.  The court then went on to examine the common law of contracts to assess whether such legal foundation for the tariff amendments existed, stating that "persons liable for demurrage charges are to be determined by the ordinary rules of the common law." Middle Atlantic, 353 F. Supp. at 1120.  It also stated:  "Land carriers in the United States must rely upon liabilities created according to common law principles." Middle Atlantic, 353 F. Supp. at 1115, citing In re Tidewater Coal Exch., 292 F. 225, 235 (D.C.S.N.Y. 1923), aff'd 296 F. 701 (2d Cir.), cert. denied, 264 U.S. 596, 44 S. Ct. 454 (1924).   After an extensive analysis of decades of case law regarding tariffs, the court stated:   "We do not interpret those cases as changing the

4

fundamentals of contract or agency law and we are unwilling to attempt to make such change in the law by this opinion." <u>Middle Atlantic</u>, 353 F. Supp. at 1126 (emphasis added).

CSX cites to one portion of the <u>Middle Altantic</u> decision, characterizing the court's finding as stating that a person's name on a bill of lading as a consignor or consignee *ipso facto* makes that person a party to the contract. (CSX brief, p. 7). This misrepresents the holding. The court framed the question in such a manner that provides the legal principles relevant to determining who, by mere operation of the tariff, may be regarded as a consignor or consignee. The court recognized up front that there was a "dearth of precise precedent . . . attributable to the rarity of attempts by carriers to hold persons liable for demurrage who were not parties to the contract." <u>Middle Atlantic</u>, 353 F. Supp. at 1118.[2] As a result, the court signaled that holdings might erroneously appear to equate a "consignee" designation with "contracting party." In reality, this perception arises merely from the fact that the courts were not asked to delineate the limits of a carrier's ability to assign liability to persons solely by operation of a tariff. The ruling in <u>Middle Atlantic</u> makes clear that, in this case, CSX is exceeding the lawful scope of its own tariff by erroneously attempting to assign demurrage liability to a person who is not a party to the transportation contract.

The <u>Middle Atlantic</u> court held that an expansion of the terms "consignor" and "consignee" to include virtually anyone who handles goods shipped by common carriers was contrary to the fundamentals of contract law.[3] The court repeatedly stressed that liability for

---

[2] This conclusion is tacitly reaffirmed by the fact that every case cited by CSX has nothing to do with the legal principles defining who is properly designated as a consignee. All of the cases focus upon the reasonableness of demurrage fees, or other similar issues in which consignee status and liability is presumed and never discussed.

[3] The transportation associations sought the approval of the following definition of consignee. "Consignee as used in this rule means the party to whom the carrier is required by the bill of lading or other instruction to deliver the shipment, or any part thereof, at destination or any stop-off point, whether he be ultimate consignee, or

demurrage must result from a person's status as an <u>actual</u> party to the contract; an <u>actual</u> consignor or consignee. <u>Middle Atlantic</u>, 353 F. Supp. at 1116 -1119, 1126.  Importantly, the court stated explicitly:  "A tariff is an inappropriate instrument to legislate liability with respect to a nonconsenting party. . . ."  <u>Middle Atlantic</u>, 353 F. Supp. at 1122.  It bears repeating that this is the analysis referenced and adopted by the Third Circuit. <u>Union Pacific Railroad Co. v. Ametek, Inc.</u>, 104 F.3d at 563-4.

This rationale is consistent with the findings of other courts, where the courts have determined that a designation on a bill of lading, by itself does not create liability.   A Louisiana court, finding no evidence that the agent actually contracted with the shipper stated: "The fact that [the shipper] erroneously put defendant's name on the bill of lading . . . hardly provides a basis for a contract between defendant and plaintiff."   <u>City of New Orleans By and Through Public Belt R. R. Commission of City of New Orleans v. Rapid Truck Leasing, Inc.</u> , 348 So.2d 1299 (1977), *1300 -1301 (La.App. 1977).   The Seventh Circuit has twice reached the same conclusion, noting that the mere fact that a party was listed on a bill of lading does not, of itself, create a contract.   <u>Evans Products Co. v. I.C.C.</u>  729 F.2d 1107, *1113 (C.A.7,1984); <u>Illinois Cent. R. Co. v. South Tec Development Warehouse, Inc.</u>, 337 F.3d 813, *821 (C.A.7 (Ill.),2003).[4]

---

warehouseman, or connecting air, motor, rail, or water carrier with whom the carrier does not maintain joint through rates, or other person designated in the bill of lading. "  <u>Middle Atlantic</u> 353 F. Supp. 1112.

