# EXHIBIT D

Case 1:05-cv-00139-SJM   Document 28-6   Filed 03/13/2006   Page 2 of 8

1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

- - -

CSX TRANSPORTATION, INC.,          )
                                   )
         Plaintiff,                )
                                   ) Civil Action
     vs.                           )
                                   ) Case No.
PORT ERIE PLASTICS, INC.,          ) 05-139 Erie
                                   )
         Defendant.                )

- - -

Deposition of JOHN UNDERWOOD

Thursday, February 2, 2006

- - -

The deposition of JOHN UNDERWOOD, called as a witness by the Defendant, pursuant to notice and the Federal Rules of Civil Procedure pertaining to the taking of depositions, taken before me, the undersigned, Teresa Constantini Berardi, a Notary Public in and for the Commonwealth of Pennsylvania, at the law offices of MacDonald Illig Jones & Britton, LLP, 100 State Street, Suite 700, Erie, Pennsylvania 16507-1498, commencing at 10:52 a.m. the day and date above set forth.

- - -

COMPUTER-AIDED TRANSCRIPTION BY
MORSE, GANTVERG & HODGE, INC.
ERIE, PENNSYLVANIA
814-833-1799

- - -

PAGE 14

```
14
 1  Port Erie was notified of the constructive placement,
 2  and now you're stating that constructive placement was
 3  actually given to Presque Isle Trucking; correct?
 4      A    Information that I've seen on fax indicated
 5  that it did go to Presque Isle Trucking.
 6      Q    And you don't have any place where it was
 7  given directly to Port Erie Plastics; correct?
 8      A    None that I've seen.
 9      Q    Okay.
10           Now, do you know who owned the plastic as
11  it was being transported from the BP facility until it
12  arrived in Erie?
13      A    From the documentation that I've seen, it
14  was owned by Nexpak.
15      Q    But Nexpak is not a party to the bill of
16  lading; are they?
17      A    Not that I've seen.
18      Q    But just as an example, a document that was
19  previously produced during Mr. Witkowski's
20  deposition -- just for clarity of the record, I'm
21  referring to Witkowski Deposition Exhibit No. 5.
22           This is the bill of lading that you are
23  referring to; correct?
24      A    Yes, sir.
25      Q    After these demurrage charges, did
```

PAGE 15

```
15
 1  anyone -- and when say "you," I do mean CSX as a
 2  whole, not you personally, and that you have personal
 3  knowledge of.
 4           Did anyone at CSX notify Nexpak that their
 5  plastic was accruing demurrage?
 6      A    We had no contact with Nexpak or did not
 7  know anything about Nexpak.
 8      Q    Did you have those bills of lading when you
 9  were accruing these demurrage charges?
10      A    We did not have these specific bill of
11  ladings, no.
12      Q    So you took transfer of these railcars
13  from Union Pacific and you didn't obtain a bill of
14  lading?
15      A    We received an electronic transaction from
16  the Union Pacific that give us the waybill information
17  and to move the car to the destination.
18      Q    And that waybill only said a destination?
19      A    I'm sorry?
20      Q    The electronic waybill, did that say this
21  is --
22      A    It was the shipper information and the
23  consignee information.
24      Q    And the consignee was what?
25      A    Port Erie Plastics.
```

PAGE 16

```
16
 1      Q    Where?
 2      A    At Erie, PA.
 3      Q    Did it say "Mount Fort Terminal"?
 4      A    I don't recall if it said that or not.
 5      Q    Okay. I got a fax from your attorney
 6  yesterday which I will refer to as Underwood
 7  Deposition No. 1.
 8           (Thereupon, Underwood Deposition Exhibit
 9      No. 1 was marked for identification.
10  BY MR. PARKS:
11      Q    Did you see this document before the
12  deposition?
13           I mean, not necessarily --
14           MR. HOWARD: Before today?
15           MR. PARKS: Before today, yes, the
16      deposition today, yes.
17      A    Yes, sir.
18      Q    And the substance of that fax is a series
19  of emails from a Billy Graham; correct?
20      A    Yes, sir.
21      Q    Did Billy Graham work for you?
22      A    Did not work for me directly, but he is an
23  employee of CSX.
24      Q    What does Billy Graham do at CSX?
25      A    He is a customer service representative.
```

