# EXHIBIT E

Case 1:05-cv-00139-SJM   Document 28-7   Filed 03/13/2006   Page 1 of 6

```
                                                                          1

 1              UNITED STATES DISTRICT COURT

 2         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3                        - - -

 4   CSX TRANSPORTATION, INC.,        )
                                      )
 5              Plaintiff,            )
                                      ) Civil Action
 6        vs.                         )
                                      ) Case No.
 7   PORT ERIE PLASTICS, INC.,        ) 05-139 Erie
                                      )
 8              Defendant.            )

 9                        - - -

10           Deposition of STEVE BARTOSIK

11           Thursday, February 2, 2006

12                        - - -

13        The deposition of STEVE BARTOSIK, called as a
     witness by the Plaintiff, pursuant to notice and the
14   Federal Rules of Civil Procedure pertaining to the
     taking of depositions, taken before me, the
15   undersigned, Teresa Constantini Berardi, a Notary
     Public in and for the Commonwealth of Pennsylvania, at
16   the law offices of MacDonald Illig Jones & Britton,
     LLP, 100 State Street, Suite 700, Erie, Pennsylvania
17   16507-1498, commencing at 1:35 p.m. the day and date
     above set forth.
18

19                        - - -

20           COMPUTER-AIDED TRANSCRIPTION BY
             MORSE, GANTVERG & HODGE, INC.
21                 ERIE, PENNSYLVANIA
                     814-833-1799
22
                          - - -
23

24

25
```

PAGE 14

```
 1   A   Yes.
 2   Q   So perhaps at some times you might put ten
 3  or 12, but --
 4   A   Yes, yes, that's true.
 5       Again, depending on the activity of -- I
 6  mean, that's -- there were any number of cars that
 7  were on storage tracks, and as I say -- I mean, we
 8  tried to limit the amount of storage charges that were
 9  being assigned those cars, but typically, as I say, we
10  would have about eight cars in there.
11   Q   How did the railcars, if you know, get to
12  Mount Fort?
13   A   The cars would come in -- based on whenever
14  we would empty a car, we would order another one in
15  from the storage track to replace it.
16   Q   All right.
17       When you say whenever you emptied a car,
18  where would this emptying process take place?
19   A   The emptying took place at Mount Fort.
20   Q   The contents of the car would be
21  transported from the railcar to a Presque Isle truck?
22   A   Yes, and then would be taken to Port Erie
23  Plastics.
24   Q   And there you would unload the product into
25  the Port Erie silo?
```

PAGE 15

```
 1   A   That's correct.
 2   Q   Do you know where the railcar was before it
 3  arrived at Mount Fort?
 4   A   Most of them were on a storage track.
 5   Q   Where is that storage track?
 6   A   They had -- CSX had various locations.
 7       One of them was right down here on the
 8  Bay Front Highway.
 9       Some of them were at their yards on
10  Ash Street, and some of them would have been out in --
11  at their marshalling yards out on Downing Avenue.
12   Q   And who brought the cars from the CSX
13  storage track to Mount Fort?
14   A   A CSX local switch crew would bring them
15  in.
16   Q   How often would that occur?
17   A   Depending on the particular day, a couple
18  times a week.
19   Q   And what triggered the movement of a
20  railcar from the CSX storage yard to the Mount Fort
21  Terminal?
22   A   Every time we would make an empty, they
23  would swap one out.
24   Q   How would CSX know that you had emptied a
25  car?
```

PAGE 16

```
 1   A   We had -- we would fax them with a -- we
 2  had a form, an empty fax -- empty car fax that we
 3  would send to the railroad with the car numbers and
 4  the date that they were emptied.
 5       MR. HOWARD:  Let's mark this as Bartosik 1.
 6       (Thereupon, Bartosik Deposition Exhibit
 7       No. 1 was marked for identification.)
 8  BY MR. HOWARD:
 9   Q   The court reporter has handed you an
10  exhibit that we have marked as Bartosik 1.  It is a
11  seven-page exhibit.
12       Do you recognize Exhibit 1?
13   A   Yes, I do.
14   Q   What is the first page?
15   A   The first page?
16   Q   Well, the real first page, that page
17  (indicating), yes.
18   A   That's just a cover letter that I hand
19  wrote explaining roughly what these documents were
20  when I faxed them to you.
21   Q   And this is your fax cover sheet to me?
22   A   Yes, it is.
23   Q   Okay.  Let's turn to the third page.  Right
24  there (indicating).
25       At the top, there's a fax line that
```

