1

1         IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

3  CSX TRANSPORTATION, INC.,
        Plaintiff

4

     v.            CIVIL ACTION NO. 05-139 ERIE

5

  PORT ERIE PLASTICS, INC.,

6        Defendant

7

8     HEARING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

9

10

        Proceedings held before the HONORABLE

11

        SEAN J. McLAUGHLIN, U.S. District Judge,

12

        in Courtroom C, U.S. Courthouse, Erie,

13

        Pennsylvania, on Monday, March 20, 2006.

14

15

16

17
  APPEARANCES:

18       CHARLES L. HOWARD, Esquire, appearing on behalf
       of the Plaintiff.

19

        RICHARD J. PARKS, Esquire, appearing on behalf

20          of the Defendant.

21

22

23

24                    - - -

25


                                2


1              P R O C E E D I N G S
               – – – – – – – – – –

2

3          (Whereupon, the proceedings began at 11:05 a.m., on

4    Monday, March 20, 2006, in Courtroom C.)

5

6          THE COURT:  First of all, I should extend an

7    apology, for reasons unclear to me, this argument did not show

8    up on my calendar this morning.  And so like I normally do, I

9    did not reread these briefs this morning.  However, I did read

10   them at some earlier point in time.  But, unfortunately, I'm

11   not going to be quite as fresh on this as I would normally

12   like.  We have cross-motions for summary judgment here.  The

13   central issue is whether or not Port Erie is responsible for

14  demurrage fees.  Who's going to be carrying the water for Port

15  Erie Plastics on your motion?

16          MR. PARKS:  I will, your Honor.

17          THE COURT:  Do you want to come up to the podium.

18          MR. PARKS:  May it please the court, Richard Parks

19  on behalf of Port Erie Plastics, the defendant.  What I will

20  address first, your Honor, is the motion by Port Erie Plastics

21  for summary judgment.  In this case, as a matter of background,

22  your Honor, Port Erie Plastics --

23          THE COURT:  Excuse me, one second.  Go ahead.

24          MR. PARKS:  In this case, your Honor, Port Erie

25  Plastics is a plastic injection molding company.  They entered


                                  3


1  into a contract with NexPak, to produce plastic DVD containers,

2  much as you would buy for any commercial movie that you would

3  buy at a movie store, they made the actual folders that the

4  movie went in.  As part of the agreement, your Honor, it's

5  uncontested that NexPak supplied all of the raw materials to

6  Port Erie Plastics.  Port Erie Plastics would then warehouse

7  all of the materials -- including the cardboard package for the

file:///A|/CSX-3-20.TXT

8   boxes, as well as the plastic resin that was delivered by rail

9   cars ultimately by CSX Transportation.  In this case, your

10  Honor, it's uncontested that NexPak retained all legal title to

11  all the raw materials.  And that there's an accounting done on

12  a just in time inventory basis, wherein, as Port Erie was using

13  these raw materials, they would get billed by NexPak as they

14  were billing for manufacturing services.  And as a sell off,

15  and Port Erie would be paid the net for its service, which were

16  primarily molding, electricity, and some of the machines.  It's

17  important also to note, your Honor, that many of the machines

18  that were used by Port Erie to mold these items were actually

19  owned by NexPak at the Port Erie location.  Ultimately, NexPak

20  then in order to supply the resin contracted with BP Amoco.

21  NexPak went to BP Amoco and would buy the resin, have it

22  delivered by Union Pacific Railroad, which was then transferred

23  to plaintiff in the case, which would deliver it to the

24  Montfort terminal.  At no time did Port Erie control the status

25  of the bills of lading.  The waybills were never known to them,

4

1   nor were they ever in direct receipt of the railroad shipments.

2  They did for NexPak make arrangements with Presque Isle

3  Trucking to have the rail cars unloaded and then paid for the

4  trucks by Presque Isle Trucking to deliver the NexPak resin to

5  Port Erie's silos.  They did not take title of the resin.  And

6  they did not at anytime assume the delivery charges.  In

7  fact --

8       THE COURT:  There are a lot of facts flying here, a

9  lot of which are really not in dispute.  Cutting to the legal

10  chase here, your position is, as I understand it, is under

11  Third Circuit law, the name of the case is escaping me --

12       MR. PARKS:  Union Pacific v. Ametek?

13       THE COURT:  Yes.  That fundamentally an entity is

14  not a party to a shipping contract and cannot be liable for

15  demurrage fees, that is the essence of your legal position?

16       MR. PARKS:  That's the essence of our legal

17  position, yes.

18       THE COURT:  Now, although, the memory is somewhat

19  dimmer than I would prefer it to be, I do have a recollection

20  that there is a document in the record that designates Port

21  Erie as the consignee, is that right?

22       MR. PARKS:  There's one bill of lading we were able

23   to obtain that did have Port Erie as the ship to/consignee.