[4] The Seventh Circuit also debunked a potential red herring that might be thrown into the present case by plaintiffs in their attempt to impose liability. 49 U.S.C. § 10743(a)(1) states:  "When the shipper or consignor instructs the rail carrier transporting the property to deliver it to a consignee that is an agent only, not having beneficial title to the property, the *consignee* is liable for rates billed at the time of delivery for which the consignee is otherwise liable, but not for additional rates that may be found to be due after delivery if the consignee gives written notice to the delivering carrier before delivery of the property-- (A) of the agency and absence of beneficial title; and (B) of the name and address of the beneficial owner of the property if it is reconsigned or diverted to a place other than the place specified in the original bill of lading."  However, the Seventh Circuit, following the analysis of <u>Middle Atlantic</u>, stated the statute applies only to agents who are also consignees, and not to agents who are *not* consignees. <u>See Middle Atl. Conference v. United States</u>, 353 F.Supp. 1109, 1120 (D.D.C.1972) (three judge panel) (noting that

CSX has failed to produce *any* material evidence of Port Erie consenting to be a party to the instant transportation contract. CSX relies solely on the placement of Port Erie's name on the bill of lading. Yet, CSX has not proffered any material evidence that Port Erie consented to being designated as such and admits it has no such evidence. (Ex. Ex. P., Underwood depo., p. 7; Ex. K. No. 5). Indeed, CSX has not produced any evidence that Port Erie knew that it is referenced on the bill of lading, and even admits that it cannot explain how or why Port Erie's name came to be referenced. In affidavits supporting its motion for summary judgment, CSX admits that it received the bill of lading information from Union Pacific (the original rail carrier), who in turn received it from BP Amoco (the originating shipper). (CSX motion for summary judgment, Ex. G).

In the face of all of this, CSX drones on about the supposed authority of the tariff to ascribe liability to Port Erie, ignoring the simple fact that it fails to address or raise any evidence relevant to a requisite of contract formation: Consent. It is uncontested that Port Erie was <u>not</u> a party to the shipping contract and did not have an interest in the plastic being purchased by NexPak from BP Amoco. CSX cites to a decision of the Surface Transportation Board as directly on point with Port Erie's position, and states that it is clear that the Surface Transportation Board has already ruled against such a position. <u>Unger</u>, Lexsee 2000 STB Lexis 333, STB Docket No. 42030, June 14, 2000. Yet, in <u>Unger</u>, the party admitted to being a consignee. <u>Unger</u>, Lexsee 2000 STB Lexis 333, p. 4. Stated differently, the party in <u>Unger</u> explicitly consented to being a party to the contract. In fact, upon close examination, Unger is factually distinguished in a variety of ways, having virtually no commonality with the present

---

"a careful reading of [a predecessor of § 10743] ... speaks only to ... certain narrow situations of warehousemen ... who appear as *consignees* on the bill of lading, but in no way can be read to impose liability on an agent not a party to the contract.")

case. <u>Unger</u>, Lexsee 2000 STB Lexis 333. [5]   As a result, CSX fails to meet its burden of

proffering undisputed evidence of Port Erie's consent to being status a party to the contract.  For

these reasons, CSX's motion for summary judgment must be denied.  In light of the fact that Port

Erie's lack of consent to this contract is undisputed, this court must grant Port Erie's motion for

summary judgment.


2.      **To the extent that CSX asserts Port Erie's implied consent to the contract, it has failed to produce any evidence of such.**


CSX seems to raise a quasi-contractual theory by stating, without any factual

support, that Port Erie recognized its status as "sole consignee" and is therefore liable for

demurrage because "PEP [Port Erie] or its agent was the only person to whom CSX could make

lawful delivery of the freight." (CSX brief, p. 9).  One who asserts a quasi-contract through

implied consent has the burden of demonstrating that a distinct benefit was conferred upon the

one to whom consent is implied.  <u>Atlantic & Gulf Stevedores, Inc. v. Alter Co.</u>, 617 F.2d 397,

401 (5th Cir, 1980).