PAGE 17

```
17
 1      Q    And before suit was filed against
 2  Port Erie, was Mr. Graham consulted about disputes by
 3  Port Erie Plastics to the billing for demurrage by
 4  CSX?
 5      A    No, sir.
 6      Q    They never had anything to do with that
 7  before the suit was filed?
 8      A    No, sir.
 9      Q    But he was investigating a problem with
10  regard to the demurrage as of January 27th?
11      A    He was -- January 27th of?
12      Q    2006. That's the date of that email to
13  you; correct?
14      A    The date of this email to me was upon my
15  research for documents.
16           This document that was put together by
17  Mr. Graham was in a draft memo file of his, and he
18  created that document in 2001, when he was trying to
19  determine how to handle the cars that were coming into
20  Erie for Port Erie Plastics.
21      Q    All right.
22           Now, when you say "draft memo," are you
23  talking about within the email system?
24      A    Yes, sir.
25      Q    And the top email to you is dated what
```

PAGE 18

        18

1 date?
2   A   January 27th, 2006.
3   Q   And it goes through a whole litany of
4 referring to Mr. Witkowski, his phone number, and
5 other things concerning this alleged dispute; correct?
6   A   Correct.
7   Q   You just told me that that was from
8 December of 2001?
9   A   Yes, sir.
10  Q   Okay. Why isn't there an email tag that
11 says December 1st, 2001 within the substance of that
12 email?
13  A   Well, there is some in the substance of the
14 email.
15  Q   But under the CSX email system, the email
16 tag appears at the top of each email; correct?
17  A   That's correct.
18  Q   And the email with all of these details was
19 only created on January 27th, 2006?
20  A   The time that he sent this to me was
21 created on January 27th of 2006.
22  Q   Is there any evidence that that was created
23 before January 27th on that document, January 27th,
24 2006, that all of the items were typed up?
25      Is there any dating on that that's tagged

PAGE 19

        19

1 by the system that shows that that was created in
2 2001, as you just testified?
3   A   For the first, or second part, or --
4   Q   The whole first part of that, before the
5 next tag, the next email tag.
6   A   No, there's no other date there.
7   Q   And then, in fact, the email tag for the
8 December 2001 email is a duplicate of the first two
9 or three lines of the January 27th, 2006 email; isn't
10 it?
11  A   Yes, sir. I see that it is the same.
12  Q   What records did your employee, Mr. Graham,
13 use to create all of that January 27th, 2006 letter?
14      MR. HOWARD: Object to the form of the
15   question. You're mischaracterizing testimony.
16      MR. PARKS: Well, I'm asking a question,
17   what documents support.
18 BY MR. PARKS:
19  Q   You cannot tell me that he knows
20 Mr. Witkowski's phone number five years later or
21 four years later.
22  A   Based on my conversation with Mr. Graham,
23 he had a file that he had kept in draft section that
24 he was using as information to himself as to how to
25 work the profile, how to work this customer, and he

PAGE 20

        20

1 had it in his draft, and he had it for this number of
2 years under --
3   Q   When you say "work this customer," really,
4 the substance of those emails from 2001 were, "How do
5 I undercut Norfolk Southern and get this shipping?
6 Do we have competitive rates? Do we have a better
7 tariff that we can get to these people to get more
8 business?"
9       That's what Mr. Graham did; didn't he?
10  A   Mr. Graham was trying to resolve how to get
11 the car to the proper location for unloading, which
12 was on CSX, and then he was working with someone to
13 resolve that issue.
14  Q   And never once in there did he say anything
15 about resolving issues with regard to demurrage, does
16 he, except for in January of 2006?
17  A   I don't believe that was his call of
18 resolving the demurrage.
19  Q   Well, then, what is the purpose of
20 producing the January 27th, 2006 email from
21 Mr. Graham?
22  A   At the time of 2001, Mr. Graham was
23 involved in building the customer profile for the
24 customer to -- which would direct the shipment to the
25 right location for unloading, and I think he had some