PAGE 17

```
 1  indicates this is page 3 of 3, and it says "CSX
 2  Transportation Constructive Placement Notice."
 3       What is a constructive placement notice?
 4   A   This is the railroad's notification to the
 5  customer that a car has arrived at destination and is
 6  awaiting their instructions as far as what to do with
 7  it.
 8   Q   Is this an example of a constructive
 9  placement notice that Presque Isle Trucking would have
10  received from CSX?
11   A   Yes, it is.
12   Q   Now, this is dated September of 2003.
13       Do you see that in the lower left-hand
14  corner?
15   A   Yes, uh-huh.
16   Q   And how many cars are identified on this
17  constructive placement notice?
18   A   There's one.
19   Q   Would a constructive placement notice have
20  been sent by CSX for every car that arrived?
21   A   Yes.
22   Q   Did Presque Isle Trucking receive
23  constructive placement notices like this for the cars
24  that were shipped to Port Erie?
25   A   Yes, we did.
```

PAGE 18

```
 1   Q   What does this constructive placement
 2  notice tell you when you get it?
 3   A   Well, first, it gives a waybill number, the
 4  shipper, origin, freight terms, gross weight -- or,
 5  net weight, I'm sorry, origin. Did you get origin?
 6  Okay.
 7   Q   When you receive this constructive
 8  placement notice, what is your understanding of where
 9  that car is at that moment?
10   A   The car is in Erie, Pennsylvania.
11   Q   Is it at Mount Fort?
12   A   No, it isn't.
13   Q   It's at the CSX storage area?
14   A   Yes, it is.
15   Q   When you receive this information, what
16  action, if any, would you take?
17   A   We wouldn't take any at this point.
18   Q   What would you do with this information?
19   A   Actually, nothing. They weren't our cars.
20       We got -- we got this notice as a courtesy
21  just so we knew what was coming. That was all.
22   Q   Do you know whether this notice was sent to
23  any other party?
24   A   I'm not sure.
25       It's addressed to Port Erie Plastics. I'm
```

PAGE 19

```
 1  not sure. I think they got one, but I can't swear to
 2  that.
 3   Q   Look at the page prior to that one.
 4       What is that document?
 5   A   That is a railcar inventory that I
 6  generated every Friday and sent to Jim Witkowski at
 7  Port Erie Plastics.
 8   Q   Did you send it to anyone else?
 9   A   No.
10   Q   The cars that are identified on here --
11  let's look at the first one.
12       AMCX 104557 indicates that the date that
13  car was placed was July 26th.
14       What does that mean, "Date Placed"?
15   A   That's the day that that railcar left the
16  storage track and was placed on our private track for
17  unloading.
18   Q   How did CSX know to move it from the
19  storage track to your lease track?
20   A   Typically, you know, I would -- I would
21  call one of the train masters at the CSX yard here and
22  give them a car number.
23       At times, we would put them on -- we would
24  mark that information on the bottom of our -- we
25  would hand write it on the bottom of our empty car
```

PAGE 20

```
 1  release.
 2       We did it a number of different ways.
 3   Q   How would you know what car number to ask
 4  for?
 5   A   This inventory that we have here is
 6  really -- is much later.
 7       During the time that this all happened,
 8  this inventory would have been much longer, and it
 9  would have shown -- in the area where "Date Placed" is
10  marked, it would have shown the information from the
11  constructive placement notice, and it would have said
12  "Constructively Placed" and the date that this
13  constructive placement notice was sent.
14   Q   All right. Let me make sure --
15   A   And at that point, I would take the oldest
16  car of the -- of -- there are two products involved
17  here, 8949 and 8931, and I would take the oldest car
18  of that product and replace it, you know, replace the
19  empty.
20   Q   Now, is it your testimony that this
21  inventory form that we're looking at was different in
22  the 2002-2003 time period?
23   A   Yes.
24   Q   In what --
25   A   I mean, the form, itself, was identical,
```