24        THE COURT:  Of course, if you are a consignee, I

25   mean all other things being equal, if you are in fact a


                              5


1   consignee, then you may be -- you may, underline may, be liable

2   for demurrage fees, is that right?

3        MR. PARKS:  If we are a legal consignee, yes.

4        THE COURT:  Now, before we decide whether you are or

5   you are not or there is a material issue of fact as to whether

6   you are -- what is required to transform an entity into a

7   consignee?

8        MR. PARKS:  The elements of a contract.  Consent,

9   consideration, in other words, a mutual agreement and

10   consideration exchanged between the parties.

11        THE COURT:  On what form, on what "shipping" form

12   does your client's name appear as the consignee?

13        MR. PARKS:  On the bill of lading that was produced

14   solely by BP Amoco, it's the only place.

15        THE COURT:  Tell me again where BP Amoco fits in the

16   shipping food chain?

17          MR. PARKS:  Amoco, BP Amoco was the seller and

18   shipper of these rail cars that were ordered by NexPak.

19          THE COURT:  Okay.  Now, what did discovery -- I

20   presume if it would have been developed anywhere, it would be

21   at deposition, what did discovery reveal as to how and why your

22   client's name ended up on this bill of lading?

23          MR. PARKS:  As a shipping address, the place where

24   NexPak was going to get its DVD boxes molded.

25          THE COURT:  So Amoco would have, somebody on behalf

6

1   of Amoco would have inserted your client's name and description

2   as consignee on the document, is that it?

3          MR. PARKS:  That is correct.

4          THE COURT:  Were you able to track down the person

5   who did that?

6          MR. PARKS:  We were not.

7          THE COURT:  All right.

8          MR. PARKS:  Unfortunately, there's been an

9   outsourcing of all of these people with the railroads and with

10   BP.

11        THE COURT:  Did anybody from Amoco have an

12    explanation, even if it wasn't the person that did it, as to

13    why that was done?

14        MR. PARKS:  The only -- I had a conversation, one

15    conversation with a person --

16        THE COURT:  We're talking about on the record?

17        MR. PARKS:  No, there is nothing on the record from

18    BP whatsoever.  Except for this bill of lading.

19        THE COURT:  Well, is there a material issue of fact

20    as to whether or not -- there was a "contract" with all of its

21    constituent elements insofar as your apparent written

22    designated status as consignee is concerned?

23        MR. PARKS:  I do not believe there is, your Honor,

24    because of the deposition taken of a CSX designated employee.

25        THE COURT:  What did that 30(b)(6) deponent say?


                                7


1        MR. PARKS:  The deposition of John Underwood taken

2    on February 2, 2006, your Honor -- I'm reading from page 70 of

3    the transcript -- "do you have any evidence" --

4        THE COURT:  Remember, you got to read a little

5  slower for him.

6      MR. PARKS:  "Do you have any evidence of or writing

7  that would show there is a contract between CSX and Port Erie

8  Plastics?  Answer:  No, sir.  Question:  Do you have any

9  contracts where CSX is a party to a shipping contract with BP

10  that is relevant to Port Erie Plastics issue?  Answer:  No,

11  sir.  Question:  Do you have any evidence or anything that

12  would indicate that Port Erie Plastics was a party to any

13  shipping contract with any party concerning these particular

14  rail cars?  Answer:  None that I'm aware of, excuse me, none

15  that I know of," I did misquote that.

16      THE COURT:  Maybe he just didn't, I just ask

17  rhetorically, maybe he didn't know of that one document?

18      MR. PARKS:  But he was aware of it, your Honor.  The

19  only other testimony concerning the placement of Port Erie

20  Plastics is the unrefuted testimony of the three Port Erie

21  Plastics employees who said we didn't know there was a

22  consignee until after he started sending us invoices.

23      THE COURT:  Let me ask you this.  With respect to --

24  it was the bill of lading that your name appears on as

25  consignee?

1        MR. PARKS:  Yes.

2        THE COURT:  Relative to this transaction that

3   generated this lawsuit, how many separate bills of lading were

4   there or was there just one?

5        MR. PARKS:  There should have been one for each rail

6   car.  There was only one found anywhere that I'm aware of.

7        THE COURT:  Now, you would have received, you

8   meaning your client, in the normal course of business, would

9   have received a copy of the bill of lading, wouldn't you?

10       MR. PARKS:  We should, we did not.  It's

11   uncontroverted that we did.  Mr. Bartosik, who testified for

12   Presque Isle Trucking, said that they never gave us notices of

13   any bills of lading for anything they would have received --

14       THE COURT:  Is your theory since you never received

15   a copy that at least in written form reflected your status as

16   consignee, you never had any opportunity to object to it?

17       MR. PARKS:  Yes.

18       THE COURT:  Now, whether one's a party or a

19   consignee or whatever, in this particular situation is it

20   accurate to say that your mere status as a party or consignee

21   under CSX's tariff would not entitle CSX to impose demurrage

22   fees unless the entities against whom they were going to impose

23   those fees had received constructive notice?