In <u>Atlantic</u>, the court determined that where a person demonstrated ultimate control over

fleets of barges, intermediaries who participated in the shipments, acting at the behest of the

person in control, could not be deemed as receiving a "benefit."  <u>Atlantic & Gulf Stevedores,</u>

<u>Inc. v. Alter Co.</u>, 617 F.2d 397, 402 (5th Cir., 1980)  The <u>Atlantic</u> court found that the ultimate

consignee was the one who exercised control.  Under such circumstances, the court found the

---

[5] It appears as though CSX may be trying to argue that, even if Port Erie was only an agent to CSX, it had to notify CSX in writing that it was not the consignee in order to escape liability.  However, as stated above, the party in <u>Unger</u> admitted that it was a consignee.  Here Port Erie did not even know that it was designated on any bill of lading or shipping document.  It is ludicrous to assert that Port Erie was obligated to notify CSX of its status with regard to a contract that it did not even know existed.  Further, upon receiving bills for demurrage, Port Erie informed CSX immediately that it had no role in this shipping contract.

attribuation of a "benefit" on an intermediary to be an insufficient basis on which to make a party liable for tariff charges. Atlantic, 617 F.2d at 402.

Similar to Atlantic, there are three problems with CSX's attempt to impute Port Erie's consent to the contract by its behavior. 1) Port Erie did not own the resin at any point in which the resin was handled by CSX. Therefore, by definition, Port Erie did not receive any "benefit" from CSX's services. Yet, it also did not exercise any appreciable control over the shipments. 2) Port Erie was not, in fact, the person to whom CSX made deliveries of the plastic resin, and did not enjoy the exclusive control over the delivery as implied by plaintiff. 3) To the extent that Port Erie even had an "agent," CSX has not produced any evidence that this agent (Presque Isle Trucking) had any authority to say or do anything that would bind Port Erie to the transportation contract at issue. Each of these points is discussed in greater detail below.


   **a.)**     ***Port Erie did not own the resin at any point in which the resin was handled by CSX.***  The unrefuted factual record substantiates that Port Erie did not even own the plastic resin at any time relevant to this cause of action. (Ex. A; Ex. C). The resin, at all times relevant, was purchased from BP Amoco by NexPak and owned by NexPak. Further, NexPak, not Port Erie, controlled the flow of plastic resin from the Mont Fort Terminal to the Harborcreek facility. (Ex. A; Ex. N, Johnson depo, pp. 11-12, Ex. O., Witkowski depo, p. 21-23, 28, 37-38 ). NexPak told Port Erie how many DVD cases to produce, dictating the quantity of its resin needed, as well as the particular type of its resin to use in the production of particular cases. Port Erie's sole role was to facilitate this flow by communicating with the truck freight carrier to ensure that NexPak's plastic resin would be available at Port Erie's Harborcreek facility to meet

NexPak's production needs. With regard to the rail shipments, then, Port Erie truly acted only as an agent to NexPak. (Ex. A, Ex. N,  Johnson depo, pp. 11-12).

As a result, CSX cannot justifiably impose an "equitable" obligation on Port Erie for services rendered by CSX, because Port Erie did not receive a benefit from CSX's services.  In fact, BP Amoco paid CSX for its services.  NexPak or BP Amoco, not Port Erie, was the owner of the resin at all times relevant to CSX's provision of transportation services.  Therefore, if a benefit is to be imputed to any party in order to conjure up an equitable remedy, CSX must turn to NexPak or BP Amoco.  As a result, CSX does not have a factual, legal, or equitable basis to conclude that Port Erie's impliedly consented to being a party to the contract by its actions, because it did not receive any benefit.