PAGE 21

        21

1 confusion as to where the car was to be placed so that
2 it could be unloaded by Port Erie.
3   Q   Who was he working with? Who was his
4 contact?
5   A   Who was his contact when?
6   Q   Yes. Back in 2001, who was his contact?
7   A   With Port Erie?
8   Q   No. Who was his contact with the
9 customer?
10      You just told me that Port Erie was not
11 your customer. Who was his contact? Who was he
12 talking to to get these transfers done more
13 efficiently?
14  A   I'm sorry. I don't understand your
15 question.
16  Q   Okay. You told me that there was never, to
17 the best of your knowledge, any contract between CSX
18 and Port Erie Plastics.
19  A   That's true.
20  Q   And you also told me that there was no
21 contract, that you know of, between BP -- or, excuse
22 me, Port Erie and Union Pacific or BP regarding the
23 shipment of this resin; correct?
24  A   Other than the bill of lading, that's
25 correct.

**Page 22**

1  Q  And your customer was actually Union
2  Pacific?
3  A  My customer is Port Erie.
4  Q  You don't have any contract with Port Erie;
5  do you?
6  A  No.
7  Q  They're not your customer, they're a place
8  where you delivered resin because Union Pacific told
9  you to?
10  A  They're the consignee on record.
11  Q  And that record was controlled completely
12  by BP, not you; correct?
13  A  That is true.
14  Q  So if the consignee was incorrect because
15  that's where BP put it as a delivery point, you
16  wouldn't have any knowledge of that; correct?
17  A  I have no knowledge other than what was
18  furnished to us.
19  Q  Did you contact Union Pacific and ask them
20  how they got Port Erie Plastics, how it was they came
21  to designate Port Erie as a consignee on this bill?
22  A  No, sir.
23  Q  You relied upon Union Pacific for payment
24  of your shipping charges; correct?
25  A  Correct.

**Page 23**

1  Q  And you got paid?
2  A  Correct.
3  Q  And then with regard to Witkowski
4  Deposition Exhibit No. 9, Witkowski Exhibit No. 9, I
5  believe the oldest invoice on there, which was
6  May 15th, 2002, was well after the last contact that
7  Billy Graham had with anybody concerning that series
8  of emails, correct, except for the email to you?
9  A  What was the date there that you said?
10  Q  May of 2002.
11  A  Okay. Those were after this, is what
12  you're asking me?
13  Q  Isn't that correct?
14  A  Yes.
15  Q  So there wasn't even an issue for
16  Billy Graham at the time about demurrage charges?
17  A  No, because he was not doing demurrage. He
18  was working on getting the cars, the railcars, to the
19  correct customer.
20  Q  And within his emails, one of his concerns
21  is, do we have a better tariff than NS, which I assume
22  is Norfolk Southern; correct?
23  A  Yes.
24  Q  Okay. So your primary concern -- or,
25  Mr. Graham's primary concern on behalf of CSX was to

**Page 24**

1  get that money away from Norfolk Southern and into
2  CSX?
3  A  I can't address his concern.
4     He was working on trying to get the railcar
5  to the proper destination.
6  Q  I want to go back to, I guess, the question
7  I asked before.
8     What is the relevance of Mr. Graham's
9  relationship to this lawsuit? Why is he now providing
10  you with emails with respect to any relevance to this
11  lawsuit?
12  A  Because he was instrumental in putting
13  together the customer profile, and determining where
14  the railcar was to be placed when it reached Erie,
15  PA.
16  Q  Now, where were the railcars to be placed?
17  A  Based on his research, it was determined
18  that the railcars were to be placed at Mount Fort
19  Terminal.
20  Q  Which you were aware that Port Erie does
21  not own; correct?
22  A  I'm aware of that.
23  Q  Were you aware of that at the time that CSX
24  was giving constructive placement notices for these
25  cars, that they arrived in Erie?

**Page 25**

1  A  Yes, sir.
2  Q  So you knew that you weren't giving
3  Port Erie Plastics direct notice that railcars were
4  arriving?
5  A  I'm not -- I can't say for sure.
6     All I've seen was where the notices were
7  going to on my research here.
8  Q  And that was Presque Isle Trucking?
9  A  Yes, sir.
10  Q  Mount Fort Terminal?
11  A  Presque Isle Trucking.
12  Q  Did you -- well, it also said Mount Fort
13  Terminal on some of the later invoices, didn't it --
14  or, bills of lading?
15  A  All I'm talking about is the constructive
16  placement notices.
17  Q  So they went there, but Presque Isle
18  Trucking wasn't the consignee?
19  A  No, sir.
20  Q  Didn't you have a duty to give a person
21  notice that you want to charge them money?
22     MR. HOWARD: Object to the question. Calls
23  for a legal conclusion.
24     You can answer.
25  A  Would you ask the question again?