PAGE 21

```
 1  except that there would be much more -- much -- you
 2  know, many more cars on here, and the constructive
 3  placement dates would be shown on that inventory.
 4       So when it was transmitted to Port Erie
 5  Plastics, it was a complete inventory of the cars that
 6  were on the private siding as well as those that were
 7  on the storage track.
 8   Q   How did you know what information was --
 9  was it the constructive placement notice that told you
10  what was available on the CSX storage track?
11   A   That -- that notice gave me the car number.
12       I also received by fax from the shipper a
13  bill of lading, the railroad bill of lading, with the
14  car number and the product codes on it, so that when
15  that car arrived, I would have both documents and I
16  would know what product it was.
17   Q   And it was a constructive placement notice
18  that told you that the car had arrived?
19   A   Yes.
20   Q   When you receive the constructive placement
21  notice, say, on a -- strike that.
22       This railcar inventory was prepared and
23  sent to Port Erie every Friday; is that correct?
24   A   That's correct, before noon every Friday.
25   Q   So if a constructive placement notice had
```

PAGE 34
```
 1   A    That's correct.
 2   Q    And did that also apply with Plastek, those
 3  notes at the bottom, bring another car in?
 4   A    Yes.
 5   Q    And with regard to this, who had the most
 6  volume running in and out of Mount Fort Terminal,
 7  Plastek or Port Erie?
 8   A    From memory, it would be difficult.
 9        I would -- to tell you -- to answer that, I
10  would say that Plastek had more cars at Mount Fort
11  than Port Erie did.
12   Q    That's all I want.
13        And, of course, Plastek was really the
14  parent company or the common ownership company for
15  Presque Isle Trucking; correct?
16   A    Correct.
17   Q    Why was Presque Isle Trucking established?
18   A    As a common carrier, we -- to provide resin
19  service, and as time went along, we would service
20  Plastek customers to give them some reliability of
21  service.
22   Q    Now, did you do anything other than bulk
23  trucking?
24   A    Oh, yes.
25   Q    What other kind of trucking did you do?
```

PAGE 35
```
 1   A    Well, as a common carrier, we are licensed
 2  to handle general commodities.
 3   Q    Did you also ship for Plastek its final
 4  product in boxed trucks?
 5   A    Yes, we did.
 6   Q    And why would a company want to own a
 7  common carrier associated with its business?
 8   A    Perhaps you might ask Mr. Prischak that
 9  question.
10   Q    Do you understand that there's a tax
11  benefit for that?
12   A    I wasn't involved with that.
13   Q    And you were hired after it was
14  established?
15   A    I was hired when it was established.
16   Q    And that was what year?
17   A    1991.
18   Q    And when did you start doing anything for
19  Port Erie?
20   A    Oh, it was many years after that.
21   Q    So did you haul resin for anyone other than
22  Plastek before the Port Erie association?
23   A    I don't remember.
24   Q    Do you recall off the cuff?
25   A    We had had -- we had done business with
```

PAGE 36
```
 1  Port Erie prior to this particular movement at least
 2  once.
 3   Q    With bulk rail?
 4   A    Yes, uh-huh.
 5   Q    Now, you said you were familiar with
 6  Nexpak.
 7        What made you familiar with Nexpak? Why
 8  would they be calling you?
 9        You said on certain occasions they would
10  call you.
11        What did they inquire of you?
12   A    Again, during the period of time that -- in
13  question here, I had no conversation with Nexpak.
14        It was only after -- the initial company,
15  Nexpak, in this period of time in question here, went
16  bankrupt.
17        And after that, the controls on releasing
18  the resin became much more stringent, as I understand
19  it, because I'm getting all of -- this information was
20  second hand, it was passed onto me from Port Erie,
21  the -- at that point, I know that the credit issues
22  became tighter, and the releases of the cars -- we got
23  more people involved in the process.
24   Q    Now, you said that BP would send you bills
25  of lading --
```

PAGE 37
```
 1   A    That's right.
 2   Q    -- when a railcar would be dropped into the
 3  Mount Fort Terminal by CSX?
 4   A    No. When it was shipped.
 5   Q    So you got a notice of shipment.
 6        Did you forward the notice of shipment to
 7  Port Erie?
 8   A    No.
 9   Q    Did you forward any of these constructive
10  placement notices to Port Erie?
11        This particular document (indicating), did
12  you fax this over?
13   A    Did I? No.
14   Q    So you did send them, you said, a car
15  inventory, but you don't have any car inventories that
16  are relevant to the time in question?
17   A    No.
18   Q    That was only after.
19        So you don't have any ones to show us what
20  exactly you disclosed to Port Erie as far as a railcar
21  inventory and what notice you gave them as far as
22  constructive placements or anything else; correct?
23   A    Right.
24   Q    And when you got the -- did you get a bill
25  of lading as the notice of shipping?
```