24          MR. PARKS:  Actual constructive notice of placement.

25          THE COURT:  What is your theory on that?


9


1          MR. PARKS:  The theory is, your Honor, under their

2   tariff, tariffs as a matter of law are to be strictly read.

3   Under the theory of tariff, it requires actual notice of the

4   placement of a rail car.

5          THE COURT:  Is that 48 hours advanced notice, what

6   is it?

7          MR. PARKS:  The way I read this tariff, your Honor,

8   is actual notice within and then you get 48 hours to unload,

9   once they provide actual notice.

10          THE COURT:  What is the state of the record as to

11   your client's receipt of actual notice with respect to any of

12   the cars?

13          MR. PARKS:  None.  They have admitted within their

14   briefing finally or initially they said of record we had

15  received all constructive notices.  Then they came back and

16  said no, we didn't receive notices, we gave it to our agent,

17  Presque Isle Trucking.  So there is no direct notice under the

18  tariff on Port Erie Plastics anywhere on the record.

19       THE COURT:  All right, let me hear from Mr. Howard.

20       MR. HOWARD:  May it please the court, I'm Charles

21  Howard from Philadelphia, and I represent CSX in this matter.

22       THE COURT:  Shall we start and let's work backwards.

23       MR. HOWARD:  Okay.

24       THE COURT:  Let's assume, only for purposes of the

25  following discussion, that as a matter of fact or law, Port

10

1  Erie is a party to the contract.  Now, a party's status to a

2  contract in and of itself, if I understand it correctly, won't

3  entitle you, meaning CSX, to subject them to demurrage fees

4  unless you satisfied the requirements of your tariff insofar as

5  notice is concerned, is that correct?

6       MR. HOWARD:  That is correct, your Honor.

7       THE COURT:  All right.  Focusing only on the 48 hour

8  notice requirement in the tariff, is there any record evidence

9   here from which a fact finder could conclude that such notice

10  had been given to Port Erie?

11         MR. HOWARD:  Directly to Port Erie or to Port Erie?

12         THE COURT:  Well, in whatever capacity you believe

13  that legally Port Erie would have received it?

14         MR. HOWARD:  Port Erie received constructive

15  placement notice -- of all the rail cars at issue in the case,

16  when CSX sent constructive placement notices to Port Erie's

17  agent, Presque Isle Trucking.

18         THE COURT:  Now, refresh my recollection, what did

19  Presque Isle Trucking do?

20         MR. HOWARD:  Presque Isle Trucking is a common

21  carrier, they had been hired by Port Erie to go to the Montfort

22  terminal where CSX rail cars were parked.  Presque Isle would

23  unload the rail cars into one of their trucks and then take the

24  material from the Montfort terminal -- to the Port Erie

25  facility in Harborcreek.


11


1          THE COURT:  This is the outfit that actually did the

2   off loading?

3          MR. HOWARD:  Yes, your Honor.

4          THE COURT:  So the theory there is if their agent

5  got it, the principal got it?

6          MR. HOWARD:  It's a little more involved than that,

7  your Honor.  When CSX first became aware of these shipments,

8  that it was going to be the carrier with these goods into Erie,

9  yet had the bills of lading in front of it that identify,

10  excuse me, Port Erie as consignee, as the designation carrier.

11          THE COURT:  You said it had the bills of lading in

12  front of it, you mean CSX?

13          MR. HOWARD:  CSX had the bills of lading that had

14  been sent by Union Pacific Railroad, the origin carrier.

15          THE COURT:  And you said the bills of lading

16  identified Port Erie as consignee?

17          MR. HOWARD:  For each rail car at issue, yes, your

18  Honor.

19          THE COURT:  Where are those bills of lading, are

20  they of record?

21          MR. HOWARD:  Exhibit G to our statement of facts in

22  support of its motion for summary judgment.  We subpoenaed the

23  Union Pacific Railroad and for them to produce the EDI or

24  electronic data interchange bills of lading for these

25  shipments.  And Exhibit G is the total of their production.


12


1        THE COURT:  Being somewhat unfamiliar with this

2  industry, is there a separate bill of lading for every rail

3  car?

4        MR. HOWARD:  Yes, your Honor, there is.

5        THE COURT:  And so you, through your subpoena, you

6  were able to obtain electronic evidence, if you will, of Port

7  Erie being designated as consignee for each of the railroad

8  cars?

9        MR. HOWARD:  On each of the railroad cars at issue,

10  yes, your Honor.

11        THE COURT:  Who does the record reflect would have

12  so designated them?

13        MR. HOWARD:  The record I don't believe reflects who

14  would --

15        THE COURT:  How does one become, I don't want to use

16  the term branded, but in this case it does have an economic

17  implication potentially -- where does it come from?

18          MR. HOWARD:  Would either be the origin carrier,

19    which is Union Pacific or the shipper, BP Amoco, or between the

20    two of them, would have decided that Port Erie was the

21    consignee.