       **b.)**    ***CSX's assertion that Port Erie enjoyed the benefits of a consignee (e.g. exclusive control of the delivered plastic resin) is factually erroneous, eliminating any inference of implied consent to the transportation contrac*t.**  To the extent that CSX asserts Port Erie had exclusive control over the plastic resin upon the arrival of rail car shipments in Erie (and as such, received the "benefit" of a consignee) the evidence demonstrates Port Erie did not exercise such control.  As detailed above, Port Erie acted as an agent of NexPak in the movement of plastic resin from Mont Fort terminal to the Harborcreek facility.

Port Erie also produced affidavits from the president of Port Erie and its former controller, demonstrating that Port Erie did not have control of the rail car shipments.  In both affidavits, Mr. Johnson and Mr. Fahey state that NexPak diverted rail cars containing plastic resin from Erie, Pennsylvania to other NexPak facilities.  In fact, John Johnson states that NexPak pulled rail cars already at the rail siding at Mount Fort Terminal and sent them instead to its facility in Atlanta, Georgia.  (Ex. A; Ex. J).  Steve Bartosik, who was familiar with the

NexPak rail shipments relevant to this cause of action, did not deny that this took place. (Ex. Q, Bartosik depo, p. 60).  Further, CSX does not deny that this occurred. (Ex. P, Underwood depo, pp. 32-33).  In addition, testimony was produced that BP stopped delivery on rail cars already in Erie when NexPak filed for bankruptcy. (Ex. Q, Bartosik depo,. pp. 50-60). The mere fact that CSX cooperated in all these diversions betrays its claim that Port Erie was the only lawful recipient of the plastic resin.  Clearly, Port Erie was not the only party to whom delivery of the plastic resin could be made.  Therefore, it is factually incorrect to assert that Port Erie exercised exclusive control over the shipments and enjoyed the benefits of a consignee.  As a result, any inference that CSX sought to make from this assertion evaporates.

        **c.)**    ***To the extent that Port Erie had an agent, CSX has not produced any evidence that the "agent" was authorized to do or say anything to imply Port Erie's consent to the transportation contract.***  CSX inserts a subtle reference to the actions of an "agent" of Port Erie, in a possible attempt to stretch its search of an equitable hook on which to hang its demurrage liability. (CSX brief p. 9).  Yet, Port Erie and the "agent" (Presque Isle Trucking [PIT]) have both discussed their business relationship in depositions, and have not even suggested that PIT was authorized by Port Erie to bind  Port Erie to a contract. (Ex. N, Johnson depo, *supra*; Ex. O, Witkowski depo, *supra*; Ex. Q, Bartosik depo, *supra*).

      Tariffs do not change the fundamental law of agency.  <u>Middle Atlantic</u>, 353 F. Supp. at 1126.  The liability of a principal to third parties for the act of an agent must rest on (1) express authority, or that which is directly granted; (2) implied authority, to do all that is proper, usual and necessary to the exercise of the authority actually granted; (3) apparent authority, as where the principal holds one out as agent by words or conduct, and (4) agency by estoppel. <u>SEI Corp. v. Norton & Co</u>.,  631 F.Supp. 497 (E.D.Pa.,1986).

Further, the burden of establishing an agency relationship rests with the party asserting it. Girard Trust Bank v. Sweeney, 426 Pa. 324, 231 A.2d 407 (1967). Although the question of whether a principal-agent relationship exists is ordinarily one of fact for the jury, where the facts giving rise to the relationship are not in dispute, the question is one which is properly decided by the court. Donegal Mut. Ins. Co. v. Grossman, 195 F.Supp.2d 657, 665 (M.D.Pa.,2001);  Breslin by Breslin v. Ridarelli, 308 Pa.Super. 179, 454 A.2d 80, 82 (1982).  Finally, the scope of agency cannot be established merely by the acts or declarations of the alleged agent.  Atchsion Topeka and Santa Fe Railway Company v. Bouziden, 307 F. 2d 230, 233 (10th Cir., 1962). In the present case, Port Erie has expressly stated that it served primarily as a conduit of information between NexPak and PIT.  (Ex. A; Ex. N, Johnson depo, p. 7-8, 11-12; Ex. O, Witkowski depo, p. 23).  Both persons deposed from Port Erie stated that they had no awareness of and had no actual authority with regard to the actual delivery of plastic resin by rail.  NexPak would merely assure Port Erie that sufficient resin would be available to meet the orders that NexPak was placing. (Ex. A; Ex. N, Johnson depo, p. 7-8, 11-12; Ex. O, Witkowski depo, p. 23).