PAGE 26

```
 1   Q    Yes.
 2        Don't you think that CSX has a duty to
 3   notify a person in some way directly that, "We are
 4   going to try and charge you money"?
 5        MR. HOWARD:  Same objection.
 6   A    The rail shipments are subject to a
 7   CSXT 8100 tariff, which obligates parties that use
 8   railcars, which describes the services for them, and
 9   it's a matter of public record that a railcar -- a
10   user of a railcar should have that knowledge.
11   Q    Okay.
12        So it's your contention that your tariff
13   goes so far that you don't have to give me any notice,
14   but if I receive a product of off a railcar,
15   regardless of who had notice of it, if I receive the
16   product, I should be responsible for paying a shipping
17   charge or a demurrage charge?
18   A    We would serve notice to the consignee if
19   there were going to be extra charges for the car
20   depending on the car type.
21        That information would be transmitted to
22   the consignee.
23   Q    And you just testified that you did not
24   transfer any of that knowledge to Port Erie Plastics
25   at any time relevant to this lawsuit; correct?
```

PAGE 27

```
 1   A    My recollection was a conversation I had
 2   with Mr. Graham when he was trying to work through
 3   this situation, is that he had a conversation with
 4   Port Erie Plastic as to the receipt of the
 5   constructive placement notices to their location, and
 6   the response to him was that, "Do not send the
 7   notifications to us, send them to Presque Isle
 8   Trucking as they are the ones unloading the cars."
 9   Q    And that's nowhere -- that response, first
10   of all, did not answer my question and, second of all,
11   there is nowhere in those emails where that is ever
12   discussed; is there?
13   A    None in the email.
14   Q    So you have a person who's trying to market
15   to a new customer, who doesn't bother to mention to
16   them that, "Oh, here are your duties, and if we're
17   going to do business with you, you're going to be
18   responsible for X, Y and Z," never mentioned anywhere
19   in those emails; is it?
20   A    Just in my conversation with him.
21   Q    So it's completely hearsay --
22        MR. HOWARD:  Objection.
23   Q    -- five years later?
24        MR. HOWARD:  Object to the form of the
25   question.
```

PAGE 28

```
 1   BY MR. PARKS:
 2   Q    That conversation took place almost
 3   five years later, correct, after his contact with the
 4   customer?
 5   A    It was his recognition at that time of this
 6   conversation.
 7   Q    Recollection?
 8   A    Yeah.
 9   Q    I understand.  All right.
10        MR. PARKS:  Now, could you repeat the last
11   question before the one I just did and ask him
12   that again, the question before?
13        (Record read.)
14   BY MR. PARKS:
15   Q    Could you answer that question?
16   A    Would you read it one more time?  I'm not
17   sure what you're asking here.
18   Q    Is there any place at any time prior to a
19   demurrage claim that CSX notified Port Erie Plastics
20   that it was asserting it was a consignee and would be
21   responsible for shipments?
22   A    None that we would directly communicate.
23   Q    Now, with regard to the demurrage tariff
24   that you say is published --
25   A    Yes, sir.
```

PAGE 29

```
 1   Q    -- today your attorney gave me one that was
 2   issued on December 19th, 2002; correct?
 3        Is that the tariff that you were referring
 4   to?
 5   A    Yes.  This is effective December 21st,
 6   2001.
 7   Q    But it was issued what date?
 8   A    It was issued December 19th, 2002.
 9   Q    And the first bill that you're trying to
10   make a claim on is May 15th, 2002; correct?
11   A    Yes, sir.
12   Q    Where is the tariff from that period of
13   time?
14   A    What is the first date there?
15   Q    May 15th, 2002 is the first apparent
16   invoice date.
17   A    This has various supplements to this, to
18   this tariff.
19        The demurrage information on this
20   supplement under the demurrage plan is dated
21   November 26th, 2002.
22   Q    Do you have the full tariff that was in
23   effect as of May 2002?
24   A    There was one in effect.  Do not have one
25   with me.
```