PAGE 30

1 instructions that you were receiving -- your drivers
2 were receiving from Port Erie?
3   A   That's correct.
4   Q   During the time period where Presque Isle
5 had a business relationship with Port Erie, did you
6 have occasion to have any communications with an
7 entity known as Nexpak?
8   A   Not during this time frame.
9   Q   How about any time frame?
10  A   Later, yes. Not a lot, a couple of times.
11      After -- I can't -- I don't know what dates
12 they were, and not very much.
13      Every once in a while, we'd get a phone
14 call about something, and as time went on and this
15 movement started to go away, we would get a phone call
16 occasionally to divert a car that was up here, but
17 other than that, very seldom.
18  Q   Do you recall conversations concerning the
19 diversion of a car during the 2002-2003 time period?
20  A   No.
21      The move was in full swing here at that
22 point, and there was -- we never diverted anything at
23 that point.
24  Q   During the relevant time point -- by that,
25 I mean the 2002-2003 time period -- did you have

PAGE 31

1 occasion to have any communications with the
2 shippers?
3       And by "shipper," I mean BP Amoco.
4   A   No.
5   Q   Did you ever discuss the accrual of
6 demurrage charges with anyone at Port Erie Plastics?
7   A   Yes.
8   Q   And with whom did you discuss that?
9   A   Jim Witkowski.
10  Q   And do you recall when the first time was
11 that you might have had that conversation?
12  A   No.
13      It was so long ago, and it was telephone,
14 you know. We talked about it a number of times. I
15 mean, it was casual conversation, such as -- you know,
16 as to the number of cars that were here, and the fact
17 that they were accruing demurrage. That was kind of
18 it.
19      They weren't my cars, so it wasn't an issue
20 that I had to spend a lot of time on.
21  Q   Was the conversation of the type where you
22 were providing information to Mr. Witkowski?
23  A   Not -- not really.
24      I mean, he had the inventory and he knew
25 how many cars were here, and the issues that were --

PAGE 32

1 and so it was not my job to carry it much further than
2 that.
3   Q   Were you attempting to give him advice?
4   A   We -- it wasn't my job. They weren't
5 paying me to give them advice.
6       I mean, we discussed the issue of having
7 all those cars on hand, and made attempts to find some
8 other areas to get them to put those cars, to get them
9 off of demurrage.
10      We made one -- he and I did make one joint
11 meeting with the people from the East Erie Commercial
12 Railroad in an attempt to -- which is at the GE
13 facility here -- in order to see if there was a way
14 that we could -- we -- he could rent the space there
15 as compared to having a storage track.
16      MR. HOWARD: That's all I have.
17               EXAMINATION
18 BY MR. PARKS:
19  Q   Mr. Bartosik, as you know --
20  A   Before we start, could I find out who else
21 is here?
22      MR. PARKS: Sure.
23      MR. WITKOWSKI: Jim Witkowski.
24      THE WITNESS: I didn't recognize you.
25      MR. WITKOWSKI: I know.

PAGE 33

1       MR. JOHNSON: John Johnson.
2       THE WITNESS: John, nice to meet you.
3       And you are?
4       MR. STROUPE: Scott Stroupe.
5       MR. PARKS: He's an associate.
6 BY MR. PARKS:
7   Q   Mr. Bartosik, as you're now aware, my name
8 is Rich Parks. I am representing Port Erie Plastics
9 in this.
10      I have some questions about your testimony.
11      First of all, if I'm correct, with regard
12 to your conversation on Deposition Exhibit No. 2,
13 which is this particular document that I'm showing you
14 (indicating), that is irrelevant to Port Erie
15 Plastics; correct?
16      Didn't you say that the testimony was,
17 these are Plastek cars?
18  A   One form was used for all the cars.
19  Q   So you didn't distinguish a Port Erie,
20 Plastek car. It was a car, you needed it out of one
21 of these facilities, and you would list them, and you
22 would tell -- ship that over to CSX and down to
23 Pittsburgh and say, "Get it out of here," and
24 sometimes you said you might put a note on here to
25 move another car in; correct?