22          THE COURT:  Now, do you disagree with Mr. Parks that

23    at the end of the day you can't, you meaning an entity, does

24    not become a consignee any more than an entity becomes an oak

25    tree simply by someone else's fiat without an agreement to be


                                13


1    so?

2          MR. HOWARD:  There does not have to be an expressed

3    agreement, your Honor.  The mere acceptance of goods -- by Port

4    Erie makes them in fact substantively consignee in this matter.

5    Not only is the designated consignee on the bill of lading,

6    they could be consignee in fact by accepting the goods.  And we

7    cited the cases.

8          THE COURT:  Put aside the acceptance at the other

9    end of the line, which makes them I guess in your view a

10    constructive consignee and focus only on -- you're not telling

11    me, are you, the fact that their name appears on a document or

12  documents, is dispositive of the issue of their consignee

13  status?

14          MR. HOWARD:  I have found no cases that said that an

15  entity designated as the consignee on the bill of lading is not

16  liable for demurrage.  I don't believe anything --

17          THE COURT:  What if it's a mistake?

18          MR. HOWARD:  If it's a mistaken consignee,

19  mistaken -- such as to refuse acceptance of goods at

20  designation.  If it does refuse acceptance of goods at

21  destination, it has no liability --

22          THE COURT:  What if the purported consignee never

23  had notice it was designated on the bill of lading, they say

24  they never were aware of it, they say they never were aware of

25  that, I'm saying the record reflects that they were aware they


                        14


1  were the designated consignee on those various railroad cars?

2          MR. HOWARD:  If they refused acceptance of goods at

3  destination, then they would have no liability.

4          THE COURT:  Now, your position is even if they

5  weren't designated as the consignee on the documents, they

6    nevertheless under the facts of this case were because they

7    accepted the shipments, is that it?

8           MR. HOWARD:  That's what the case law says, your

9    Honor, that's our position.

10          THE COURT:  Tell me how they accepted, tell me what

11   critical things -- what was the conduct in this case of Port

12   Erie that constituted acceptance so as to render them liable

13   for the demurrage fees?

14          MR. HOWARD:  Port Erie knew they designated Presque

15   Isle as its agent -- on the constructive placement notices.

16   Presque Isle would only bring the resin from the Montfort

17   terminal to Port Erie's facility when instructed to do so by

18   Port Erie.  Had there been no instructions, there would be no

19   delivery of resin to Port Erie.

20          THE COURT:  Was Port Erie a party to the shipping

21   contract?

22          MR. HOWARD:  Port Erie was a consignee under the

23   case.

24          THE COURT:  That's a different question, I'm asking

25   a different question now.  Were they a party to the contract?

15

1      MR. HOWARD:  They were not involved in the original

2   negotiations for freight transportation service between -- I

3   have no evidence they were involved between BP Amoco and Union

4   Pacific.

5      THE COURT:  So the record will be clear when I go

6   back and read this, it would be accurate to say that CSX

7   Transportation's theory as against Port Erie, not that they're

8   liable as a party to the contract and in classic sense like

9   that Third Circuit case, because you have no evidence that they

10  were a party, your position is, I don't want to oversimplify

11  it, although they're not a party, they're liable as a

12  consignee?

13      MR. HOWARD:  Yes, your Honor.

14      THE COURT:  Pure and simple?

15      MR. HOWARD:  As Mr. Parks accurately pointed out,

16  CSX has no record of any contract that it had with PEP, which

17  would make PEP liable for demurrage under the contract.  It was

18  because of its contracts and its assignment of consignee.

19      THE COURT:  Is either party entitled to summary

20  judgment in this case or are there material issues of fact?

21      MR. HOWARD:  CSX does not believe there are material

22    issues of fact, we believe CSX is entitled to summary judgment.

23         THE COURT:  Let me hear back from Mr. Parks.  Let's

24    start in the same place I started with your opposing counsel.

25    He says you received notice, actual notice under the tariff

16

1    because your agent received notice and, therefore, that's

2    legally your notice, what's wrong with that theory?

3         MR. PARKS:  The theory is flawed because there was

4    no agency or permission given as between Port Erie Plastics and

5    Presque Isle Trucking to act as an agent to receive notice.

6    There is no evidence whatsoever on the record of that until

7    after discovery closed.  There is an affidavit of Mr. Graham,

8    who now asserts --

9         THE COURT:  Who is Mr. Graham?

10        MR. PARKS:  Mr. Graham is a party that was not

11    designated as a 30(b)(6) deponent, who ends up being an affiant

12    stating that Mr. Witkowski from Port Erie Plastics had

13    specifically told him to send the notices to Presque Isle

14    Trucking.

15        THE COURT:  Then, for goodness sake, that's an issue

16  of material fact on that point?