A PIT representative testified that telephone calls would take place between PIT and Port Erie on mornings in which resin shipments were already sitting at the Mont Fort facility. (Ex. Q, Bartosik depo, p. 41).  Port Erie testified that it generally received phone calls from PIT drivers (inquiring about production needs for resin) who were essentially attempting to rustle up business each morning. (Ex. O, Witkowski depo, p. 24).  Additionally, PIT would send a weekly update to Port Erie that would indicate how much resin had been shipped by NexPak.  Yet, the weekly update had no control-related purpose.  Rather, it was simply to give comfort to Port Erie that NexPak's assurances of sufficient resin supplies to meet NexPak orders were accurate. (Ex. N, Johnson depo., pp. 11-12; Ex. O, Witkowski depo, p. 50-51).   NexPak received the

same notice. (Ex. O, Witkowski depo, p. 50-51). Port Erie's understanding of its relationship to Presque Isle Trucking was limited to letting PIT know when it should truck NexPak's resin to Port Erie's Harborcreek facility so that NexPak's orders could be filled. (Ex. O, Witkowski depo., pp. 23, 50-51).

PIT has clearly expressed its role as limited to moving cars of resin into the Mont Fort facility as rail siding space became available to make the cars ready to be tapped. (Ex. Q, Bartosik depo., p. 15).    PIT stressed that its role was largely facilitative, in automatically moving rail cars into the terminal sidings as other cars were released as space became available. (Ex. Q, Bartosik depo., pp. 15, 33-34). PIT admitted it rarely distinguished between cars carrying NexPak resin, and cars carrying resin for other entities as it moved cars in and out of the Mont Fort facility. (Ex. Q, Bartosik depo., pp. 15, 33-34). It viewed its job solely as facilitating the movement of cars in and out of the terminal rail sidings, and attempting to secure truck freight work for its drivers. (Ex. Q, Bartosik depo., pp. 15, 33-34, 47).

Mr. Bartosik completely disavowed having any explicit or implied authority to direct shipments of the resin, or to act in any official capacity regarding the demurrage fees claimed by CSX as due. (Ex. Q, Bartosik depo., p. 47).  Likewise, Port Erie specifically denies vesting, or appearing to vest PIT with any such authority:  indeed, it didn't even know that such fees were accruing and could not have vested any such authority on anyone. (Ex. A; Ex. N, Johnson depo., p. 13-14; Ex. O, Witkowski depo, pp. 54-54).[6]  As a result, even CSX's stretch to hook Port Erie into demurrage fee liability through "benefits" conferred on a Port Erie agent falls apart.

---

[6] CSX produced, on the morning discovery closed the identity of William Graham, a CSX customer service representative.  Port Erie was not given the opportunity to depose him, as he was not proffered as a corporate designee with relevant knowledge, and was identified on the morning of the depositions.  The affidavit of Mr. Graham, seen for the first time in CSX's motion for summary judgment, alleges phone calls between Mr. Graham and Mr. Witkowski of Port Erie in which Witkowski allegedly told CSX to send all paperwork relating to the

C.  **Even if Port Erie was a party to the transportation contract, CSX admits it did not give Port Erie Notice of Constructive Placement (a requirement for liability of demurrage under CSX's tariff), eliminating any liability by Port Erie**.

CSX requires delivery of "notice of constructive placement" (a notice to the customer that a particular rail car has reached its destination) before demurrage can be assessed (Port Erie Ex. E; Port Erie Ex. H, pp. 11, 13), CSX admits that it never gave such notice to Port Erie. (Port Erie Ex. P, Underwood depo., p. 25).  CSX skirts this issue by claiming that Port Erie designated a truck-freight company, Presque Isle Trucking, to be Port Erie's agent in the receipt of constructive notice.