PAGE 30

```
 1  Q   So that tariff arose after these demurrage
 2  charges were already allegedly beginning to accrue;
 3  correct?
 4  A   This is the same tariff that would have
 5  been in place at -- in 2001, with updates to it.
 6  Q   But you never gave notice of this tariff
 7  directly to Port Erie Plastics; did you?
 8  A   No, sir.
 9       We were not obligated to do so.
10  Q   But Mr. Graham was having, according to
11  those, in 2001 was having conversations, alleged
12  conversations, with Mr. Witkowski about, you know, how
13  we get things in, and how he recalled these things
14  from 2001 but, yet, never shared any information about
15  the tariff and never asked for acknowledgment that
16  Port Erie be a party to the shipping contract;
17  correct?
18  A   That's correct.
19  Q   Okay.
20       Now, your attorney also gave me a set of
21  documents that he said that he either got yesterday
22  afternoon or this morning from you, and I'm going to
23  refer to those as Underwood Exhibit No. 2.
24       (Thereupon, Underwood Deposition Exhibit
25  No. 2 was marked for identification.)
```

PAGE 31

```
 1  BY MR. PARKS:
 2  Q   There are two packets of documents, and
 3  since I haven't had a chance to kind of look at them,
 4  can you identify what those documents are?
 5       MR. HOWARD: Do you mind if I put them in
 6    the Bates number order? Because they didn't
 7    come back that way.
 8       MR. PARKS: That's fine, that's because the
 9    paper caught in the --
10       MR. HOWARD: That's the order that they
11    should be in.
12  A   This is information from our computer
13  system for the -- that we create as a customer
14  profile, that assigns a code that brings the car when
15  it is received on CSX to the proper destination and
16  the proper location for unloading.
17  Q   Do those indicate that the cars would be
18  delivered to Mount Fort Terminal?
19  A   It indicates that we were showing Port Erie
20  Plastics as a subset of Mount Fort Terminal.
21  Q   What does that mean? Who enters that
22  information?
23  A   The customer service rep responsible for
24  inputting this information at the time was
25  Billy Graham.
```

PAGE 32

```
 1  Q   When was that information produced? I
 2  mean, when was that document printed off and placed in
 3  the system?
 4       MR. HOWARD: This is a better copy. Here
 5    (indicating).
 6  A   I printed these in January of '06, but the
 7  profile was created on December 17th of '01.
 8  Q   Now, when you set up a customer profile,
 9  how do you determine -- when you didn't have an
10  agreement with Port Erie Plastics, how do you
11  determine who your customer is?
12  A   It's based on the consignee information
13  that we receive.
14  Q   Did Mr. Graham contact Nexpak about these?
15  A   He had no information about Nexpak.
16  Q   All right.
17       Now, with regard to the records of CSX, do
18  any of the records show a transfer of railcars from
19  Erie to Canton, Ohio?
20  A   I have no records of that.
21  Q   Are there records of CSX moving a truck, a
22  train car, back out of its Erie terminal and sending
23  it to Nexpak that was originally designated for
24  Port Erie Plastics?
25  A   I don't know.
```

PAGE 33

```
 1  Q   Did you look for that?
 2  A   I was not looking for that, no.
 3  Q   Did you see the requests for production of
 4  documents that were given to your counsel?
 5  A   Yes.
 6  Q   And in there, there was a request for any
 7  records you would have about diverting or transferring
 8  railcars from Erie to Canton, Ohio that were within
 9  this group of shipments; correct?
10  A   I don't recall seeing any information.
11  Q   Did you look for this information? Do you
12  recall thinking that, "I need to be able to find out
13  that information, whether or not it exists"?
14  A   I checked with our diversion group, and
15  they said, unless I had a specific car number, they
16  probably were not going to be able to determine any
17  type of diversion on a car.
18       I went through our diversion systems and
19  did not find any on the search.
20  Q   So you would have no record of that?
21  A   I could not find any.
22  Q   So you wouldn't know whether or not Nexpak
23  continued to exercise control of these railcars
24  through delivery to the Mount Fort Terminal?
25  A   None that I could find.
```