17        MR. PARKS:  As to agency absolutely.  There is a

18  counteraffidavit specifically contrary to each other, your

19  Honor.

20        THE COURT:  Of course, in order to be an agent,

21  there's a couple kind of agents -- there's apparent authority,

22  there's implied authority.  You could theoretically be on the

23  hook under apparently authority, couldn't you?

24        MR. PARKS:  If there's some sort of apparent

25  authority, yes.  But there wasn't, we don't believe.


17


1        THE COURT:  All right.  So now address his other

2  point and that is that even though you may not be liable as a

3  party, original party to the shipping contract, you

4  nevertheless accepted the goods and you are de facto a

5  consignee, what's wrong with that theory?

6        MR. PARKS:  It's contrary to the law.

7        THE COURT:  What's your understanding of the law and

8  how it is at odds with Mr. Howard's view?

9        MR. PARKS:  As we assert, your Honor, we were

10    warehousing NexPak's raw material, we did receive it, and it

11    wasn't ours.  We were the warehouseman for that under this

12    letter, that's not in dispute.  The facts aren't in dispute

13    about when the plastic was paid for and it was delivered, so

14    that we were accepting it for NexPak.  The title and beneficial

15    interest of the shipment was retained only between BP and

16    NexPak.

17        THE COURT:  Is lack of title ownership to a

18    commodity that is moving in commerce -- is that fatal to that

19    party's status, in other words, to be a consignee, must you

20    have a legal or beneficial interest in the material that's

21    being shipped?

22        MR. PARKS:  Under the Middle Atlantic case, your

23    Honor --

24        THE COURT:  Where does that come from?

25        MR. PARKS:  It comes from the legal consignee and


                                    18


1    who is the beneficiary of those services as determined by the

2    case law.  Both by the Third Circuit and the Union Pacific v.

3    Ametek case, cited within that, which is Middle Atlantic.

4  Which make a designation between a consignee and a legal

5  consignee.  And you do have to look into what was a legal

6  consignee.  And there has to be some contract connection to

7  that.  Not just --

8      THE COURT:  I don't understand what you mean.  What

9  is the difference between a legal consignee and a consignee?

10     MR. PARKS:  A consignee, as you stated before, your

11 Honor, anybody can put your name on a bill of lading as

12 consignee.  And I will point out, your Honor, that the

13 representation at Exhibit G was the bill of lading is

14 incorrect.  It is the waybill that is produced, I understand it

15 is purely between Union Pacific and CSX, not by BP.  So what is

16 referred to as the bill of lading is actually a waybill.

17     THE COURT:  I don't know what a waybill is, but

18 somebody on more than one occasion thought you were a

19 consignee?

20     MR. PARKS:  Well, put the ship to/consignee on this

21 bill of lading, yes.

22     THE COURT:  Just looking at the practicalities of

23 this thing, your agent, Presque Isle Shipping --

24     MR. PARKS:  Presque Isle Trucking.

25      THE COURT:  Presque Isle Trucking.  They go get the


19


1   stuff and unload it at your direction, is that right?

2        MR. PARKS:  No.  It was delivered to them, they are

3   the owner of the Montfort terminal.  CSX delivered directly to

4   them, not to Port Erie.  They took their trucks and delivered

5   it to a silo.

6        THE COURT:  They deliver it right to them and then

7   they take it off, right?

8        MR. PARKS:  Correct, they empty the cars.

9        THE COURT:  Do you tell them when to take it off?

10       MR. PARKS:  Yes.  Well, actually, NexPak will tell

11  us to get specific cars unloaded.

12       THE COURT:  I'm not saying this is necessarily of

13  any legal moment, but the last two entities involved in this

14  before the material gets taken off the train, it is you and

15  Presque Isle, right?

16       MR. PARKS:  Yes.

17       THE COURT:  Now, if you had any ownership interest

18  in those widgets that are being taken off under this scenario

19  and by your understanding of the state of the law, you would be

20  a consignee, is that right?

21      MR. PARKS:  That's my understanding.  Then we would

22  be a party to the contract, yes.

23      THE COURT:  Is there such, if you're not a

24  consignee -- let's put it this way.  If you are a consignee,

25  must you be a party to the contract?

20

1       MR. PARKS:  I believe, yes.  I believe that's what

2   the case law states.  And I think the holding --

3       THE COURT:  But you can be a party to a contract but

4   not be a consignee, right?

5       MR. PARKS:  You could have an interest in the

6   contract.  I don't know how you would do that, your Honor.

7       THE COURT:  I don't know, either.

8       MR. PARKS:  I think you would be a third-party

9   beneficiary.

10      THE COURT:  In any event, this Mid Atlantic case is

11  a Third Circuit case?

12      MR. PARKS:  No, it's out of Illinois.

13          THE COURT:  Is it a circuit case or a district court

14    case?

15          MR. PARKS:  District court case.

16          THE COURT:  About 1972?

17          MR. PARKS:  Hold on a second.  Middle Atlantic

18    Conference v. United States, district court, 1972.  Looks like

19    a district DC, 1972.  353 F.Supp. 1109.  And it was cited

20    within the Union Pacific v. Ametek case.