In its motion for summary judgment, CSX submits an eleventh-hour affidavit by William Graham supposedly in support of its contention.  There are a number of problems with his testimony. (*See infra*, n. 6).  However, ultimately, his affidavit has no relevance.  Port Erie states

---

shipments to Presque Isle Trucking at Mont Fort Terminal.  (Plaintiff Ex. E)  Port Erie notes that Mr. Graham's affidavit, and the equitable arguments that now seem to be surfacing on the part of CSX, arose after discovery closed and only after CSX admitted that it has no evidence of consent, and admitted that it never gave Port Erie notice of constructive placement. While Port Erie strongly disputes the veracity of this CSX marketing representative's eleventh hour epiphany supposedly five years after the fact (see Plaintiff's Ex. R), inferences from this evidence from CSX must be construed in a light most favorable to the non-moving party.  As such, Port Erie regards such a conversation, even if it had actually happened, to be of no material relevance.  Mr. Graham's affidavit, even if taken at face value, has Mr. Witkowski telling CSX that CSX should not send paperwork relating to the subject rail shipments to Port Erie.  This would be completely consistent with Port Erie's position that it was not a party to the transportation contract, and was not involved in any aspect of the rail shipments.  A statement stating "don't send the papers to us" says nothing about agency.  Further, CSX has testified that Mr. Graham's task was the development of a "customer profile" for the purpose of marketing CSX service to potential customers. (Ex. P, Underwood depo, p. 23.)  Even if CSX was entitled to every reasonable inference, which it is not as the moving party, they fail to demonstrate the materiality of a casual sales call between CSX and Port Erie to the issue of Port Erie's alleged authorization of PIT as its shipping agent.  The affidavit fails to show that Port Erie vested, or designated, in any way, PIT with the authority to receive notices of constructive placement on its behalf, or vested PIT with the authority to bind Port Erie, impliedly or otherwise, to assuming the obligations of a party to the underlying transportation contract. Further, and more importantly, CSX does not have any contemporaneous business record between CSX and Port Erie reflecting this alleged arrangement.  Again, Port Erie maintains that this phone call never even happened.  But, for purposes of summary judgment, it is important to note that CSX wishes this Honorable Court to morph a sales call into contractually binding consent through agency on the part of Port Erie. Even accepting, *arguendo*, Mr. Graham's affidavit as true, the evidence simply does not exist.

clearly it never received notice of constructive placement, and never authorized PIT to do so on its behalf.  (Ex. A; Ex. O, Wtikowski depo, p. 52).  CSX admits that it has no record or memory of ever providing Port Erie with such notice. (Ex. P., Underwood depo., p. 25).  Finally, the PIT representative states that, while he received a copy of the notice of constructive placement, he does not  have any direct knowledge that Port Erie received any such notice. (Ex. Q, Bartosik depo, pp. 53-53).

While PIT received notice of constructive placement from CSX, it is clear that it was not Port Erie's agent in this regard.  The mere act of receiving the notice by PIT is not sufficient basis to infer an agency in this regard. Atchsion Topeka and Santa Fe Railway Company v. Bouziden, 307 F. 2d 230, 233 (10th Cir., 1962).  CSX, therefore, has no evidence that it effected notice of constructive placement upon Port Erie.  Without such notice, by the terms of its own tariff, there is no liability for demurrage.

**III.    CONCLUSION**

For the above stated reasons, defendant Port Erie Plastics respectfully requests this Honorable Court deny plaintiff CSX Transportation Inc.'s Motion for Summary Judgment.


Respectfully submitted,


s:/ *Richard J. Parks*

Richard J. Parks
Pa. Bar I.D. No. 40477
Scott T. Stroupe
Pa. Bar I.D. No. 89496
MacDONALD, ILLIG, JONES & BRITTON LLP
100 State Street, Suite 700
Erie, Pennsylvania 16507-1459
(814) 870-7654
FAX (814) 454-4647
rparks@mijb.com

Attorneys for defendant
 Port Erie Plastics, Inc.

942780

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing Brief in Opposition to Plaintiff's Motion for Summary Judgment of Port Erie Plastics, Inc. was served upon the following attorney of record, via electronic transmission by the procedures of this Court as follows, this 13th day of March, 2006:

Charles L. Howard, Esq.          choward@janssenkeenan.com


_s:/ Richard J. Parks_
Richard J. Parks, Esq.