PAGE 34

```
 1   Q    And Nexpak is on the bill of lading,
 2  though; correct?
 3   A    I did not see Nexpak.
 4        The bill of lading information that I
 5  received from the -- from the Union Pacific rail
 6  carrier.
 7   Q    But the bill of lading clearly shows who
 8  the plastic was sold to; doesn't it?
 9   A    Yes, it shows that.
10   Q    Did your electronic transfers show that?
11   A    I did not see that on there.
12   Q    Isn't it important to know who the
13  beneficial interest of your shipments go to with
14  respect to your tariff for demurrage?
15   A    Only if they're the consignee that is
16  detaining the car or unloading the car.
17   Q    What if the party is exercising control
18  over the car, requiring that they be transferred to a
19  different location based upon the information from the
20  shipper, which was BP; correct?
21   A    The shipper was BP.
22   Q    And you would follow the controls and
23  directions of the shipper; correct?
24   A    Yes.
25   Q    Until it's delivered?  In fact, the shipper
```

PAGE 35

```
 1  retains control over the shipment?
 2   A    When you say "shipment," are you talking
 3  about the product or the railcar?
 4   Q    I'm talking about the railcar that leaves
 5  BP.
 6        Until you deliver it to the destination, BP
 7  has a right to hold that train car, they have a right
 8  to divert that train car as the shipper in this
 9  particular case; correct?
10   A    They have a right to do those.
11   Q    Okay.
12   A    The ultimate destination was Erie, PA.
13   Q    Now, in your investigation, do your records
14  show that BP directed you, CSX, to hold a shipment of
15  four cars because Nexpak filed bankruptcy?
16   A    I have seen no records of that.
17   Q    Did you look?
18   A    Yes.
19   Q    So never in any of your shipment records
20  did anybody exercise control over any shipment of CSX
21  to the Mount Fort Terminal?
22   A    I did not see any.
23   Q    I'm going to go back to the question.
24        But you didn't look for that as part of
25  the -- were other people controlling railcars?
```

PAGE 36

```
 1   A    I looked for everything I could determine
 2  when I was reviewing our records that had to do
 3  with -- with Port Erie or any other customers in
 4  there.
 5        I did not find those records.
 6   Q    Okay.
 7        On the bills of lading, which is Witkowski
 8  Deposition Exhibit No. 5 -- sorry, I grabbed your
 9  copy -- at the top of those, those are marked
10  "Prepaid"; correct?
11   A    Yes, sir.
12   Q    And it says underneath the "COD Information
13  (If Applicable)," it says "Carriers Send Invoices To:
14  BP Chemicals," and it says "Carriers"; correct?
15   A    It says that.
16   Q    Multiple?
17   A    What do you mean, "multiple"?
18   Q    More than one carrier.  It has an S.  It
19  doesn't say "Carrier," it says "Carriers Send Invoices
20  To:  BP Chemicals."
21   A    Yes.
22   Q    Did you send your invoices for demurrage to
23  BP Chemicals?
24   A    No, sir.
25   Q    Why not?
```

PAGE 37

```
 1   A    Because this has to do with freight
 2  services, not assessorial charges at destination.
 3   Q    Where do you see that?  Where on that would
 4  I find that information?
 5   A    It's not written on this document.  This is
 6  for the shipment of freight.
 7   Q    Which is what you did, you shipped freight?
 8   A    Yes, sir.
 9   Q    And then you delivered to Mount Fort
10  Terminal, and once it was delivered to Mount Fort
11  Terminal, there are no demurrage charges accruing;
12  correct?
13   A    Yes, sir.
14   Q    So before you delivered to Mount Fort
15  Terminal is where all of the demurrage charges would
16  have had to accrue?
17   A    That's correct.
18   Q    And once it's in Mount Fort Terminal, which
19  was your direction, did you send your invoices to
20  BP Chemicals as directed on this bill of lading?
21   A    No, sir.
22   Q    Did you send any invoices to Nexpak?
23   A    No, sir.
24   Q    When there was a contest -- and correct me
25  if I'm wrong, but the testimony of both Port Erie
```