21          THE COURT:  You believe that case stands for the

22    proposition that you cannot be a consignee unless you have

23    ownership interest in the material that is moving?

24          MR. PARKS:  Specifically they were discussing the

25    liabilities for consignment and demurrage for warehousing, yes.


                              21


1           THE COURT:  Isn't consignee a term of art that is

2     defined under the regulations?

3           MR. PARKS:  I don't see it defined specifically.  If

4     it is, it's been modified by case law.  In Middle Atlantic they

5     were talking about warehouseman and other parties in possession

6     without the owner --

7          THE COURT:  Who was the consignee if not you?

8          MR. PARKS:  The consignee was NexPak, no doubt about

9   that, they were the party that held all the interest in the

10  plastic.  They're listed as the buyer on the bill of lading.

11  There's no doubt it's NexPak.

12         THE COURT:  So when all is stripped away here, your

13  position is that the notice, constructive notice, doesn't have

14  to be actual or constructive?

15         MR. PARKS:  It has to be actual notice.

16         THE COURT:  You say there is a disputed issue of

17  material fact on that issue?

18         MR. PARKS:  Correct.

19         THE COURT:  On the other issue, you say that your

20  position, boiled down to its essence, is you cannot be a

21  consignee because you did not own the shipment?

22         MR. PARKS:  Or have another beneficial interest in

23  the plastic.

24         THE COURT:  What would be another beneficial

25  interest that would qualify?

22

1          MR. PARKS:  If we had somehow --

2          THE COURT:  You had a beneficial interest in this

3     case in this sense, that you were working on the widgets for

4     profit?

5          MR. PARKS:  Yes.

6          THE COURT:  Isn't that a beneficial interest?

7          MR. PARKS:  Again, it was the way our contract was

8     structured.  So, no, I don't think they have a beneficial

9     interest.  We clearly could have bought the material ourselves

10    and raised the price to Port Erie, excuse me, to NexPak.

11    In fact, your Honor, it is uncontested in the case that the

12    shipments that were on there way -- had actually been delivered

13    to the Montfort terminal, were diverted to other NexPak plants

14    in Canton and Atlanta, Georgia.  So NexPak always exercised,

15    through the delivery at the Montfort terminal, exercised

16    control over that plastic.  And when NexPak went bankrupt, BP

17    stopped the delivery of the plastic on, I believe it was three

18    or four cars that were actually in the Montfort terminal.

19          THE COURT:  All right, I'll give Mr. Howard one more

20    opportunity.

21          MR. PARKS:  If I might, there is one other question

22    of fact I do wish to point out.  In this case, your Honor,

23  they've asserted damages of $127,000.  They they've also put of

24  record, I think improperly, but it does impeach themselves, a

25  letter dated September 23, 2003, to Mr. Witkowski offering to


                              23


1  settle this dispute.  It's important to note that when you look

2  at this --

3          THE COURT:  Mr. Witkowski being a representative of?

4          MR. PARKS:  He's the purchasing manager of Port Erie

5  Plastics.  At this time the dispute had already arisen --

6  they had an outstanding demurrage bill of $85,000, that's as

7  September 23, 2003.  They attach an alleged statement of

8  account that is dated well after September of 2003, and has one

9  invoice after September 23, 2003, of $2,700 in October of 2003.

10  And yet their bill says $127,000, not $85,000.

11         THE COURT:  What are you saying, it's inflated by

12  $40,000?

13         MR. PARKS:  Exactly.  Their own records have two

14  different statements of what was owed.  It's also a question of

15  fact.  Your Honor, thank you.

16         MR. HOWARD:  Your Honor, do you have some questions

17 or should I just respond?

18        THE COURT:  Go ahead.

19        MR. HOWARD:  I'd like to address the disclosure of

20 William Graham, who executed an affidavit on behalf of CSX

21 concerning the agency relationship.  Mr. Graham was disclosed

22 to Port Erie, its counsel, the morning of Mr. Underwood's

23 deposition, during Mr. Underwood's deposition.  It was not the

24 result of disclosure after discovery closed.  We address that

25 in one of the briefs as well.


                                24


1        THE COURT:  It certainly appears to indicate a

2 material issue of fact to me on the question of notice.

3        MR. HOWARD:  It's not provided by any record

4 evidence.  I'm not aware of any statement in the record, either

5 through affidavit or otherwise, that contradicts what Mr.

6 Graham says.

7        THE COURT:  Let me make sure we're talking about the

8 same thing.  He says there are dueling affidavits or dueling

9 affidavit and a deposition, as to whether or not Port Erie

10 Plastics authorized, if you will, Presque Isle Trucking to be

11    their agent for purposes of accepting notice.  If I remember

12    the name correctly, he says I believe Mr. Witkowski filed an

13    affidavit in this case?

14           MR. HOWARD:  Yes, Mr. Witkowski did file an

15    affidavit.

16           THE COURT:  To the extent they did not do that.  And

17    you have testimony from whom that would rebut that?

18           MR. HOWARD:  William Graham's affidavit is attached

19    to our motion, he was charged with the responsibility --

20           THE COURT:  William Graham is from?

21           MR. HOWARD:  CSX.

22           THE COURT:  Go ahead.

23           MR. HOWARD:  He was charged with the responsibility

24    of creating a customer profile for Port Erie Plastics when

25    their business came to CSX.  He has a bill of lading in front

25

1    of him, it identified Port Erie Plastics as a consignee.  He

2    has to contact them to find out how this delivery is going to

3    be made.  In some instances CSX can put the rail car right at

4    the customer's site.  He had found out who he was going to

5    contact on behalf of CSX when the rail cars arrived in Erie at

6    the CSX yard.  So according to Mr. Graham, he had a telephone

7    conversation with Mr. Witkowski back in late 2001, which is

8    several months before the demurrage bill was sent out.  As a

9    result of that conversation or series of conversations that he

10   had with Mr. Witkowski, he was instructed that when the rail

11   cars arrived in Erie, Presque Isle Trucking was to receive the

12   constructive placement notice.

13         THE COURT:  But they dispute that, don't they?

14         MR. HOWARD:  Mr. Parks disputes it.  But I do not, I

15   missed it if it's in the Witkowski affidavit -- I don't believe

16   it's there.

17         THE COURT:  Is it there?

18         MR. PARKS:  I'm reading from the original, your

19   Honor.  "At no time did I ever instruct or imply to William

20   Graham or anyone at CSX Transporation -- designated by Port

21   Erie to receive CSX paperwork on behalf of Port Erie as Port

22   Erie's agent relative to the shipments in question.  At no time

23   did William Graham inform Port Erie as designated consignee to

24   shipments in question."  Signed by Witkowski.

25         THE COURT:  Does that tee up an issue of fact?

26

1      MR. HOWARD:  I stand corrected, your Honor.  I stand

2  corrected in light of that affidavit, there is an issue of

3  fact.

4      THE COURT:  All right.  Now, let's go back to the

5  other part.  His position very simply on consignee status is

6  that as a matter of law you can't be a consignee if you don't

7  have legal or beneficial interest in the property.  I think

8  that's their whole position, isn't it?

9      MR. HOWARD:  Yes, the Supreme Court of the United

10  States addressed that in the Railroad v. Fink case in 1991.

11  We cite that in our brief.

12      THE COURT:  That's an oldie but goody?

13      MR. HOWARD:  Doesn't matter, a lot of this law is

14  old but still good.

15      THE COURT:  What does the Supreme Court say

16  pertinently on the point -- you tell me, what do they say on

17  the point?

18      MR. HOWARD:  In the Fink case the issue is whether a

19  consignee or receiver of goods should have to pay a full tariff

20    rate.  He had paid for the freight when it arrived at the

21    destination.  The carrier came back later and said I paid the

22    rate but I didn't pay the full tariff rate.  That's back in the

23    days of the rate doctrine when carriers were entitled or

24    required to charge full tariff rate.  The defendant alleged

25    that because he didn't become the owner of the goods until


                                27


1    after the goods had been delivered to him, he had no liability

2    as consignee.  The Supreme Court said there is no proof such

3    agreement was known to the carrier, nor could that fact lessen

4    an obligation of the consignee to pay the legal tariff rate

5    when he accepted the goods.  It didn't matter.

6          THE COURT:  Did he acquire title to the goods after,

7    at some point in the process?

8          MR. HOWARD:  Not after he had received the goods,

9    according to the facts reported in the case.

10          THE COURT:  He had a beneficial owner interest in

11    them or something, didn't he, he had an expectancy he would

12    acquire an ownership interest?

13          MR. HOWARD:  I assume that's the case, yes.

14        THE COURT:  Doesn't that case arguably cut against

15   you then?

16        MR. HOWARD:  Same expectancy interests exists in

17   this case.  The ownership transferred to Port Erie Plastics

18   when the goods were put into title.

19        THE COURT:  There's a difference between ownership

20   and possession, you can process something and not have title,

21   beneficial or otherwise to them, right?

22        MR. HOWARD:  In the Fink case the owner took

23   ownership possession.  In the Port Erie Plastics case, Port

24   Erie takes ownership upon its possession of goods in the silo.

25        THE COURT:  Now we're getting to it then.  You're


28


1   equating physical possession with legal title?

2        MR. HOWARD:  Actually, I'm addressing ownership as

3   it was addressed by the court.

4        THE COURT:  Is possession synonymous with ownership

5   under railroad law?

6        MR. HOWARD:  I don't know, your Honor.

7        THE COURT:  But did Port Erie do anything other

8   than -- we know Port Erie, perhaps through its agent,

9   possessed -- well, we know they possessed the material because

10  they worked on it, right?

11         MR. HOWARD:  Yes, your Honor.

12         THE COURT:  By virtue of that physical possession

13  and making these widgets into something else, if you will, is

14  it that possession that makes consignee status possible for

15  them?

16         MR. HOWARD:  No.  Consignee status is because they

17  were on the bill of lading as such and because they accepted

18  the goods.  Exhibit C to Port Erie's initial brief.  It's a

19  letter from Jim Witkowski to Jeff Calderone, materials manager

20  at NexPak, dated July 13, 2002.  Witkowski writes "I just

21  wanted to confirm my understanding of the arrangement we have

22  in place with regards to the shipment of resins to Port Erie

23  Plastics since the situation is a little unique.  We will be

24  operating with the understanding that ownership of the resin

25  will not transfer to Port Erie until the material is delivered


                                29


1   to our facility in Harborcreek, PA.  Therefore, ownership and

2   all risk of loss will remain with NexPak, and/or shipping

3   companies, while the resin is in transit and/or in storage at

4   the Plastek storage facility."  Which was the Montfort

5   facility.

6          THE COURT:  All right.  So your point is Witkowski,

7   on behalf on Port Erie, said once we get it in our plant --

8          MR. HOWARD:  It's ours.

9          THE COURT:  What do you say, it sure sounds like it

10  says that?

11         MR. PARKS:  The actual receipt, as I stated

12  previously, your Honor, when the plastic was pulled out, the

13  deposition transcript showed how it actually worked.

14  Basically, they would as an offset, account for all the raw

15  materials as part of their invoices when they molded and worked

16  with -- these DVD holders.  So, eventually, yes on paper the

17  plastic resin was accounted for and set off against the final

18  labor product.

19         THE COURT:  Then you owned it?

20         MR. PARKS:  At the very end after it was worked on.

21         THE COURT:  Are you saying that that ownership came

22  too late in the shipping process?

23         MR. PARKS:  Yes.  That had nothing to do with

24  shipment, your Honor.  That was warehouseman and, again, that's

25  what the Mid Atlantic and Ametek cases specifically address.


30


1       THE COURT:  You got about two minutes.

2       MR. HOWARD:  Neither Ametek nor Middle Atlantic

3  addressed the situation involving -- people for whom these

4  carriers were seeking demurrage, and had the name of the

5  consignee on the bill of lading.  That's an easy way to

6  distinguish our case.

7       THE COURT:  What is your damage claim?

8       MR. HOWARD:  $127,000.

9       THE COURT:  Could you briefly address his point that

10  he thinks it's about eighty-some thousand dollars?

11       MR. HOWARD:  The bills we have produced in discovery

12  and that we've attached to our motions, when added up, come to

13  $127,000 and change.  There at one point I believe Mr. Parks

14  mentioned it was 115,000.

15       MR. PARKS:  Eighty-five.

16       MR. HOWARD:  That obviously is inaccurate.  The

17  bills we produced and put into the record was 115 for all

18  demurrage and the remainder for liquidated damages.

19      THE COURT:  Anything else you want to tell me on one

20  last point?

21      MR. HOWARD:  Mr. Parks characterized the material

22  that was produced by Union Pacific as the waybills.  I think it

23  would be clear if the court looks at Exhibit G --

24      THE COURT:  What's a waybill, I have no idea?

25      MR. HOWARD:  A waybill was the document that is a


31


1  CSX internal document, CSX would have created internally upon

2  its receipt of the bills of lading from Union Pacific.  Our

3  subpoena of Union Pacific specifically asks for the bill of

4  lading.  We've attached an affidavit from Union Pacific the

5  person who responded to the subpoena, he refers to them as

6  bills of lading.  We asked for the bills of lading, they're not

7  waybills.  They're copies of the electronic bills of lading

8  that control the shipments at issue.

9      THE COURT:  Thank you, sir.  Is there a jury trial

10  demand in this case?

11      MR. PARKS:  No.

12          THE COURT:  All right.  Let's go off the record.

13          (Discussion held off the record.)

14          THE COURT:  Just so the record is clear, Mr. Howard

15  is going to get back to us in the next few days just to confirm

16  his client's willingness in having this matter submitted

17  temporarily to the magistrate judge for a settlement conference

18  inasmuch as it's a non-jury case.  In the meantime against the

19  possibility that that green light is a likelihood, I will talk

20  to her as soon as we hear from Mr. Howard, then we'll get back

21  to you with a date.  But as I said before, I strongly encourage

22  you to get this thing resolved.

23          (Whereupon, at 11:55 a.m., the proceedings were

24  concluded.)

25                    - - -


                                32


1          C E R T I F I C A T E

2

3

4     I, Ronald J. Bench, certify that the foregoing is a

5  correct transcript from the record of proceedings in the

6   above-entitled matter.

7

8

9

10

11   _____

12   Ronald J. Bench

13

14

15

16

17

18

19

20

21

22

23

24

25